# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| Board of Education of the Highland Local School District, | |
| Plaintiff, | |
| vs. | Case No: 16-524 |
| United States Department of Education; John B. King, Jr., in his official capacity as United States Secretary of Education; United States Department of Justice; Loretta E. Lynch, in her official capacity as United States Attorney General; and Vanita Gupta, in her official capacity as Principal Deputy Assistant Attorney General, | |
| Defendants. | |

## VERIFIED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Defendants United States Department of Education, United States Secretary of Education John B. King, Jr., United States Department of Justice, United States Attorney General Loretta E. Lynch, and Principal Deputy Assistant Attorney General Vanita Gupta have attempted to rewrite Title IX of the Education Amendments of 1972. That statute prohibits schools that receive federal funding from discriminating "on the basis of sex." Now that Congress has refused multiple times to add "gender identity" to Title IX, Defendants have decided to take matters into their own hands and accomplish that goal by executive pronouncement, creating a new rule that implausibly declares that the term "sex" in Title IX and its regulations includes "gender identity." Defendants' obvious end-run

1

around Congress violates the Administrative Procedure Act (APA), the Spending Clause in Article 1, Section 8 of the United States Constitution, the federalism guarantees of the United States Constitution, the separation-of-powers guarantees of the United States Constitution, and the Regulatory Flexibility Act (RFA).

2. Defendants have made it abundantly clear that their new rule requires all schools that receive federal funding to allow students who profess a gender identity that conflicts with their biological sex to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex. In other words, schools must permit students who are biologically male but profess a female identity to share sleeping quarters, shower facilities, and restrooms with female students. By creating and enforcing this rule, Defendants have shown no regard for the dignity and privacy rights of students who do not want to share these intimate facilities with students of the opposite sex. Nor have they shown regard for the schools that care about the interests and concerns of those students. In fact, Defendants and their agents are openly and aggressively threatening to revoke those schools' federal funding simply because they are trying to balance the rights and interests of all students.

3. Plaintiff Board of Education of the Highland Local School District (Highland) now finds itself embroiled in Defendants' nationwide push to enforce their new Title IX rule. A student at one of Highland's schools professes a gender identity (female) that conflicts with that student's biological sex (male). Highland has generally acceded to the requests of that student's legal custodian to respect that student's gender-identity choice, but because of the dignity interests and privacy rights of other students, Highland has not

2

allowed that student to access intimate facilities like overnight accommodations, locker rooms, and restrooms designated for girls. Instead, Highland has ensured that the student has access to alternate private facilities, and in doing so, has protected the dignity and privacy rights of all students. Highland, in short, has admirably navigated a difficult and sensitive situation.

4. Unfortunately, however, Defendants and their agents demand that Highland change its district policies to allow the student (and others who profess a gender identity that conflicts with their biological sex) to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex, and Highland's federal funding is in jeopardy if it does not submit to Defendants' rewriting of Title IX. As a result, Highland faces an impossible choice: capitulate to Defendants' demands and sacrifice the dignity and privacy rights of its students; or protect those rights and watch Defendants strip away more than a million dollars each year in federal funding devoted to special-education programs, lunches for underprivileged children, and educational advancement. The Court should resolve this dilemma, declare that Defendants' new Title IX rule is an unlawful executive-branch attempt to rewrite federal law, enjoin Defendants from enforcing that rule, and protect Highland from having to cut programs that serve underprivileged children and students struggling to learn.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law. It involves (1) Defendants' unlawful attempt to revise the term "sex" in Title IX and its regulations and (2) the violation of Highland's rights under

various provisions of federal law and the United States Constitution. Additionally, this Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform his or her duty.

6. This Court has jurisdiction to review Defendants' unlawful actions and enter appropriate relief under the APA, 5 U.S.C. §§ 702-706.

7. This Court has jurisdiction to enter declaratory and other appropriate relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and Federal Rule of Civil Procedure 57.

8. This Court has jurisdiction to award injunctive relief under the APA, 5 U.S.C. §§ 702-703, Title IX, 20 U.S.C. § 1683, and Federal Rule of Civil Procedure 65.

9. This Court has jurisdiction to order corrective action under the Regulatory Flexibility Act (RFA), 5 U.S.C. § 611.

10. This Court has jurisdiction to award costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

11. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district, because Highland is located and receives federal funding in this district, and because Defendants have residency in this district.

## PARTIES

12. Plaintiff Board of Education of the Highland Local School District (Highland) is organized under the laws of the State of Ohio and administers public educational institutions in Morrow County, Ohio. Highland is comprised of public educational

4

institutions that provide education to both male students and female students from pre-kindergarten through 12th grade. Highland receives education funding from the federal government that is subject to Title IX.

13.     Defendant United States Department of Education (DOE) is an executive agency of the United States government and is responsible for the administration and enforcement of Title IX, 20 U.S.C. §§ 1681-1688, and the promulgation of Title IX's implementing regulations, 34 C.F.R. Part 106.

14.     Defendant John B. King, Jr., is the United States Secretary of Education. In this capacity, he is responsible for the operation and management of the DOE. King is sued in his official capacity.

15.     Defendant United States Department of Justice (DOJ) is an executive agency of the United States government and is responsible for the enforcement of Title IX, 20 U.S.C. §§ 1681-1688, and its implementing regulations, 34 C.F.R. Part 106. Pursuant to Executive Order 12250, the DOJ has authority to bring actions to enforce Title IX.

16.     Defendant Loretta E. Lynch is the United States Attorney General. In this capacity, she is responsible for the operation and management of the DOJ. Lynch is sued in her official capacity.

17.     Defendant Vanita Gupta is Principal Deputy Assistant Attorney General at the DOJ and acting head of the Civil Rights Division of the DOJ. She is assigned the responsibility to bring enforcement actions under Title IX. 28 C.F.R. § 42.412. Gupta is sued in her official capacity.

## FACTUAL ALLEGATIONS

**A.      Title IX and Its Meaning**

18.      Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX thus prohibits discrimination "on the basis of sex."

19.      The regulations implementing Title IX provide, in relevant part, that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular . . . or other education program or activity operated by a recipient which receives Federal financial assistance." 34 C.F.R. § 106.31(a).

20.      The term "sex" as used in Title IX and its regulations refers to biological sex—that is, a person's status as male or female as determined by biology.

21.      Nothing in Title IX's text, structure, legislative history, or regulations prohibits discrimination on the basis of "gender identity."

22.      On multiple occasions, members of Congress have introduced legislation to prohibit discrimination on the basis of gender identity in education. *See, e.g.*, H.R. 1652 (2013), 113th Cong. (2013); S.439, 114th Cong. (2015). Those legislative efforts have failed every time that they have been introduced.

23.      Congress has chosen to prohibit discrimination on the basis of gender identity in other areas of federal law. For example, Congress has enacted the Violence Against

6

Women Act (VAWA), which prohibits recipients of certain federal grants from discriminating on the basis of "sex" and "gender identity." 42 U.S.C. § 13925(b)(13)(A).

24.     Congress intended that Title IX would not force schools to violate students' dignity interests, privacy rights, and safety concerns. Congress guaranteed that schools could prevent students of one biological sex from sharing overnight facilities reserved for students of the other biological sex.

25.     Title IX states that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686.

26.     This concern for privacy reaches back to Title IX's inception. When Senator Bayh first introduced Title IX, Senator Dominick asked about the scope of the law with respect to this very issue:

> Mr. DOMINICK. The provisions on page 1, under section 601, refer to the fact that no one shall be denied the benefits of any program or activity conducted, et cetera. The words "any program or activity," in what way is the Senator thinking here? **Is he thinking in terms of dormitory facilities, is he thinking in terms of athletic facilities or equipment, or in what terms are we dealing here?** Or are we dealing with just educational requirements? I think it is important, for example, because we have institutions of learning which, because of circumstances such as I have pointed out, may feel they do not have dormitory facilities which are adequate, or they may feel, as some institutions are already saying, that you cannot segregate dormitories anyway. **But suppose they want to segregate the dormitories; can they do it?**

117 Cong. Rec. 30407 (1971) (emphasis added).

27.     In response, Senator Bayh explained that Title IX was in no way designed to eradicate or even modify the common practice of designating that males and females use private facilities based on their biological sex:

7

Mr. BAYH. The rulemaking powers referred to earlier, I think, give the Secretary discretion to take care of this particular policy problem. **I do not read this as requiring integration of dormitories between the sexes**, nor do I feel it mandates the desegregation of football fields. What we are trying to do is provide equal access for women and men students to the educational process and the extracurricular activities in a school, where there is not a unique facet such as football involved. **We are not requiring** that intercollegiate football be desegregated, nor **that the men's locker room be desegregated**.

*Id.* (emphasis added).

28.     The following year, when Title IX was passed, Senator Bayh reiterated that the

legislation was not meant to compel men and women to share facilities under circumstances

that would sacrifice their privacy rights:

[E]ach Federal agency which extends Federal financial assistance is empowered to issue implementing rules and regulations effective after approval of the President. **These regulations would allow enforcing agencies to permit differential treatment by sex** only—very unusual cases where such treatment is absolutely necessary to the success of the program— such as in classes for pregnant girls or emotionally disturbed students, in sports facilities or other **instances where personal privacy must be preserved**.

118 Cong. Rec. 5807 (1972) (emphasis added).

29.     Members of the House expressed similar sentiments. Representative

Thompson, who was concerned about men and women using the same facilities, offered an

amendment to clarify that Title IX did not mandate that men and women must share the

same private facilities:

**I have been disturbed however, about the statements that if there is to be no discrimination based on sex then there can be no separate living facilities for the different sexes.** I have talked with the gentlewoman from Oregon (Mrs. Green) and discussed with the gentlewoman an amendment which she says she would accept. **The amendment simply would state that nothing contained herein shall preclude any educational institution from maintaining separate living facilities because of sex.** So, with that

8

understanding I feel that the amendment [exempting undergraduate programs from Title IX] now under consideration should be opposed and I will offer the "living quarters" amendment at the proper time.

117 Cong. Rec. 39260 (1971) (emphasis added). Congress eventually introduced and passed the "living quarters" amendment. 117 Cong. Rec. 39263 (1971).

30.     Title IX's regulations similarly confirm that schools "may provide separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33.

31.     The only condition placed on this regulatory authorization of sex-specific locker rooms, shower facilities, and restrooms is that the "facilities provided for students of one sex shall be comparable to [the] facilities provided for students of the other sex." *Id.*

32.     Allowing schools to separate biological boys and biological girls in intimate environments like overnight accommodations, locker rooms, shower facilities, and restrooms is the very reason that Congress allowed for separate living facilities and that Title IX regulations permit sex-specific locker rooms, shower facilities, and restrooms.

33.     Contemporaneous with Title IX's enactment, legal scholars and other federal agencies confirmed the propriety of separate overnight accommodations, locker rooms, shower facilities, and restrooms. For instance, in a 1975 *Washington Post* editorial, then Columbia Law School Professor Ruth Bader Ginsburg wrote that "[s]eparate places to disrobe, sleep, perform personal bodily functions are permitted, in some situations *required*, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Washington Post, Apr. 7, 1975, at A21 (emphasis added). Moreover, the United States Commission on Civil Rights, in a 1977 report, concluded that "the personal privacy principle permits maintenance of separate sleeping and bathroom facilities" for biological

9

women and biological men. United States Commission on Civil Rights, *Sex Bias in the United States Code* 216 (1977).

**B.    Defendants' Creation of a New Title IX Rule and their Efforts to Enforce it Nationally**

34.    Defendants, acting without constitutional or statutory authority, have created a new legislative rule declaring that the term "sex" in Title IX and its regulations includes "gender identity."

35.    Defendants announced this rule redefining the term "sex" in Title IX and its regulations to include "gender identity" in several documents published over the last few years, including the following: U.S. Department of Education, Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence*, at 5 (Apr. 29, 2014); U.S. Department of Education, Office for Civil Rights, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities*, at 25 (Dec. 1, 2014); U.S. Department of Education, Office for Civil Rights, *Title IX Resource Guide*, at 1 (Apr. 2015) (explaining that "Title IX protects students . . . from all forms of sex discrimination, including discrimination based on gender identity").

36.    When Defendants began announcing this rule, every court in the country that had considered whether the term "sex" in Title IX and its regulations included "gender identity" concluded that it did not.

37.    On May 13, 2016, the DOJ and DOE provided their most recent and most definitive iteration of their new legislative rule in a "Dear Colleague Letter" sent to every public school district in the country. *See* Dear Colleague Letter from U.S. Dep't of Justice Civil Rights Division and U.S. Dep't of Educ. Office for Civil Rights (May 13, 2016).

38.     In that Letter, the DOJ and DOE declared in no uncertain terms that Title IX's prohibition on discrimination based on sex "encompasses discrimination based on a student's gender identity," *id.* at 1, and that "a student's gender identity [is] the student's sex for purposes of Title IX and its implementing regulations," *id.* at 2.

39.     The 2016 Dear Colleague Letter purports to definitively outline schools' "*Title IX obligations*" and explain how the DOJ and DOE will evaluate whether schools "are complying with their *legal obligations*." *Id.* at 1 (emphasis added). For example, the Letter categorically states that when a student or a student's guardian informs a school that the student "assert[s] a gender identity that differs from previous representations or records, the school *will* begin treating the student consistent with the student's gender identity." *Id.* at 2 (emphasis added).

40.     The 2016 Dear Colleague Letter purports to unequivocally declare rights for students who profess a gender identity that conflicts with their biological sex.

41.     The 2016 Dear Colleague Letter definitively addresses issues, and in effect attempts to announce new law, far beyond anything addressed in Title IX or its regulations. For instance, after defining "gender identity" as a person's "internal sense of gender," *id.* at 1, the Letter declares that "there is no medical diagnosis or treatment requirement that students must meet as a prerequisite to being treated consistent with their gender identity," *id.* at 2.

42.     The 2016 Dear Colleague Letter speaks to student use of sex-specific facilities like locker rooms and restrooms, unequivocally stating that schools "*must* allow . . . students access to such facilities consistent with their gender identity." *Id.* at 3 (emphasis added).

11

43. The 2016 Dear Colleague Letter unambiguously forbids certain means of accommodating students who profess a gender identity that conflicts with their biological sex. The Letter states that "the desire to accommodate others' discomfort" with sharing a locker room or restroom with a person of the opposite biological sex "cannot justify a policy that singles out and disadvantages" students who profess a gender identity that conflicts with their biological sex. *Id.* at 2. The Letter thus declares that "[a] school *may not require* transgender students . . . to use individual-user facilities when other students are not required to do so." *Id.* at 3 (emphasis added).

44. The 2016 Dear Colleague Letter makes it clear that similar principles apply to student access to overnight accommodations that are part of school trips or events. Although "Title IX allows a school to provide separate housing on the basis of sex," the Letter states, schools must allow "students to access housing consistent with their gender identity." *Id.* at 4.

45. The 2016 Dear Colleague Letter directly ties continued federal funding to compliance with its directives, stating that "[a]s a condition of receiving Federal funds, a school agrees that it . . . must not treat a transgender student differently from the way it treats other students of the same gender identity." *Id.* at 2.

46. No legal authority that is binding on Highland supports Defendants' pronouncement that Title IX prohibits discrimination on the basis of gender identity.

47. Defendants are treating their declaration that Title IX prohibits discrimination on the basis of gender identity as a legislative rule that they consider binding on all schools subject to Title IX.

48. According to the DOE's website, Defendants have been and will continue enforcing their legislative rule that redefines the term "sex" in Title IX and its regulations to include "gender identity." *See* U.S. Dep't of Educ, Office for Civil Rights, Resources for Transgender and Gender-Nonconforming Students, http://www2.ed.gov/about/offices/list/ocr/lgbt.html (linking to, among other things, (1) Letter from Timothy C.J. Blanchard, U.S. Dep't of Educ. Office for Civil Rights, to Stephen M. Tomlinson, Superintendent of Broadalbin-Perth Central School District (NY) (Dec. 22, 2015) (explaining that the DOE's investigation and enforcement of Title IX compelled a school board to permit students "to access the bathrooms and the locker rooms consistent with [their] gender identity"); (2) Letter from Adele Rapport, U.S. Dep't of Educ. Office for Civil Rights, to Dr. Daniel E. Cates, Superintendent of Township High School District 211 (IL) (Nov. 2, 2015) (similar); and (3) Letter from Anurima Bhargava, U.S. Dep't of Justice Civil Rights Division, to Dr. Joel Shawn, Superintendent of Arcadia Unified School District (CA) (July 24, 2013) (similar)).

49. Earlier this year, North Carolina enacted the Public Facilities Privacy and Security Act (the Privacy Act), which provides that boards of education and other governmental entities (including the University of North Carolina (UNC)) must require that every government-owned multiple-occupancy locker room, changing facility, and restroom be designated for and used by only people of the same biological sex.

50. On May 4, 2016, the DOJ sent letters to North Carolina Governor Patrick McCrory and UNC leaders (among others) regarding the Privacy Act. *See* Letter from Vanita Gupta to Governor Patrick McCrory (May 4, 2016); Letter from Vanita Gupta to Margaret

Spellings, President of the University of North Carolina, et al. (May 4, 2016) (Spellings Letter).

51.     The letter to the UNC leaders reiterated Defendants' position that "Title XI's prohibition on sex discrimination extends to discrimination based on gender identity," Spellings Letter at 2, and that "barring a student from the restrooms that correspond to his or her gender identity . . . constitutes unlawful sex discrimination in violation of Title IX," *id.* at 3.

52.     The letter to the UNC leaders also stated that the DOJ "has determined that UNC is in violation of . . . Title IX," *id.* at 2, simply by enforcing the Privacy Act's requirement that "every multiple-occupancy bathroom and changing facility . . . be designated for and used only by persons based on their biological sex," *id.* at 1.

53.     The letter to the UNC leaders threatened that unless the DOJ received assurances of compliance, it would "take enforcement action." *Id.* at 2.

54.     Just five days later, on May 9, 2016, the DOJ made good on its threat by filing suit in the United States District Court for the Middle District of North Carolina against the State of North Carolina, Governor Patrick McCrory, UNC, and the Board of Governors of UNC (among others).

55.     The DOJ's complaint against the State of North Carolina alleges that the Privacy Act violates Title IX by requiring governmental agencies, including UNC, to direct that "multiple occupancy bathrooms or changing facilities . . . be designated for and only used by individuals based on their biological sex." Complaint ¶¶ 12, 55, *United States v. North*

14

*Carolina*, Case No. 1:16-cv-425 (M.D.N.C. May 10, 2016). The DOJ alleges that this constitutes "discriminat[ion] on the basis of sex in violation of Title IX." *Id.* at ¶ 55.

## C.    Highland Faces the Issues Raised by Defendants' New Title IX Rule

56.    Highland serves approximately 850 elementary-school students (pre-kindergarten through 5th grade), 450 middle-school students (6th grade through 8th grade), and 600 high-school students (9th grade through 12th grade).

57.    Highland operates one large campus on which separate buildings for its Elementary School, Middle School, and High School are located.

58.    Highland serves a low-income community. The median income of families whose children attend Highland's schools was $33,686 in tax year 2013.

59.    Highland currently has a student who professes a gender identity that conflicts with that student's biological sex. That student—referred to herein as Student A—is a biological male who professes a female identity.

60.    Student A's legal custodian enrolled Student A in Highland Elementary School when Student A was entering kindergarten, during the 2011-2012 school year.

61.    When Student A enrolled in Highland Elementary School, Student A was listed on all paperwork as a male.

62.    When Student A began attending Highland Elementary School, Student A presented as a male.

63.    When Student A began attending Highland Elementary School, Student A used a name that is typically understood to be male.

64.     When Student A began attending Highland Elementary School, all Student A's classmates understood Student A to be male.

65.     When Student A began attending Highland Elementary School, Student A was identified by Student A's legal custodian, Highland's staff, and other students as a male.

66.     In or around August 2012, after Student A finished kindergarten, but before Student A entered the 1st grade, Student A's legal custodian informed Highland that Student A would like to be addressed as a female.

67.     After receiving this request, Highland agreed to address Student A as a female.

68.     Highland and its representatives have at all times wanted to do what is best for Student A, but in doing so, they are also committed to protecting the dignity, privacy, safety, well-being, and rights of other students.

69.     Student A's legal custodian has acknowledged in communications with school representatives that doing what is best for Student A is Highland's goal.

70.     Highland has acceded, and will continue to accede, to the requests of Student A's legal custodian to respect Student A's gender-identity choice by not interfering with Student A's current gender expression. But Highland will not accede to requests that adversely impact the dignity, privacy, safety, well-being, or rights of other students.

71.     Student A began the 1st grade (during the 2012-2013 school year) presenting as a female and has continued to present as a female at school since that time.

72.     Student A's legal custodian first requested that Highland allow Student A to use the girls' restroom when Student A was in the 2nd grade (during the 2013-2014 school year).

16

73.    Highland declined to allow Student A to use the girls' restroom.

74.    It is Highland's policy that students using sex-specific locker rooms and restrooms, or overnight accommodations during school trips or events, must use the facilities that correspond to their biological sex.

75.    Highland realizes that altering its policy to address Student A's request will have ramifications throughout all its schools.

76.    Changing Highland's policies to address Student A's request will not simply affect restroom access at the Elementary School, but will also require Highland to allow students to access locker rooms consistent with their professed gender identity (rather than their biological sex) at all the schools in the district.

77.    Changing Highland's policies to address Student A's request will also require Highland to allow students to select overnight accommodations during school trips or events consistent with their professed gender identity (rather than their biological sex).

78.    Highland has concluded that allowing students who profess a gender identity that conflicts with their biological sex to access overnight accommodations, locker rooms, or restrooms designated for the opposite sex will violate the dignity interests and privacy rights of other students using those shared facilities.

79.    All individuals, including students, have a constitutional right to bodily privacy protected by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution that forbids the government from placing them in situations where they will expose their unclothed or partially clothed bodies to people of the opposite sex.

80.     Highland wants to avoid the liability under 42 U.S.C. §§ 1983 and 1988 that will result if it adopts policies that violate the constitutional rights of its students. *See* Complaint ¶¶ 358-396, *Students and Parents for Privacy v. U.S. Dep't of Educ.*, Case No. 1:16-cv-04945 (N.D. Ill. May 4, 2016) (alleging that a school district violated its students' constitutional rights to bodily privacy by allowing a biological male who professes a female identity to access the girls' locker room and restroom).

81.     These privacy concerns arise in the use of overnight accommodations because during some school trips and events students of the same sex share rooms in overnight accommodations.

82.     These privacy concerns also arise in the use of locker rooms. Highland Middle School has one locker room for male students and one locker room for female students, and Highland High School has two locker rooms for male students and two locker rooms for female students. The layout of all these locker rooms is very open. And the showers in the boys' and girls' locker rooms at the High School are group showers that do not have individual stalls.

83.     These privacy concerns also arise in the use of restrooms because the stalls in the student restrooms at all of Highland's schools are open at the top and bottom. In particular, the stalls in the girls' student restrooms at Highland Elementary School are open at the top and bottom by approximately two feet at the bottom and two feet at the top.

84.     Highland has also concluded that allowing students who profess a gender identity that conflicts with their biological sex to access overnight accommodations, locker

rooms, or restrooms for the opposite sex will violate the Title IX rights of other students using those shared facilities.

85.    Title IX prohibits schools from creating a hostile environment based on sex.

86.    Granting students access to sex-specific overnight accommodations, locker rooms, and restrooms based on gender identity requires girls to share these intimate facilities with biological males (and vice versa). By doing this, a school creates a hostile environment based on sex. *See* Complaint ¶¶ 418-472, *Students and Parents for Privacy v. U.S. Dep't of Educ.*, Case No. 1:16-cv-04945 (N.D. Ill. May 4, 2016) (alleging that a school district created a hostile environment based on sex in violation of Title IX by allowing a biological male who professes a female identity to access the girls' locker room and restroom).

87.    Highland wants to avoid the liability that will result if it adopts policies that violate the Title IX rights of its students.

88.    Highland is also concerned that allowing students who profess a gender identity that conflicts with their biological sex to access overnight accommodations, locker rooms, or restrooms for the opposite sex will be unworkable and will create safety issues and lewdness concerns in the educational setting.

89.    For example, a male student who wants to access a room full of partially clothed or unclothed girls (whether to pursue sexual advances toward them, undress in front of them, or view them in a state of partial or complete undress) can simply profess a female identity and the school would be required to allow him to access the girls' locker room.

90.    Indeed, Defendants' 2016 Dear Colleague Letter acknowledges that students who profess a gender identity that conflicts with their biological sex need not produce a

19

medical diagnosis or other verification in order for their schools to treat them consistent with their professed gender identity.

91. Highland does not want to create such an unworkable policy that will undermine its ability to secure the safety and peace of mind of all its students.

92. Highland wants to avoid the liability that will result if it adopts policies that risk jeopardizing the safety and security of its students.

93. For the foregoing reasons, Highland declined to change its policies to allow Student A to use the girls' restroom.

94. Highland nevertheless has allowed Student A to use any of the three single-use staff restrooms at the Elementary School or any of the two restrooms in the main office at the Elementary School.

95. Most recently, during Student A's fourth-grade year (the 2015-2016 school year), Student A was part of a class that met close to one of the single-use staff restrooms, and Highland encouraged everyone in Student A's class to use the nearby single-use staff restroom.

96. Highland plans to make similar arrangements for Student A's restroom use for the 2016-2017 school year, which will include encouraging and permitting Student A's classmates to use nearby single-use restrooms, while also continuing to allow Student A to use any of the five single-use restrooms located throughout the Elementary School building.

## D. Federal Efforts to Enforce Defendants' New Title IX Rule against Highland

97. On December 23, 2013, Student A's legal custodian filed a complaint against Highland with the DOE's Office for Civil Rights (OCR).

98.     That complaint alleged that Highland engaged in sex-based discrimination against Student A, specifically claiming that Highland prohibited Student A "from using the girls' student restroom" and required instead that Student A "use a restroom in the School's office/sick room."

99.     On April 21, 2014, Highland agreed to participate in OCR's Early Complaint Resolution (ECR) process. Despite this, the parties were unable to reach a resolution through that process, and OCR resumed its investigation of the complaint in June 2014.

100.    On August 29, 2014, OCR amended the complaint, claiming that Highland staff and students referred to Student A "as a boy" and failed "to use female pronouns" when referring to Student A.

101.    Whenever Student A or Student A's legal custodian have raised concerns about comments from Highland staff or students to Student A, Highland officials have promptly addressed and resolved all those situations.

102.    As part of their investigation, OCR representatives interviewed at least eight Highland employees and demanded that Highland produce (among other things) Student A's class schedule, Student A's school records, Highland officials' communications with Student A's legal custodian, complaints that Highland officials received from Student A or Student A's legal custodian, and Highland officials' responses to those complaints.

103.    Since concluding their investigation, OCR representatives have been very complimentary of the way that Highland has handled the complaints from Student A or Student A's legal custodian alleging that Highland staff and students referred to Student A "as a boy" or failed "to use female pronouns" when referring to Student A.

104.    After concluding their investigation, on March 30, 2016, OCR representatives sent a proposed Resolution Agreement to Highland.

105.    In the OCR representative's email sending Highland the proposed Resolution Agreement, OCR stated its position that "Title IX's prohibition on sex discrimination encompasses discrimination . . . based on gender identity." Email from Ted Wammes, U.S. Dep't of Educ., Office for Civil Rights, to Andrew J. Burton (Mar. 30, 2016).

106.    The proposed Resolution Agreement indicates that OCR requires Highland to take all the steps outlined in the Agreement "[i]n order to resolve the issues raised in [Student A's] complaint" and ensure Highland's "compliance with the requirements of Title IX." Resolution Agreement at 1.

107.    Under the proposed Resolution Agreement, OCR demands that Highland "engage a third-party consultant . . . with expertise in child and adolescent gender identity . . . to support and assist [Highland]." *Id.* at 2.

108.    Under the proposed Resolution Agreement, OCR demands that Highland take the following steps with regard to Student A:

    a.  "provide the Student access to sex-specific facilities at the District consistent with the Student's gender identity; however, the Student may request access to private facilities based on privacy, safety, or other concerns;

    b.  provide the Student access to sex-specific facilities at all District-sponsored activities, including overnight events and extracurricular activities on and off campus, consistent with the Student's gender identity; however, the

22

Student may request access to private facilities based on privacy, safety, or other concerns;

c. treat the Student consistent with the Student's gender identity and the same as other students of the same gender in all respects in the education programs and activities offered by the District;

d. review all District records and systems and ensure that the Student's preferred name and gender identity are reflected in the records and systems from August 2012 through the duration of the Student's attendance at the District's schools. Where the District states it is not permitted to change the Student's name and/or gender, the District will promptly provide an explanation of the record and the reason the Student's name and gender have not been changed; and

e. ensure that any District records containing the Student's assigned sex at birth, if any, are treated as confidential, personally identifiable information; are maintained separately from the Student's records; and are not disclosed to any District employees, students, or others without the express written consent of the Student's parents or, after the Student turns 18 or is emancipated, the Student."

*Id.* at 2-3.

109. The proposed Resolution Agreement defines "sex-specific facilities" to mean "facilities and accommodations used by students at school or during school-sponsored

activities and trips, and include, but are not limited to, restrooms, locker rooms, and overnight facilities."

110. Under the proposed Resolution Agreement, OCR demands that Highland make the following policy changes (among others) throughout the district: (1) revise "all its policies, guidelines, procedures, regulations, and related documents and materials . . . related to sex discrimination . . . to . . . specifically include gender-based discrimination as a form of discrimination based on sex" and "state that gender-based discrimination includes discrimination based on a student's gender identity, gender expression, gender transition, transgender status, or gender nonconformity." *Id.* at 4-5.

111. OCR also requires Highland to "submit to OCR for review and approval all of its revised policies, procedures, regulations, and related documents and materials." *Id.* at 5.

112. Under the proposed Resolution Agreement, OCR demands that Highland annually "conduct mandatory training on issues related to gender nonconformance . . . for all District administrators," annually "provide training to all faculty and staff who interact with students at any grade level regarding the District's obligations to prevent and address gender-based discrimination," and provide "instruction to all students on gender-based discrimination and . . . examples of prohibited conduct . . . , including the types of conduct prohibited with respect to sex-specific facilities." *Id.* at 6-7.

113. Under the proposed Resolution Agreement, OCR demands that Highland submit "a copy of the training materials and attendance rosters" and "documentation of the implementation of the age-appropriate instruction the District implements for students." *Id.* at 7.

24

114. If Highland were to accept the proposed Resolution Agreement, OCR has made it clear that its officials retain the right to "visit the District, interview staff and students, and request . . . additional reports or data as are necessary for OCR to determine whether the District has fulfilled the terms of the Agreement and is in compliance with . . . Title IX." *Id.* at 8.

115. If Highland were to accept the proposed Resolution Agreement, OCR has made it clear that it "may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of th[e] Agreement." *Id.*

116. OCR told Highland that it would have 90 days, or until June 28, 2016, to accept the proposed Resolution Agreement.

117. During discussions between one of OCR's representatives and Highland's representatives, the OCR representative stated that OCR will reject any counter-proposal by Highland that does not agree to let students use the overnight accommodations, locker rooms, and restrooms that correspond to their gender identity.

118. Highland decided that it will not accept OCR's proposed Resolution Agreement—particularly the demands concerning student use of overnight accommodations, locker rooms, and restrooms—for all the reasons that it originally declined the request of Student A's legal custodian to allow Student A to use the girls' restroom.

119. In addition, Highland has concluded that OCR's proposed Resolution Agreement would require Highland to violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. This is because the Agreement requires Highland to respect and accommodate Student A's privacy and safety interests in accessing

25

overnight accommodations, locker rooms, and restrooms, *see* Resolution Agreement at 2-3 (explaining that Student A "may request access to private [overnight, locker-room, or restroom] facilities based on privacy, safety, or other concerns"), but Defendants' new rule forbids Highland from respecting and accommodating the privacy rights and safety interests of the approximately 1,900 other students who attend Highland's schools, *see* 2016 Dear Colleague Letter at 2-3 (stating that schools "may not require" students who profess a gender identity that conflicts with their biological sex to "use individual-user facilities" in order "to accommodate other's discomfort" with sharing overnight accommodations, locker rooms, or restrooms with people of the opposite sex).

120. Highland has determined that it will not hire a gender-identity consultant or implement special gender-identity training for its administrators, faculty, staff, and students because it endeavors to treat all students fairly and respectfully and does not want to create the impression that some students are treated more favorably than others.

121. Highland has determined that if it were to implement the costly measures discussed in the prior paragraph, it would be forced to divert its limited resources away from other educational programs that it currently provides to its students.

122. Highland has decided not to submit to ongoing OCR review of its records and actions because doing that would continue to divert its resources away from educating its students and will thus continue to hamper its students' educational experience.

123. On May 13, 2016, the day that Defendants issued their 2016 Dear Colleague Letter, an OCR representative emailed Highland's legal counsel a copy of a press release announcing the Letter, stating that the DOE and the DOJ had issued "guidance that

26

summarizes a school's Title IX's obligations regarding transgender students." Email from Ted Wammes, U.S. Dep't of Educ., Office for Civil Rights, to Andrew J. Burton (May 13, 2016).

124.    Upon receipt, Highland's legal counsel forwarded that email to Highland's Superintendent and School Board members.

125.    In that email, OCR's representative wrote that OCR may "end the negotiations period at any time prior to the expiration of the 90-calendar day period when it is clear that agreement will not be reached (e.g., the recipient has refused to discuss any resolution; the recipient has indicated a refusal to agree to a key resolution term; the recipient has not responded to a proposed resolution agreement and at least 30 calendar days have passed)." *Id.*

126.    In that email, OCR's representative also wrote that if a resolution is not reached by June 28, 2016, OCR would proceed to the next steps outlined in Section 303(b) of OCR's Case Processing Manual, which would soon result in OCR issuing a "Letter of Impending Enforcement Action" to Highland.

127.    An enforcement action against Highland imperils its federal funding. *See* 20 U.S.C. § 1682 ("Compliance with any requirement adopted pursuant to this section [Title IX] may be effected . . . by the termination of or refusal to grant or to continue [Federal financial] assistance . . . to any recipient . . . .").

128.    For the 2015-2016 school year, Highland received funding from the federal government in the amount of $1,123,390. Highland's total funding for that school year was $15,400,000.

129. For the 2015-2016 school year, Highland received the following federal funding: (1) $307,710 for special education; (2) $415,240 for school-wide Title I programming for educational advancement; (3) $50,440 for improving teacher quality; and (4) $350,000 for free and reduced-cost lunches.

130. Defendants' threatened revocation of these funds will compel Highland to eliminate special-education classes and programs, end many of its educational-advancement programs and resources, increase class sizes (which will decrease the individualized time and attention that staff members are able to give each student), and cut the number of free and reduced-cost lunches available to students.

131. Defendants are prepared to impose these hardships on Highland's students—hardships that will be disproportionately experienced by socioeconomically disadvantaged children and students struggling to learn—simply because Highland seeks to protect those students' dignity interests, privacy rights, and safety concerns through a policy that requires all students to access overnight accommodations, locker rooms, and restrooms consistent with their biological sex.

<u>**CLAIM ONE**</u>
**Defendants' Actions Violate the Administrative Procedure Act (APA)**

132. Highland realleges all matters set forth in Paragraphs 1 through 131 and incorporates them herein.

133. The DOE and DOJ are federal agencies subject to of the APA. 5 U.S.C. § 701(b); 5 U.S.C. § 551(1).

134. Defendants have promulgated, and are enforcing nationwide, a new legislative rule that redefines the term "sex" in Title IX and its regulations to include "gender identity"

28

and that requires schools, in order to comply with Title IX, to permit students to access sex-specific overnight accommodations, locker rooms, and restrooms based on their professed gender identity.

135.    Defendants' legislative rule contradicts the text, structure, legislative history, and historical judicial interpretation of Title IX, all of which confirm that "sex" means biological sex—that is, a person's status as male or female as determined by biology.

136.    Defendants' legislative rule is a "rule" under the APA. 5 U.S.C. § 551(4).

137.    Defendants have communicated their legislative rule to school districts nationwide, including Highland.

138.    Defendants have stated that failing to comply with their legislative rule will result in investigations and enforcement actions that could revoke millions of dollars in federal funding.

139.    Defendants are currently enforcing their legislative rule against Highland.

140.    Highland has suffered a legal wrong and been adversely affected and aggrieved as a direct result of Defendants' actions in promulgating and enforcing their legislative rule.

141.    As explained below under Claims 2, 3, and 4, Defendants' actions violate Highland's constitutional rights under the Spending Clause in Article 1, Section 8 of the United States Constitution, the federalism guarantees of the United States Constitution, and the separation-of-powers guarantees of the United States Constitution.

142.    Defendants seek to imminently compel Highland to undertake costly and time-consuming steps—such as hiring a gender-identity consultant, adopting unwarranted district-wide policy changes, and providing unnecessary district-wide training to

administrators, teachers, and students—all of which Defendants and their agents claim are necessary to bring Highland into compliance with Title IX.

143.    Undertaking these costly and time-consuming steps will force Highland to divert its limited resources away from the educational programs that it currently provides to its students.

144.    Defendants seek to imminently compel Highland to expose itself to liability by enacting changes to its policies regulating student access to overnight accommodations, locker rooms, and restrooms that will result in Highland violating the constitutional right to bodily privacy of its students, violating the Title IX rights of its students by (among other things) creating hostile environments based on sex, violating the constitutional equal-protection rights of its students by accommodating the privacy and safety concerns of Student A while ignoring the privacy and safety concerns of other students, jeopardizing the safety of its students, and creating lewdness concerns in its facilities.

145.    Defendants threaten an imminent enforcement action against Highland through which Defendants and their agents have the authority to revoke all of Highland's federal funding, which currently amounts to more than a million dollars each year.

146.    That revocation of federal funding will harm Highland and its students by compelling Highland to eliminate special-education classes and programs, end many of its educational-advancement programs and resources, increase class sizes (which will decrease the individualized time and attention that staff members are able to give each student), and cut the number of free and reduced-cost lunches available to students.

147.   These hardships on Highland's students will be disproportionately experienced by underprivileged children and students struggling to learn.

148.   Defendants have forced Highland to endure an illegitimate and invasive investigation and threaten to force Highland to submit to ongoing investigation and monitoring by Defendants and their agents.

149.   Defendants' legislative rule constitutes "final agency action" reviewable by this Court under 5 U.S.C. § 704.

150.   Defendants' legislative rule is definitive in its declaration of what Defendants think that the law requires; it is not in the least bit tentative in announcing Defendants' legal policy.

151.   Defendants' legislative rule purports to determine the rights of students, including but not limited to the rights of Student A, and the obligations of schools that receive federal funding, including but not limited to the obligations of Highland.

152.   Legal consequences are already flowing from Defendants' legislative rule. Defendants have aggressively enforced it, and are aggressively enforcing it, throughout the nation, against not only Highland but also the State of North Carolina and schools in North Carolina, New York, Illinois, and California (among other places).

153.   Under the APA, a reviewing Court must "hold unlawful and set aside agency action" in four instances that apply to this case: (1) if the agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C); (2) if the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); (3) if the agency action is

"contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B); and (4) if the agency action is "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

154.   Defendants' actions in promulgating and enforcing their legislative rule violate all four of these standards and should be set aside.

### A.   Defendants' Actions Exceed Statutory Jurisdiction, Authority, and Limitations

155.   Defendants' actions in promulgating and enforcing their legislative rule are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), because they redefine the unambiguous term "sex" in Title IX to include "gender identity" without the authorization of Congress.

156.   Congress has not delegated to Defendants the authority to define, or redefine, unambiguous terms in Title IX.

157.   The term "sex" as used in Title IX means biological sex—that is, a person's status as male or female as determined by biology.

158.   The term "sex" as used in Title IX is not ambiguous.

159.   Title IX makes no reference to "gender identity" in the language of the statute, and Title IX's regulations likewise make no reference to "gender identity."

160.   Title IX is not ambiguous when it states that schools receiving federal funds may "maintain[] separate living facilities for the different sexes." 20 U.S.C. § 1686.

161.   Title IX's regulation is not ambiguous when it states that schools receiving federal funds may separate locker rooms, shower facilities, and restrooms "on the basis of sex." 34 C.F.R. § 106.33.

162. Title IX does not require that Highland or any other school district open its girls' overnight accommodations, locker rooms, or restrooms to biological males who profess a female identity.

163. Nor does Title IX require that schools open their boys' facilities to biological females who profess a male identity.

164. Defendants have thus promulgated and begun enforcing their legislative rule in excess of statutory jurisdiction, authority, and limitations.

165. Defendants promulgated and are enforcing their rule in excess of statutory jurisdiction regardless of whether the rule is considered legislative or interpretive.

**B.      Defendants' Actions Are Arbitrary and Capricious, An Abuse of Discretion, and Not In Accordance With Law**

166. Defendants' actions in promulgating and enforcing their legislative rule are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

167. Congress requires that agency action follows a process by which the agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted).

168. An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

169.    Defendants have relied on the concept of "gender identity" in promulgating and enforcing their new legislative rule.

170.    But gender identity is absent from the legislative history of Title IX and thus is a factor that Congress did not intend Defendants to consider.

171.    Defendants failed to consider important aspects of the problems created by allowing students who profess a gender identity that conflicts with their biological sex to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex.

172.    Defendants ignored the language and structure of Title IX and its regulations, the congressional history and judicial interpretations of Title IX and its regulations, the practical and constitutional harms that their unlawful actions create, and the hostile environments based on sex in violation of Title IX (and the other violations of Title IX) that result from their unlawful actions.

173.    Defendants' actions in redefining the term "sex" in Title IX and its regulations to include "gender identity" were not accompanied by rational explanation.

174.    Defendants' actions inexplicably departed from established Title IX policy that unambiguously allowed schools to maintain overnight accommodations, locker rooms, and restrooms separated by biological sex.

175.    Defendants' actions are contrary to law.

176.    Defendants' actions in redefining the term "sex" in Title IX and its regulations to include "gender identity" are so implausible that they could not be ascribed to a difference in view or the product of agency expertise.

177.    Defendants' actions expose schools, including Highland, to liability by requiring them to enact policies that will violate the dignity interests and privacy rights of their students, violate the Title IX rights of their students by creating hostile environments based on sex, and create safety issues and lewdness concerns on school premises.

178.    Defendants' actions in promulgating and enforcing their legislative rule are thus arbitrary and capricious, an abuse of discretion, and not in accordance with law.

179.    Defendants' actions in promulgating and enforcing their rule are arbitrary and capricious, an abuse of discretion, and not in accordance with law regardless of whether the rule is considered legislative or interpretive.

## C.    Defendants' Actions Are Contrary to Constitutional Right, Power, Privilege, and Immunity

180.    Defendants' actions in promulgating and enforcing their legislative rule are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

181.    Defendants' actions in requiring schools to allow students who profess a gender identity that conflicts with their biological sex to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex will violate the constitutional rights to bodily privacy of other students using those shared facilities.

182.    All individuals, including students, have a constitutional right to bodily privacy protected by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution that forbids the government from placing them in situations where they will expose their unclothed or partially clothed bodies to people of the opposite sex.

183.    As explained below under Claim 2, Defendants' actions in redefining the term "sex" in Title IX and its regulations to include "gender identity," and in mandating that

35

schools permit students to access overnight accommodations, locker rooms, and restrooms consistent with their professed gender identity, violate the Spending Clause in Article 1, Section 8 of the United States Constitution.

184.    As explained below under Claim 3, Defendants' actions in redefining the term "sex" in Title IX and its regulations to include "gender identity," and in mandating that schools permit students to access overnight accommodations, locker rooms, and restrooms consistent with their professed gender identity, violate the federalism guarantees of the United States Constitution, which include but are not limited to the Tenth Amendment.

185.    As explained below under Claim 4, Defendants' actions in redefining the term "sex" in Title IX and its regulations to include "gender identity," and in mandating that schools permit students to access overnight accommodations, locker rooms, and restrooms consistent with their professed gender identity, violate the separation-of-powers guarantees of the United States Constitution.

186.    Defendants' actions in promulgating and enforcing their legislative rule are thus contrary to constitutional right, power, privilege, and immunity.

187.    Defendants' actions in promulgating and enforcing their rule are contrary to constitutional right, power, privilege, and immunity regardless of whether the rule is considered legislative or interpretive.

## D.    Defendants' Actions Did Not Observe Procedure Required By Law

188.    Defendants' actions were done "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

189.    Defendants have promulgated a legislative rule that redefines the term "sex" in Title IX and its regulations to include "gender identity" and that requires schools, in order to comply with Title IX, to permit students to access overnight accommodations, locker rooms, and restrooms based on their professed gender identity.

190.    This rule requires school districts, including Highland, to allow students who profess a gender identity that conflicts with their biological sex to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex.

191.    This rule applies to all school districts that receive federal funding.

192.    This rule adds substantive content to the rights and obligations established under Title IX.

193.    This rule announces new policy that in effect creates new law, rights, and obligations under Title IX's statutory language.

194.    This rule announces new policy that in effect creates new law, rights, and obligations under Title IX's regulations, including but not limited to 34 C.F.R. § 106.33.

195.    This rule does not explicate, and in fact is inconsistent with, Congress's desires and purposes for Title IX.

196.    This rule is an extra-statutory imposition of rights and obligations under Title IX.

197.    Defendants are enforcing this rule nationwide and using it as a predicate for numerous investigations and threats against school districts, including Highland.

198.    Defendants and their agents are treating this rule as if it has the full force of law in their enforcement efforts against Highland, and they have indicated that this rule

binds Highland and that a failure to comply with it will result in an enforcement action against Highland that threatens to revoke all of its federal funding.

199.    This rule, given its nature and operation, qualifies as a legislative rule.

200.    Legislative rules must comply with the APA's notice-and-comment requirements. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) (concluding that all legislative rules must satisfy the notice-and-comment requirements).

201.    Notice-and-comment requirements mandate that an agency (1) provide notice to the public of the proposed rulemaking, typically by publishing notice in the Federal Register, (2) give interested parties an opportunity to submit written data, views, or arguments on the proposed rule, and consider and respond to significant comments received, and (3) include in the promulgation of the final rule a concise general statement of the rule's basis and purpose. Notice-and-comment requirements also mandate that an agency consider all the relevant comments offered during the public-comment period before finally deciding whether to adopt a proposed rule.

202.    Defendants promulgated and began enforcing their legislative rule without satisfying these notice-and-comment requirements.

203.    Under Title IX, final rules, regulations, and orders of general applicability issued by the DOE must be signed by the President of the United States. 20 U.S.C. § 1682.

204.    Defendants promulgated and began enforcing their legislative rule without the signature of the President.

205.    Defendants thus did not follow the requisite procedures when they adopted their legislative rule.

## CLAIM TWO
**Defendants' Actions Violate the Spending Clause in Article 1, Section 8 of the United States Constitution**

206.    Highland realleges all matters set forth in Paragraphs 1 through 205 and incorporates them herein.

207.    Defendants' actions in redefining the term "sex" in Title IX and its regulations to include "gender identity," and in mandating that schools permit students to access overnight accommodations, locker rooms, and restrooms consistent with their professed gender identity, violate the Spending Clause in Article 1, Section 8 of the United States Constitution.

208.    Congress enacted Title IX using its Spending Clause power.

209.    Defendants' actions violate the Spending Clause in two ways. First, Defendants attempt to impose new conditions on federal funding that conflict with the clear and unambiguous conditions that Congress imposed when it enacted Title IX. Second, Defendants' actions unconstitutionally coerce and commandeer Highland and every other school district in the United States to implement Defendants' gender-identity policies.

### A.    Defendants Attempt to Impose New Conditions on Federal Funding that Conflict with the Clear and Unambiguous Conditions that Congress Imposed When It Enacted Title IX

210.    When Congress uses its Spending Clause power, the resulting legislation operates much like a contract: in return for federal funds, the states, their political subdivisions, and related governmental entities agree to comply with federally imposed conditions.

211.    Congress must clearly and unambiguously state the conditions for receipt of federal funds so that the states, their political subdivisions, and related governmental entities can knowingly decide whether to accept that funding.

212.    Until Defendants' recent efforts to change the unambiguous meaning of Title IX, it was understood that the term "sex" in Title IX and its regulations did not include "gender identity."

213.    Until Defendants' recent efforts to change the unambiguous meaning of Title IX, it was understood that schools receiving federal funding did not violate Title IX by requiring students to access overnight accommodations, locker rooms, and restrooms consistent with their biological sex.

214.    No school district could have reasonably anticipated that Defendants would impermissibly attempt to alter Title IX and its regulations to change the term "sex" to include "gender identity" and to mandate that schools permit biological males to access overnight accommodations, locker rooms, and restrooms designated for females (and vice versa).

215.    Defendants' actions thus violate the Spending Clause.

**B.      Defendants' Actions Unconstitutionally Coerce and Commandeer Highland to Implement Defendants' Gender-Identity Policies**

216.    The federal government cannot place unreasonable conditions on federal funding or otherwise offer financial inducements that effectively coerce and commandeer the states, their political subdivisions, or related governmental entities to implement the policies of the federal government.

217. Through their efforts to enforce their new gender-identity policies against Highland, Defendants threaten to revoke all (not merely part) of the educational funding that the federal government provides to Highland.

218. The amount of federal funding that Defendants threaten to revoke is a substantial percentage of Highland's overall funding.

219. The federal funding that Defendants threaten to revoke is designated for special-education programs, educational advancement, improving teacher quality (including class-size reduction), and providing free and reduced-cost lunches.

220. Being stripped of those funds will compel Highland to eliminate special-education classes and programs, end many of its educational-advancement programs and resources, increase class sizes (which will decrease the individualized time and attention that staff members are able to give each student), and cut the number of free and reduced-cost lunches available to students.

221. Being stripped of those funds will impose hardships on Highland's students that will be disproportionately experienced by socioeconomically disadvantaged children and students struggling to learn.

222. Threatening to revoke Highland's federal funding is so coercive that it passes the point at which pressure turns into compulsion.

223. Defendants' actions thus violate the Spending Clause.

## CLAIM THREE
### Defendants' Actions Violate the Federalism Guarantees of the United States Constitution

224.    Highland realleges all matters set forth in Paragraphs 1 through 223 and incorporates them herein.

225.    Several provisions of the United States Constitution make clear that the states remain independent sovereigns in the federal system, that they joined the union with their sovereignty—including their traditional police power—intact, and that the federal government is one of limited powers.

226.    Those provisions include but are not limited to Section 2 of the Thirteenth Amendment, Section 5 of the Fourteenth Amendment, Section 2 of the Fifteenth Amendment, and Article I, Section 8—all of which delineate specific and limited subjects on which Congress may legislate—and the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

227.    No provision of the United States Constitution authorizes any arm of the federal government to require state-operated schools to permit students access to sex-specific overnight accommodations, locker rooms, or bathrooms consistent with their professed gender identity. This is particularly true considering that "education" is an area "where States historically have been sovereign." *United States v. Lopez*, 514 U.S. 549, 564 (1995).

228.    Because the federal government lacks the constitutional authority to interfere with Highland's policies concerning student access to sex-specific overnight

accommodations, locker rooms, and bathrooms, Defendants' actions usurp Highland's sovereign authority to regulate access to those intimate facilities.

229.   Defendants' actions thus violate the federalism guarantees of the United States Constitution.

230.   The Constitution's federalism guarantees also constrain the federal government's ability to place conditions on the receipt of federal funds through legislation under the Spending Clause in Article I, Section 8. So for all the reasons explained under Claim 2, Defendants' actions also violate the federalism guarantees of the United States Constitution.

## CLAIM FOUR
### Defendants' Actions Violate the Separation-of-Powers Guarantees in the United States Constitution

231.   Highland realleges all matters set forth in Paragraphs 1 through 230 and incorporates them herein.

232.   Multiple provisions of the United States Constitution make clear that if the federal government is to impose new legal requirements on the states or their political subdivisions, those requirements must be imposed by or at the behest of Congress, and not by the executive branch acting on its own.

233.   Those provisions include but are not limited to the Vesting Clause of Article I, Section 1, the Bicameralism and Presentment Clauses of Article I, Section 7, the Take Care Clause of Article II, Section 3, and Section 5 of the Fourteenth Amendment.

234.    Defendants' new Title IX directives go so far beyond any reasonable reading of that statute and its regulations that it is tantamount to exercising the lawmaking powers reserved exclusively to Congress.

235.    Defendants' efforts to impose its new Title IX directives on Highland are a usurpation of Congress's exclusive authority under Article I of the Constitution, which provides that "[a]ll legislative Powers herein granted shall be vested in . . . Congress."

236.    Defendants' new Title IX directives thus violate the separation-of-powers guarantees in the United States Constitution.

## CLAIM FIVE
### Defendants' Actions Violate the Regulatory Flexibility Act (RFA)

237.    Highland realleges all matters set forth in Paragraphs 1 through 236 and incorporates them herein.

238.    The RFA requires federal agencies to prepare and make available for public comment an initial and final regulatory flexibility analysis before issuing a new rule. 5 U.S.C. § 603(a).

239.    Defendants have promulgated a new rule that redefines the term "sex" in Title IX and its regulations to include "gender identity" and that requires schools, in order to comply with Title IX, to permit students to access overnight accommodations, locker rooms, and restrooms based on their professed gender identity.

240.    Defendants failed to prepare and make available for public comment an initial and final regulatory flexibility analysis before issuing their new Title IX rule.

241.     An agency can avoid performing a flexibility analysis if its top official certifies that the rule will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. § 605(b).

242.     The certification must include a statement providing the factual basis for the agency's determination that the rule will not significantly impact small entities. *Id.*

243.     Defendants did not make such a certification.

244.     Defendants' new Title IX rule would impose disproportionate and unnecessary burdens on small and economically disadvantaged school districts, including Highland.

245.     Defendants and their agents demand, among other things, that Highland (1) adopt district-wide changes to its policies forbidding sex discrimination; (2) adopt district-wide changes to its policies regarding student use of sex-specific overnight accommodations, locker rooms, and restrooms; (3) hire a gender-identity consultant; and (4) implement gender-identity training for its administrators, faculty, staff, and students.

246.     Implementing these demands would impose burdens on Highland that are disproportionate and unnecessary.

247.     Defendants' actions in promulgating and enforcing their new Title IX rule thus violate the RFA.

## PRAYER FOR RELIEF

WHEREFORE, Highland respectfully requests that this Court enter judgment:

A.     Declaring unlawful and setting aside Defendants' rule announcing that the term "sex" in Title IX and its regulations includes "gender identity" and that Title IX

requires schools to allow students to access overnight accommodations, locker rooms, and restrooms consistent with their professed gender identity;

B.    Declaring that the policies that Highland administers and enforces with respect to student use of overnight accommodations, locker rooms, and restrooms do not violate Title IX;

C.    Declaring that Defendants' efforts to create their rule and enforce it against Highland violate the Administrative Procedure Act, the Spending Clause in Article 1, Section 8 of the United States Constitution, the federalism guarantees in the United States Constitution, the separation-of-power guarantees in the United States Constitution, and the Regulatory Flexibility Act;

D.    Preliminarily and permanently enjoining Defendants, their officers, agents, employees, and all other persons acting in concert with them from enforcing their rule that the term "sex" in Title IX and its regulations includes "gender identity" and that Title IX requires schools to allow students to access overnight accommodations, locker rooms, and restrooms consistent with their professed gender identity;

E.    Preliminarily and permanently enjoining Defendants, their officers, agents, employees, and all other persons acting in concert with them from enforcing Title IX to require Highland to allow any of its students to access overnight accommodations, locker rooms, and restrooms consistent with their gender identity;

F.    Preliminarily and permanently enjoining Defendants, their officers, agents, employees, and all other persons acting in concert with them from taking any adverse action against Highland for its policy that students must use overnight accommodations, locker

rooms, and restrooms consistent with their biological sex, including but not limited to enjoining Defendants, their officers, agents, employees, and all other persons acting in concert with them from taking steps to revoke Highland's federal funding.

      G.      Awarding Highland costs and attorneys' fees; and

      H.      Granting such other and further relief as the Court deems just and proper.

Dated: June 10, 2016

Respectfully submitted,

/s/ James A. Campbell

James A. Campbell, OH Bar No. 0081501
*Trial Attorney*
Kenneth J. Connelly, AZ Bar No. 025420*
Jeana Hallock, AZ Bar No. 032678*
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, Arizona 85260
(480) 444-0020 Phone
(480) 444-0028 Fax
jcampbell@ADFlegal.org
kconnelly@ADFlegal.org
jhallock@ADFlegal.org

J. Matthew Sharp, GA Bar No. 607842*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
msharp@ADFlegal.org

Andrew J. Burton, OH Bar No. 0083178
RENWICK, WELSH & BURTON LLC
9 North Mulberry Street
Mansfield, Ohio 44902
(419) 522-2889
(419) 525-4666 Fax
andrew@rwblawoffice.com

*Counsel for Plaintiff*

*\*Pro Hac Vice Applications Forthcoming*

## VERIFICATION OF COMPLAINT

I, William Dodds, Superintendent of Highland Local School District and authorized representative of the Board of Education of the Highland Local School District, a citizen of the United States and a resident of the State of Ohio, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the allegations in the foregoing Complaint are true and correct to the best of my knowledge.

Executed this the ___9th___ day of June, 2016, in Morrow County, Ohio.


_William Dodds_
William Dodds
Superintendent of Highland Local School District
and Authorized Representative of the Board of
Education of the Highland Local School District