## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| Board of Education of the Highland Local School District, | |
| Plaintiff, | ORAL ARGUMENT REQUESTED |
| vs. | Case No: 2:16-cv-524 |
| United States Department of Education; John B. King, Jr., in his official capacity as United States Secretary of Education; United States Department of Justice; Loretta E. Lynch, in her official capacity as United States Attorney General; and Vanita Gupta, in her official capacity as Principal Deputy Assistant Attorney General, | Judge Algenon L. Marbley Magistrate Judge Kimberly A. Jolson |
| Defendants. | |

### Plaintiff's Motion for Preliminary Injunction

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Board of Education of the Highland Local School District (Highland) respectfully moves this Court for a preliminary injunction enjoining Defendants, their officers, agents, employees, and all other persons acting in concert with them from enforcing their agency rule declaring (1) that the term "sex" in Title IX of the Education Amendments of 1972 and its regulations includes "gender identity" and (2) that Title IX requires schools to allow students to access overnight accommodations, locker rooms, and restrooms consistent with their professed gender identity. Highland also asks this Court to preliminarily enjoin Defendants, their officers, agents, employees, and all other persons acting in concert with them (1) from enforcing Title IX in a manner that would require Highland to allow students who profess a

1

gender identity that conflicts with their sex to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex and (2) from taking any adverse action against Highland, including but not limited to steps to revoke Highland's federal funding, because of Highland's policy requiring students to use sex-specific overnight accommodations, locker rooms, and restrooms consistent with their sex.

Highland satisfies the four factors for obtaining a preliminary injunction: (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Highland demonstrates that these factors are satisfied in the accompanying memorandum of law. That memorandum, along with the supporting exhibits and the Verified Complaint, form the basis of this motion and the relief requested above.

Highland respectfully requests oral argument on this motion. The legal issues raised herein are of immense public importance. Defendants are attempting to change longstanding law for the purpose of commandeering school policies on student use of overnight accommodations, locker rooms, and restrooms. They want to create a legal regime in which some students are allowed to access intimate facilities designated for the opposite sex. They are threatening schools' authority to protect the dignity and privacy rights of their students. These matters present issues of great national importance, and oral argument is warranted.

Highland also respectfully requests that this Court waive any bond requirement under Rule 65(c). Although the language of the rule may "appear[] to be mandatory," courts in this circuit have long held that "the district court possesses discretion over *whether* to require the

positing of security." *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013). Imposing a bond requirement here would be especially inequitable given Defendants' patently unlawful actions and Highland's strong likelihood of success on the merits. This conclusion is bolstered by the fact that neither Defendants nor anyone else will suffer any harm—financial or otherwise—by this Court's preserving the status quo through an injunction. *See Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974) (stating that "the district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined"). Finally, waiving the bond requirement is appropriate because Highland acts in the public interest by seeking to affirm a proper understanding of federal law and to vindicate vital constitutional and statutory rights. *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (affirming the district court's decision refusing to require posting of security because of the strength of plaintiff's case and the "strong public interest involved"); *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (noting the public interest litigation exception to the bond requirement).

Date: July 15, 2016.

Respectfully submitted,

s/ James A. Campbell
James A. Campbell, OH Bar No. 0081501
   *Trial Attorney*
Kenneth J. Connelly, AZ Bar No. 025420*
Jeana Hallock, AZ Bar No. 032678*
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jcampbell@ADFlegal.org
kconnelly@ADFlegal.org
jhallock@ADFlegal.org

J. Matthew Sharp, GA Bar No. 607842*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
msharp@ADFlegal.org

Andrew J. Burton, OH Bar No. 0083178
RENWICK, WELSH & BURTON LLC
9 North Mulberry Street
Mansfield, Ohio 44902
(419) 522-2889
(419) 525-4666 Fax
andrew@rwblawoffice.com

*Counsel for Plaintiff*
*Admitted Pro Hac Vice*

4

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| Board of Education of the Highland Local School District,<br><br>       Plaintiff,<br><br>  vs.<br><br>United States Department of Education; John B. King, Jr., in his official capacity as United States Secretary of Education; United States Department of Justice; Loretta E. Lynch, in her official capacity as United States Attorney General; and Vanita Gupta, in her official capacity as Principal Deputy Assistant Attorney General,<br><br>       Defendants. | ORAL ARGUMENT REQUESTED<br><br>Case No: 2:16-cv-524<br><br>Judge Algenon L. Marbley<br>Magistrate Judge Kimberly A. Jolson |

---

**Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction**

---

James A. Campbell, OH Bar No. 0081501
   *Trial Attorney*
Kenneth J. Connelly, AZ Bar No. 025420*
Jeana Hallock, AZ Bar No. 032678*
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jcampbell@ADFlegal.org
kconnelly@ADFlegal.org
jhallock@ADFlegal.org

Andrew J. Burton, OH Bar No. 0083178
RENWICK, WELSH & BURTON LLC
9 North Mulberry Street
Mansfield, Ohio 44902
(419) 522-2889
(419) 525-4666 Fax
andrew@rwblawoffice.com

J. Matthew Sharp, GA Bar No. 607842*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
msharp@ADFlegal.org

*Counsel for Plaintiff*
**Admitted Pro Hac Vice*

## <u>TABLE OF CONTENTS</u>

**Table of Authorities** .................................................................................. vi

**Introduction** ..............................................................................................1

Defendants are attempting to rewrite Title IX of the Education Amendments of 1972, which prohibits discrimination "on the basis of sex." They have created an agency rule declaring that the term "sex" includes the fundamentally distinct concept of "gender identity." They are enforcing that rule against school districts throughout the country, including Plaintiff Board of Education of the Highland Local School District (Highland). In so doing, Defendants have violated the Administrative Procedure Act (APA) and the Spending Clause in Article 1, Section 8 of the United States Constitution.

**Background** ............................................................................................. 3

Defendants have created an agency rule declaring (1) that the term "sex" in Title IX includes "gender identity" and (2) that schools must permit students who profess a gender identity that conflicts with their sex to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex. Defendants are enforcing that rule against schools throughout the country. In particular, they are enforcing it against Highland and threatening to revoke its federal funding because Highland will not permit students who profess a gender identity that conflicts with their sex to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex.

**Argument** ................................................................................................ 7

A plaintiff seeking a preliminary injunction must show that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Highland satisfies these factors.

**I.      Highland is likely to succeed on the merits.** .................................................... 7

To establish a strong likelihood of success on the merits, "[i]t is ordinarily sufficient if the plaintiff has raised questions . . . so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quotation marks omitted). Here, Highland is likely to succeed on the merits because (1) Defendants have created a final legislative rule in violation of the APA and (2) Defendants' actions violate the Spending Clause.

**A.      Defendants' actions violate the Administrative Procedure Act.** .............. 8

The APA authorizes courts to review final agency action. 5 U.S.C. § 704. Agency action is final if it (1) "mark[s] the 'consummation' of the agency's decisionmaking process"

and (2) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Defendants' rule, as most recently articulated in their May 13, 2016 Dear Colleague Letter, constitutes final agency action because it definitively articulates legal obligations and because Defendants demand compliance with it.

The APA provides that agency action must be set aside if it is "(A) arbitrary, capricious, . . . or otherwise not in accordance with law; (B) contrary to constitutional right . . . ; (C) in excess of statutory jurisdiction, authority, or limitations . . . ; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

1.      **Defendants have exceeded their statutory grant of authority.** ...................................................................................11

Congress has authorized agencies implementing Title IX to "issu[e] rules, regulations, or orders of general applicability which shall be *consistent with achievement of the objectives of the statute.*" 20 U.S.C.A. § 1682 (emphasis added). Defendants have exceeded that authority. Title IX's overriding objective is to prohibit federally funded schools from discriminating based on "sex." Sex is a binary concept that refers to a person's biological status as either male or female determined at birth and manifested by chromosomes, gonads, hormones, and genitalia. Gender identity, however, is fundamentally different from sex. Gender identity contemplates infinite variations and depends upon subjective perceptions and unverifiable professions. Congress has shown that it considers sex and gender identity to be distinct. *See* 42 U.S.C. § 13925(b)(13)(A) (adding "gender identity" right next to "sex").

Defendants have also exceeded their statutory authority when addressing overnight accommodations. Three factors demonstrate Defendants' overreach on this point: (1) Title IX's plain language, 20 U.S.C. § 1686, (2) its legislative history, and (3) Department of Education's (DOE) own regulations, 34 C.F.R. § 106.32—all of which confirm that schools may separate overnight accommodations based on sex. Defendants have similarly exceeded their authority when addressing locker-room and restroom access. Long ago, DOE effectuated the Title IX provision that allows schools to "maintain[] separate living facilities for the different sexes," 20 U.S.C. § 1686, by promulgating a regulation that permits "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. Yet Defendants now contradict that. In so doing, they have ignored the weight of legal authority holding that Title IX permits schools to separate locker rooms and restrooms based on sex.

2.      **Defendants did not follow the requisite notice-and-comment procedures when creating their legislative rule.** ..........16

The APA requires agencies to comply with notice-and-comment procedures when creating legislative rules. 5 U.S.C. § 553(b); *First Nat'l Bank of Lexington, Tenn. v. Sanders*, 946 F.2d 1185, 1188 (6th Cir. 1991). Defendants' rule is legislative because it purports to bind schools throughout the country. It does so through its use of mandatory language, *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002), and through Defendants' efforts to enforce

it nationally, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000). Another characteristic of a legislative rule is that it adds substantive content to the existing statutory and regulatory requirements. *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 680 (6th Cir. 2005). By redefining sex to include the fundamentally distinct concept of gender identity, Defendants have added substantive content that Congress has specifically and repeatedly decided not to include. This confirms that Defendants have created a legislative rule. Because Defendants have created that legislative rule without following the APA's notice-and-comment procedures, this Court should set it aside.

3.    **Defendants' rule is arbitrary, capricious, and not in accordance with law**.....................................................................18

An agency rule is arbitrary and capricious if the agency "relied on factors" that Congress did not intend for it to consider and if the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Defendants have acted arbitrarily and capriciously here by (1) relying on a concept—gender identity—that Congress did not intend for them to consider and (2) failing to consider the practical problems that schools will face if they allow students who profess a gender identity that conflicts with their sex to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex.

In situations when an agency seeks to change the law, it acts in an arbitrary and capricious manner if it does not, at the very least, "display awareness that it is changing position." *Encino Motorcars, LLC v. Navarro*, -- S. Ct. --, No. 15-415, 2016 WL 3369424 at *7 (June 20, 2016). Defendants' past representations and existing regulations demonstrate that they previously treated "sex" as referring to the biological differences between men and women, but now they have changed their position without acknowledging that is what they did. This qualifies as arbitrary and capricious agency action.

Finally, Defendants' rule is contrary to law because instead of bringing schools into compliance with Title IX, it will actually force them to violate Title IX, by creating hostile environments based on sex. *See Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 489 (6th Cir. 2006). School policies that require students to change clothes, sleep, and use the restroom with opposite-sex classmates will create hostile educational environments.

4.    **Defendants' rule violates constitutional rights**..............................21

Defendants' rule violates the United States Constitution in two ways. First, it contravenes the Spending Clause, which is discussed in the following section. Second, it violates, and forces schools like Highland to violate, students' constitutional rights of bodily privacy. Students have a constitutional right to bodily privacy that forbids the government from placing them in situations where they will risk exposing their unclothed or partially clothed bodies "to viewing by the opposite sex." *Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008). Implementing the policy changes that Defendants demand will violate that right by forcing many students into situations where they must risk exposing their partiality or fully unclothed bodies to the opposite sex.

**B.      Defendants' actions violate the Spending Clause.** ................................. 23

     **1.      Defendants' rule violates the clear notice requirement.** ............. 23

Statutes like Title IX that are enacted under Congress's Spending Clause power must provide funding recipients with "clear notice" of their obligations. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Here, Title IX's plain language, its regulations, its legislative history, and widespread judicial precedent interpreting it all indicate that schools receiving federal funding may maintain multi-occupancy overnight accommodations, locker rooms, showers, and restrooms separated based on sex. But Defendants' new rule requires schools to allow some individuals to access sex-specific intimate facilities designated for the opposite sex. Because Highland did not have notice of this requirement when it agreed to accept federal funding subject to Title IX, *see Bennett v. New Jersey*, 470 U.S. 632, 638 (1985), Defendants' new rule violates the Spending Clause.

     **2.      Defendants' rule unlawfully attempts to commandeer Highland into implementing Defendants' gender-identity policies.** ....................................................................... 24

The federal government violates the Spending Clause when it conditions a substantial percentage of a governmental entity's budget on adopting a federal policy. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2604-05 (2012). Defendants are threatening to revoke all Highland's federal funding, which was 7.29% of its total funding for the 2015-2016 school year. That approximates the "gun to the head" commandeering that the Supreme Court invalidated in *NFIB*, *id.* at 2604; thus Defendants' rule violates the Spending Clause.

     **3.      Defendants' rule is unrelated to the purposes for the funding that they are threatening to revoke.** ............................... 25

The federal government violates the Spending Clause when it imposes a condition on the receipt of funding that is not "reasonably related to the purpose of [an] expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992). Highland receives federal money for special-education programs, lunches for underprivileged children, educational advancement, and teacher improvement. The purposes for that funding are entirely unrelated to a federal rule that seeks to control how schools regulate access to overnight accommodations, locker rooms, and restrooms. Defendants' actions thus violate the Spending Clause.

     **4.      Defendants' rule encounters an independent constitutional bar because it would force Highland to violate its students' privacy rights.** ............................................................................ 26

Federal funds cannot be conditioned on violating constitutional rights. *South Dakota v. Dole*, 483 U.S. 203, 210-11 (1987). Defendants contravene this by attempting to coerce Highland into violating its students' constitutional privacy rights.

**II.     Highland will suffer irreparable harm absent a preliminary injunction. ......... 26**

Without a preliminary injunction, Highland and the students whose rights it is obligated to protect will suffer irreparable harm in five ways.

First, Defendants' actions violate Highland's constitutional rights under the Spending Clause, and such a constitutional violation constitutes irreparable harm. *Am. Civil Liberties Union of Ky. v. McCreary Cty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003).

Second, Defendants' enforcement of their rule against Highland will essentially strip the district of its authority to enact policies that protect the dignity, privacy, and safety of its students. That intrusion into an important function of a local governmental entity like Highland constitutes irreparable injury. *Cf. Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (noting that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

Third, forcing Highland to change its privacy policies will substantially disrupt its operations and its ability to educate its students. This disruption to the learning environment is an irreparable harm.

Fourth, loss of federal funding will interfere with Highland's ability to carry out its educational mission and will result in real harm to its students through reduced educational resources. For example, many students who no longer receive free lunches will go hungry, and all students will receive less individualized attention because class sizes will increase.

Fifth, forcing Highland to open sex-specific intimate facilities to students of the opposite sex will violate students' constitutional rights to bodily privacy. This is demeaning to students and distracting to their education.

**III.    The balance of equities tips decisively in Highland's favor. ........................... 30**

As shown above, Highland will experience significant harms absent an injunction. In contrast, however, Defendants will not experience any harm if this Court enjoins their unlawful actions. Accordingly, the balance of equities favors Highland.

**IV.    The public interest favors a preliminary injunction. ....................................... 30**

A preliminary injunction will serve the public interest because "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). And the requested injunction will further the public interest in forestalling violations of federal law. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

**Conclusion................................................................................................................31**

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*A & E Coal Co. v. Adams,*
694 F.3d 798 (6th Cir. 2012) ............................................................................................. 16

*Abbott Laboratories v. Gardner,*
387 U.S. 136 (1967) ............................................................................................................ 8

*American Civil Liberties Union of Kentucky v. McCreary County, Kentucky,*
354 F.3d 438 (6th Cir. 2003) ....................................................................................... 26, 29

*Appalachian Power Co. v. Environmental Protection Agency,*
208 F.3d 1015 (D.C. Cir. 2000) ................................................................................... 16, 17

*Arizona Dream Act Coalition v. Brewer,*
747 F.3d 1053 (9th Cir. 2014) .......................................................................................... 31

*Arlington Central School District Board of Education v. Murphy,*
548 U.S. 291 (2006) .......................................................................................................... 23

*Barrick Goldstrike Mines, Inc. v. Browner,*
215 F.3d 45 (D.C. Cir. 2000) ........................................................................................... 10

*Bennett v. New Jersey,*
470 U.S. 632 (1985) .......................................................................................................... 24

*Bennett v. Spear,*
520 U.S. 154 (1997) ...................................................................................................... 8, 10

*Bethel School District No. 403 v. Fraser,*
478 U.S. 675 (1986) .......................................................................................................... 27

*Blaylock v. Cheker Oil Co.,*
547 F.2d 962 (6th Cir. 1976) ............................................................................................ 31

*Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls,*
536 U.S. 822 (2002) .......................................................................................................... 27

*Brannum v. Overton County School Board,*
516 F.3d 489 (6th Cir. 2008) ............................................................................................ 22

*Brown v. Gardner,*
513 U.S. 115 (1994) .......................................................................................................... 15

*Califano v. Sanders*,
    430 U.S. 99 (1997)................................................................................................9

*Canedy v. Boardman*,
    16 F.3d 183 (7th Cir. 1994)................................................................................22

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corporation*,
    511 F.3d 535 (6th Cir. 2007)................................................................................7

*Ciba-Geigy Corporation v. United States Environmental Protection Agency*,
    801 F.2d 430 (D.C. Cir. 1986)........................................................................8, 9

*City of Cleveland v. Ohio*,
    508 F.3d 827 (6th Cir. 2007)..............................................................................21

*Coalition for Economic Equity v. Wilson*,
    122 F.3d 718 (9th Cir. 1997)..............................................................................27

*Davis Next Friend LaShonda D. v. Monroe County Board of Education*,
    526 U.S. 629 (1999)............................................................................................23

*De Ja Vu of Nashville, Inc. v. Metropolitan Government of Nashville & Davidson County, Tennessee*,
    274 F.3d 377 (6th Cir. 2001)..............................................................................30

*Dismas Charities, Inc. v. United States Department of Justice*,
    401 F.3d 666 (6th Cir. 2005)..............................................................................17

*Doe v. Clark County School District*,
    No. 206-Cv-1074-JCM-RJJ, 2008 WL 4372872 (D. Nev. Sept. 17, 2008) ..................15

*Encino Motorcars, LLC v. Navarro*,
    --S.Ct--, No. 15-415, 2016 WL 3369424 (June 20, 2016) ................................20

*Everson v. Michigan Department of Corrections*,
    391 F.3d 737 (6th Cir. 2004)..............................................................................29

*First National Bank of Lexington, Tennessee v. Sanders*,
    946 F.2d 1185 (6th Cir. 1991) ...........................................................................16

*Food & Drug Administration v. Brown & Williamson Tobacco Corporation*,
    529 U.S. 120 (2000)............................................................................................11

*Franklin Federal Savings Bank v. Director, Office of Thrift Supervision*,
    927 F.2d 1332 (6th Cir. 1991) .........................................................................8, 9

*G.G. ex rel. Grimm v. Gloucester County School Board,*
  822 F.3d 709 (4th Cir. 2016) ........................................................... 11, 15

*G & V Lounge, Inc. v. Michigan Liquor Control Commission,*
  23 F.3d 1071 (6th Cir. 1994) .................................................................. 30

*General Electric Co. v. Environmental Protection Agency*
  290 F.3d 377 (D.C. Cir. 2002) ............................................................... 16

*Henderson v. Walled Lake Consolidated Schools,*
  469 F.3d 479 (6th Cir. 2006) .................................................................. 21

*Homemakers North Shore, Inc. v. Bowen,*
  832 F.2d 408 (7th Cir. 1982) .................................................................. 18

*Iowa League of Cities v. Environmental Protection Agency*
  711 F.3d 844 (8th Cir. 2013) .................................................................. 17

*Jeldness v. Pearce,*
  30 F.3d 1220 (9th Cir. 1994) .................................................................. 15

*Johnston v. University of Pittsburgh of Commonwealth System of Higher Education,*
  97 F. Supp. 3d 647 (W.D. Pa. 2015) ..................................................... 15

*Lee v. Downs,*
  641 F.2d 1117 (4th Cir. 1981) ............................................................... 29

*Liberty Coins, LLC v. Goodman,*
  748 F.3d 682 (6th Cir. 2014) .................................................................... 7

*M.C.I. Telecommunications Corporation v. American Telephone & Telegraph Co.,*
  512 U.S. 218 (1994) ............................................................................... 11

*Maryland v. King,*
  133 S. Ct. 1 (2012) ................................................................................. 27

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual*
  *Automobile Insurance Co.,*
  463 U.S. 29 (1983) ................................................................................. 18

*National Family Planning & Reproductive Health Association, Inc. v. Sullivan,*
  979 F.2d 227 (D.C. Cir. 1992) .......................................................... 17, 18

*National Federation of Independent Business v. Sebelius,*
  132 S. Ct. 2566 (2012) ...................................................................... 24, 25

*Natural Resources Defense Council, Inc. v. Costle,*
    568 F.2d 1369 (D.C. Cir. 1977) ...................................................................13

*New Jersey v. T.L.O.,*
    469 U.S. 325 (1985)........................................................................................28

*New Motor Vehicle Board of California v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) .....................................................................................27

*New York v. United States,*
    505 U.S. 144 (1992) .......................................................................................25

*O'Centro Espirita Beneficiente Uniao De Vegetal v. Ashcroft,*
    314 F.3d 463 (10th Cir. 2002) ......................................................................27

*Ohio Department of Human Services v. United States Department of Health & Human Services,*
    862 F.2d 1228 (6th Cir. 1988) ......................................................................16

*Overstreet v. Lexington-Fayette Urban County Government,*
    305 F.3d 566 (6th Cir. 2002)................................................................ 26, 29

*Pennhurst State School & Hospital v. Halderman,*
    451 U.S. 1 (1981) ................................................................................. 23, 24

*Planned Parenthood of Greater Texas Surgical Health Services v. Abbot,*
    734 F.3d 406 (5th Cir. 2013)..........................................................................27

*In re R.M.A. v. Blue Springs R-IV School District,*
    477 S.W.3d 185 (Mo. Ct. App. 2015) ..........................................................15

*Schroer v. Billington,*
    577 F. Supp. 2d 293 (D.D.C. Aug. 1, 2005) .................................................20

*South Dakota v. Dole,*
    483 U.S. 203 (1987)............................................................................... 25, 26

*Texas Children's Hospital v. Burwell,*
    76 F. Supp. 3d 224, (D.D.C. 2014) ...............................................................29

*Vernonia School District 47J v. Acton,*
    515 U.S. 646 (1995)........................................................................................27

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) .............................................................................. 22, 23

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................7

## Constitutional Provisions

U.S. Const. Art. I Sec. 8 .......................................................................................2, 22

## Statutes & Regulations

5 U.S.C. § 551 ........................................................................................................8

5 U.S.C. § 553 ......................................................................................................16

5 U.S.C. § 704 ........................................................................................................8

5 U.S.C. § 706 ..................................................................................................10, 21

20 U.S.C. § 1681 ...................................................................................1, 3, 12, 23

20 U.S.C. § 1682 ..................................................................................................11

20 U.S.C. § 1683 ....................................................................................................8

20 U.S.C. § 1686 ...............................................................................4, 13, 14, 20, 23

42 U.S.C. § 1983 ....................................................................................................5

42 U.S.C. § 13925 ............................................................................................4, 13

34 C.F.R. § 106.31 .................................................................................................3

34 C.F.R. § 106.32 ...........................................................................................4, 14, 20, 23

34 C.F.R. § 106.33 ...........................................................................................4, 14, 21, 23

## Other Authorities

117 Cong. Rec. 30407 (1971) .........................................................................14, 23

117 Cong. Rec 39260 (1971) ..........................................................................13, 14

118 Cong. Rec. 5807 (1972) ...........................................................................14, 24

*American College Dictionary* (1970) ...................................................................11

*American Heritage Dictionary* (1976) .................................................................11

American Psychological Association, *Answers to Your Questions About Transgender People, Gender Identity and Gender Expression,* http://www.apa.org/topics/lgbt/transgender.pdf.................................................................................................1, 12

*Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013)...................................................1

H.R. 1652 Student Non-Discrimination Act of 2013, 113th Congress (2013)....................3, 13

H.R. 1755 Employment Non-Discrimination Act of 2013, 113th Congress (2013-2014) .....13

*Implementing Title IX: The New Regulations*, 124 U. Pa. L. Rev. 806 (1976) ..................................14

*Random House College Dictionary* (rev. ed. 1980) .............................................................11

S. 439 Student Non-Discrimination Act of 2015, 114th Cong. (2015)..................................3, 13

## INTRODUCTION

Defendants United States Department of Education (DOE), United States Secretary of Education John B. King, Jr., United States Department of Justice (DOJ), United States Attorney General Loretta E. Lynch, and Principal Deputy Assistant Attorney General Vanita Gupta have attempted to rewrite Title IX of the Education Amendments of 1972. That statute prohibits schools that receive federal funding from discriminating "on the basis of sex." 20 U.S.C. § 1681(a). The term "sex," as used in both Title IX and this memorandum, is a binary concept that refers to one's biological status as either male or female determined at birth and manifested by biological indicators such as chromosomes, gonads, hormones, and genitalia. *See, e.g.*, Am. Psychological Ass'n, *Answers to Your Questions About Transgender People, Gender Identity and Gender Expression* at 1, http://www.apa.org/topics/lgbt/transgender.pdf (Ex. 9) ("*Sex* is assigned at birth, refers to one's biological status as either male or female, and is associated primarily with physical attributes such as chromosomes, hormone prevalence, and external and internal anatomy."); *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) ("DSM-5") (noting that sex "refer[s] to the biological indicators of male and female (understood in the context of reproductive capacity), such as in sex chromosomes, gonads, sex hormones, and nonambiguous internal and external genitalia").

Title IX does not include or in any way contemplate the distinct concept of "gender identity." In the more than four decades that have passed since that law's enactment, Congress has refused multiple times to add gender identity. Defendants have nevertheless decided to take matters into their own hands and accomplish the goal of rewriting the law by executive pronouncement. They did so by creating a new agency rule that implausibly

1

declares that the term "sex" in Title IX and its regulations includes "gender identity." Defendants' obvious end-run around Congress violates the Administrative Procedure Act (APA) and the Spending Clause in Article 1, Section 8 of the United States Constitution.

Defendants have made it abundantly clear that their new rule requires all schools that receive federal funding to allow students who profess a gender identity that conflicts with their sex to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex. In other words, schools must permit students who are male but profess a female identity to share sleeping quarters, shower facilities, and restrooms with female students. By creating and enforcing this rule, Defendants have shown no regard for the dignity and privacy rights of students who do not want to share these intimate facilities with students of the opposite sex. Nor have they shown regard for the schools that care about the interests and concerns of those students. In fact, Defendants are openly and aggressively threatening to revoke those schools' federal funding.

Plaintiff Board of Education of the Highland Local School District (Highland) now finds itself embroiled in Defendants' nationwide push to enforce their new Title IX rule. A student at one of Highland's schools professes a gender identity (female) that conflicts with that student's sex (male). For purposes of this litigation, Highland refers to that student as Student A. Highland has generally acceded to the requests of Student A's legal custodian to respect that student's gender-identity choice, but because of the dignity interests and privacy rights of other students, Highland has not allowed Student A to access intimate facilities like overnight accommodations, locker rooms, and restrooms designated for girls. Instead, Highland has provided Student A the option to access alternate private facilities, and in

doing so, has protected the dignity and privacy rights of all students. Highland, in short, has admirably navigated a difficult and sensitive situation.

Unfortunately, however, Defendants and their agents demand that Highland change its district policies to allow Student A (and all others who profess a gender identity that conflicts with their sex) to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex. Defendants have made it clear that Highland's federal funding is in jeopardy if it does not submit to Defendants' rewriting of Title IX. As a result, Highland faces an impossible choice: capitulate to Defendants' demands and sacrifice the dignity and privacy rights of its students; or protect those rights and watch Defendants strip away more than a million dollars each year in federal funding devoted to special-education programs, lunches for underprivileged children, and educational advancement. Faced with imminent and irreparable injury no matter what it does, Highland asks this Court to preliminarily enjoin Defendants from enforcing their unlawful executive-branch attempt to rewrite federal law and, in so doing, ensure that Highland will not need to cut programs that are vital to its students, especially underprivileged children and students struggling to learn.

## <u>BACKGROUND</u>

Title IX and its regulations prohibit discrimination "on the basis of sex." 20 U.S.C. § 1681(a); 34 C.F.R. § 106.31(a). Recognizing that the term "sex" does not include "gender identity," members of Congress have in recent years introduced legislation to add "gender identity" to Title IX, but none of those bills has been enacted as law. *See* H.R. 1652 Student Non-Discrimination Act of 2013, 113th Cong. (2013); S. 439 Student Non-Discrimination Act of 2015, 114th Cong. (2015); Verified Complaint ¶ 22 (hereinafter "Compl."). In other

areas of federal law, however, Congress has included proscriptions against discrimination based on both "sex" and "gender identity," clearly treating those categories as distinct. *See* Violence Against Women Act (VAWA), 42 U.S.C. § 13925(b)(13)(A) (including both "sex" and "gender identity" as separate categorical proscriptions); Compl. ¶ 23.

Against this legislative background, Defendants have created a new legislative rule to add "gender identity" to Title IX. *See* Compl. ¶¶ 34-38. Highland challenges two parts of this rule: first, the rule's declaration that the term "sex" in Title IX and its regulations includes "gender identity"; and second, the rule's directive that Title IX requires schools to allow students who profess a gender identity that conflicts with their sex to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex.

Defendants have announced this new rule in a number of documents published over the past few years, with the most definitive iteration coming in their May 13, 2016 "Dear Colleague" letter sent to public school districts throughout the country. *See* Dear Colleague Letter from U.S. Dep't of Justice Civil Rights Division and U.S. Dep't of Educ. Office for Civil Rights (May 13, 2016) (Ex. 3) (hereinafter "Dear Colleague Letter"); Compl. ¶¶ 35-37. In that letter, Defendants unequivocally declare that Title IX's prohibition on discrimination based on sex "encompasses discrimination based on a student's gender identity," Dear Colleague Letter at 1 (Ex. 3), and that a student's gender identity must be "treated as the student's sex for purposes of Title IX and its implementing regulations," *id.* at 2. Moreover, even though Title IX permits schools to provide "separate living facilities," including "separate housing" and "separate toilet, locker room, and shower facilities," for men and women, 20 U.S.C. § 1686; 34 C.F.R. §§ 106.32, 106.33; Compl. ¶¶ 24-30, the Dear Colleague

Letter declares that schools "*must* allow . . . students access to such facilities consistent with their gender identity," Dear Colleague Letter at 3-4 (Ex. 3) (emphasis added); Compl. ¶¶ 42-44. Defendants have clearly indicated that continued federal funding is dependent on a school's compliance with these new directives, *see* Dear Colleague Letter at 2 (Ex. 3); Compl. ¶ 45; and they are actively enforcing this new regime against school districts nationwide, Compl. ¶¶ 48-55.

Highland is one of those districts. *See* Compl. ¶¶ 97-131. Highland currently has a student (referred to as Student A for purposes of this litigation) who professes a gender identity (female) that conflicts with that student's sex (male). *Id.* ¶ 59. Highland has conscientiously sought to accommodate and respect Student A's gender-identity choice by not interfering with Student A's gender expression, but it cannot take steps that would adversely impact the dignity, privacy, safety, well-being, or rights of other students. *See id.* ¶¶ 68-73; 78-96. In particular, Highland has decided that it cannot alter its policy requiring students to use overnight accommodations, locker rooms, shower areas, and restrooms that correspond to their sex. *See id.* ¶¶ 68, 70, 74, 78. Highland has determined that changing that policy—and thereby allowing students to enter intimate facilities designated for the opposite sex—would not only sacrifice the dignity, privacy, and safety interests of its students, but would also expose Highland to potential liability under 42 U.S.C. § 1983 and even Title IX itself. *See id.* ¶¶ 68-93.

In December 2013, Student A's legal custodian filed a complaint with the Department of Education's Office for Civil Rights ("OCR"). Compl. ¶¶ 97-98. Except for the demand that Highland abandon its policy regarding access to sex-specific intimate

facilities, Highland has promptly addressed concerns raised by Student A's legal custodian. *Id.* ¶¶ 69, 101, 103. After concluding its investigation in March 2016, OCR sent Highland a proposed Resolution Agreement that would have required Highland to (1) change its policies to state that "sex discrimination . . . include[s] gender-based discrimination," (2) permit students whose gender identity conflicts with their sex to use overnight accommodations, locker rooms, and restrooms designated for the opposite sex, (3) hire a consultant with expertise in gender-identity issues, (4) conduct mandatory staff and student instruction on gender-identity issues, and (5) submit its operations to OCR's ongoing oversight. Compl. ¶¶ 107-14; Resolution Agreement at 2-8 (Ex. 4); Email from Ted Wammes, U.S. Dep't of Educ., Office for Civil Rights, to Andrew J. Burton (Mar. 30, 2016) (Ex. 5).

OCR made it clear to Highland that if it did not accept OCR's demands, Highland would be subject to an enforcement action that imperils its federal funding. Email from Ted Wammes, U.S. Dep't of Educ., Office for Civil Rights, to Andrew J. Burton (May 13, 2016) (Ex. 6); Compl. ¶ 123-127. Despite this threat, Highland determined that it could not accept the terms of the proposed agreement because, among other things, it wants to respect the dignity and privacy rights of all its students. Compl. ¶ 118; *see also id.* ¶¶ 119-122. Faced with Defendants' ominous threats, and left with no other legal options, Highland filed this suit to prevent Defendants from continuing down their unlawful path.

Upon learning of Highland's filing, on June 10, 2016, OCR sent Highland a Letter of Impasse, in which it indicated that unless a resolution was reached, OCR would "issue a letter finding the District in violation of Title IX." Letter of Impasse, U.S. Dep't of Educ. Office for Civil Rights, Region XV, at 2 (June 10, 2016) (Ex. 7). Then on June 28, 2016,

OCR issued a Letter of Findings, concluding "that [Highland] treated [Student A] differently on the basis of sex . . . in violation of Title IX" and further stating that "[i]f an agreement is not reached within 30 calendar days . . . OCR will issue a Letter of Impending Enforcement Action." Letter of Findings, U.S. Dep't of Educ. Office for Civil Rights, Region XV, at 12 (June 28, 2016) (Ex. 8) (hereinafter "Letter of Findings").

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must show that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of these factors "[should] be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). A preliminary injunction is particularly appropriate to preserve the status quo "until a trial on the merits can be held." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). As established below, this Court should enter an order preliminarily enjoining Defendants from enforcing their new Title IX rule against Highland.

### I.    Highland is likely to succeed on the merits.

To establish a strong likelihood of success on the merits, "[i]t is ordinarily sufficient if the plaintiff has raised questions . . . so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation." *Certified Restoration Dry Cleaning Network, LLC*, 511 F.3d at 543 (quotation marks omitted). Here, Highland is likely to succeed on the merits of its claims because (1) Defendants have created a final legislative rule in violation of the APA and (2)

Defendants' actions violate the Spending Clause. Highland is likely to prevail on these claims, but at the very least it has raised substantial questions on these issues. Therefore, this factor weighs in favor of issuing the requested preliminary injunction.

### A. Defendants' actions violate the Administrative Procedure Act.

Judicial review of agency action is authorized when a statute expressly permits it or when agency action is "final" and there is "no other adequate remedy in a court." 5 U.S.C. § 704. In this case, Title IX expressly permits judicial review, 20 U.S.C. § 1683, and Defendants' issuance of its new rule constitutes final agency action reviewable under the APA, *see* 5 U.S.C. § 551(13) ("'agency action' includes the whole or part of an agency rule . . . ."); 5 U.S.C. § 551(4) ("'rule' means the whole or part of an agency statement of general or particular applicability and future effect designed to implement . . . law or policy").

Under the APA, agency action is final if two conditions are met. The first is that "the action must mark the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). This ensures that courts do not review agency action that is "merely tentative or interlocutory" in nature. *Id.* at 178. In assessing whether this requirement is satisfied, courts consider "whether the agency views its deliberative process as sufficiently final to demand compliance with its announced position." *Franklin Fed. Sav. Bank v. Dir., Office of Thrift Supervision*, 927 F.2d 1332, 1337 (6th Cir. 1991) (quoting *Ciba–Geigy Corp. v. U.S. EPA,* 801 F.2d 430, 436 (D.C. Cir. 1986)). The second requirement of finality is that "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178. The requirement of finality is treated pragmatically. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other*

*grounds by Califano v. Sanders*, 430 U.S. 99 (1997). Thus, "[o]nce the agency publicly articulates

an unequivocal position . . . and expects regulated entities to alter their primary conduct to

conform," the agency can no longer insulate its actions from judicial review. *Franklin Fed.*

*Sav. Bank*, 927 F.2d at 1337.

　　Highland challenges two parts of Defendants' rule as articulated most recently in their

Dear Colleague Letter, and both of those parts satisfy the elements of finality. The first part

declares that the term "sex" in Title IX and its regulations includes "gender identity." Dear

Colleague Letter at 1 (Ex. 3). Over the last several years, Defendants have articulated this

position in several published documents. *See id.* at 7 n.10; Compl. ¶ 35. Their actions

culminated in their Dear Colleague Letter, which Defendants refer to as "*significant guidance.*"

Dear Colleague Letter at 1 (Ex. 3). That letter definitively asserts that Title IX's prohibition

on sex discrimination "encompasses discrimination based on a student's gender identity." *Id.*

And the letter further states that it "summarizes a school's Title IX *obligations*" regarding

students who profess a gender identity that differs from their sex and "explains how

[Defendants] *evaluate* a school's *compliance*." *Id.* (emphasis added). The requirements for

finality are thus met because the Dear Colleague Letter articulates legal obligations of

schools that receive federal funding and because Defendants have indicated that they

demand compliance. "[A]n agency may not avoid judicial review merely by choosing the

form of a letter to express its definitive position." *Ciba-Geigy Corp.*, 801 F.2d at 438 n.9.

　　The second part of Defendants' rule—which requires schools to allow students

whose gender identity conflicts with their sex to access overnight accommodations, locker

rooms, and restrooms designated for the opposite sex—also satisfies the finality

requirements. The Dear Colleague Letter directs in no uncertain terms that "students must be allowed to . . . access [sex-segregated] facilities consistent with their gender identity." Dear Colleague Letter at 3 (Ex. 3). The language employed by Defendants is not tentative; rather it is unequivocal on this point. This unqualified expression of official policy constitutes final agency action. If there were any doubt on this point, Defendants' efforts to imminently enforce the rule against Highland, *see* Compl. ¶¶ 3-4, 97-127; Email from Ted Wammes to Andrew J. Burton (May 13, 2016) (Ex. 6); Letter of Findings, at 12 (Ex. 8), confirm that the rule is final agency action. *See Bennett*, 520 U.S. at 178 (indicating that agency action is final if "legal consequences will flow" from it); *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) ("[A] letter from an agency official stating the agency's position and threatening enforcement action . . . constitute[s] final agency action.").

Having established that final agency action is at issue, Highland now discusses the four ways in which Defendants have violated the APA. The APA imposes several limitations on final agency action. Relevant to this motion, the APA states that a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be (A) arbitrary, capricious, . . . or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations . . . ; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). Defendants' rule violates each of these four limitations on agency action. As a result, that rule must be set aside.

10

**1.    Defendants have exceeded their statutory grant of authority.**

To determine whether an agency has exceeded its authority, a court must first examine the statute because an "agency's power to regulate . . . must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). Here, Congress has authorized agencies implementing Title IX to "issu[e] rules, regulations, or orders of general applicability which shall be *consistent with achievement of the objectives of the statute*." 20 U.S.C.A. § 1682 (emphasis added); *see also MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994) (noting that every congressional delegation of power implies that the agency is "bound . . . by the ultimate purposes" of the statute). Because Defendants' rule is not consistent with Title IX's objectives, as explained below, Defendants' actions in creating and enforcing that rule exceed their express grant of statutory authority.

Title IX's overriding objective is to prohibit federally funded schools from discriminating based on "sex." When Congress enacted Title IX in 1972, dictionaries defined "sex" as referring to the biological distinctions between men and women.[1] That Congress intended a binary understanding of the term "sex" is confirmed by Title IX's text, which repeatedly references "both sexes" and "students of one sex" as compared with "students of

---

[1] *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 736 (4th Cir. 2016) (Niemeyer, J., dissenting) (noting dictionaries contemporaneous to Title IX's enactment relied on biological distinctions to define sex, and including the following, among other, examples: *The Random House College Dictionary* 1206 (rev. ed. 1980) ("either the male or female division of a species, esp. as differentiated with reference to the reproductive functions"); *American Heritage Dictionary* 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions"); *The American College Dictionary* 1109 (1970) ("the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished . . . .")).

the other sex." *See, e.g.*, 20 U.S.C. § 1681(a)(2) (discussing "students of both sexes"); *id.* § 1681(a)(8) (discussing activities "provided for students of one sex" and "for students of the other sex").

Despite the clear meaning of the unambiguous word "sex," the first part of Defendants' new rule implausibly declares that "sex" in Title IX includes "gender identity." But gender identity is fundamentally different than sex in at least two ways. First, sex is determined at birth based on objective criteria, *see* Am. Psychological Ass'n, *Answers to Your Questions About Transgender People, Gender Identity and Gender Expression* at 1, http://www.apa.org/topics/lgbt/transgender.pdf (Ex. 9), whereas gender identity is based on an individual's current subjective perceptions—that is, his or her "internal sense of gender," Dear Colleague Letter at 1 (Ex. 3). Second, sex is binary (male or female), as the statutory language of Title IX makes clear, but gender identity, in stark contrast, has many more than two variations.[2] In short, then, gender identity is very different from sex, and replacing sex with gender identity ushers in a paradigm shift never intended by Congress, one in which a binary biological reality is replaced with multifarious professed identities based on internal perceptions.

---

[2] *See* Am. Psychological Ass'n, *Answers to Your Questions About Transgender People, Gender Identity and Gender Expression* at 2, http://www.apa.org/topics/lgbt/transgender.pdf (Ex. 9) (acknowledging that some "[g]enderqueer" people "identify their gender as falling outside the binary constructs of 'male' and 'female,'" and indicating that other gender identities include "androgynous, multigendered, gender nonconforming, third gender, and two-spirit"); Order, *In the Matter of the Sex Change of Jamie Shupe*, Multnomah Cty., Ore. (June 10, 2016), available at https://thelawworks.wordpress.com/2016/06/10/oregon-judge-grants-sex-change-to-non-binary/ (Ex. 10) (changing an individual's official sex designation from "female to non-binary"); Casey Parks, *Oregon court allows person to change sex from 'female' to 'non-binary,'* The Oregonian, http://www.oregonlive.com/portland/index.ssf/2016/06/oregon_court_allows_person_to.html (Ex. 11) (person who professes a "non-binary" sex stating "I consider myself as a third sex").

Other federal legislative action clearly shows that Congress understands gender identity to be distinct from sex. Notably, Congress recently added "gender identity"—right next to the word "sex"—in the Violence Against Women Act. 42 U.S.C. § 13925(b)(13)(A). But in contrast, Congress has repeatedly refused to add gender identity to Title VII or Title IX. *See, e.g.*, H.R. 1755 Employment Non-Discrimination Act of 2013, 113th Cong. (2013-2014); H.R. 1652 Student Non-Discrimination Act of 2013, 113th Cong. (2013); S. 439 Student Non-Discrimination Act of 2015, 114th Cong. (2015). Congress's voice thus could not be clearer: sex means sex and does not include gender identity. That "is the natural reading" of Title IX, and it alone "retains the fundamental logic of the statute." *Nat. Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1375-76 (D.C. Cir. 1977). Thus, the first part of Defendants' rule exceeds their statutory authority.

The second part of Defendants' rule similarly extends beyond their statutory authority. That part of the rule requires that "when a school provides sex-segregated . . . facilities," students who profess a gender in conflict with their sex "must be allowed to . . . access such facilities consistent with their gender identity." Dear Colleague Letter at 3 (Ex. 3). This portion of Defendants' rule applies to (among other things) a school's overnight accommodations, locker rooms, and restrooms. *Id.* at 3-4.

Three factors demonstrate that Defendants exceeded their statutory authority when addressing overnight accommodations: (1) the plain language of Title IX, (2) its legislative history, and (3) DOE's own regulations. First, Title IX expressly states that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate *living facilities* for the different sexes." 20 U.S.C. §

13

1686 (emphasis added). Second, Title IX's legislative history shows that Congress intended to permit schools to provide separate sleeping facilities based on sex.[3] Third, DOE's own regulations state that schools "may provide separate housing on the basis of sex." 34 C.F.R. § 106.32. Now, however, Defendants' pronouncement that "students [must be allowed] to access housing" and overnight accommodations "consistent with their gender identity," Dear Colleague Letter at 4 (Ex. 3), directly contradicts these indicators of congressional intent. Requiring schools to allow students access based on gender identity necessarily forecloses them from maintaining separate overnight accommodations based on sex.

Furthermore, Defendants also acted beyond their authority when they decreed their new rule concerning locker-room and restroom access. Dear Colleague Letter at 3 (Ex. 3). When DOE effectuated the "separate living facilities" provision in Title IX, 20 U.S.C. § 1686, it adopted a regulation that allows schools to maintain "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33; *see also Implementing Title IX: The New Regulations,* 124 U. Pa. L. Rev. 806, 811 (1976). But Defendants now contradict the language of DOE's own regulation by demanding that schools "must allow" students who profess a gender identity that conflicts with their sex to access locker rooms and restrooms "consistent with their gender identity." Dear Colleague Letter at 3 (Ex. 3). After all, if schools must open locker rooms, showers, and restrooms based on professed gender identity, they will be required to allow boys into the girls' locker room (and vice versa). By

---

[3] *See* 117 Cong. Rec. 39260 (1971) (discussing an eventually implemented amendment to Title IX that would ensure that schools can have "separate living facilities for the different sexes"); 117 Cong. Rec. 30407 (1971) (Senator Bayh, Title IX's sponsor, stating "I do not read this as requiring integration of dormitories between the sexes"); 118 Cong. Rec. 5807 (1972) (Senator Bayh indicating that "differential treatment by sex" will be allowed in "instances where personal privacy must be preserved").

establishing its new rule, then, DOE has nullified, rather than clarified, its regulation on locker-room, shower, and restroom facilities.

Before Defendants created their new rule, courts widely held that Title IX and its regulations permit schools to provide sex-specific locker-room, shower, and toilet facilities based on sex. *See, e.g.*, *Jeldness v. Pearce*, 30 F.3d 1220, 1228 (9th Cir. 1994) (finding it "clear" that Title IX and its regulations allow "separate toilet, shower and locker room facilities"); *Johnston v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 670 (W.D. Pa. 2015), *appeal dismissed* (March 30, 2016) (recognizing that Title IX allows schools to "separat[e] students by sex based on biological considerations—which involves the physical differences between men and women—for restroom and locker room use"); *Doe v. Clark Cty. Sch. Dist.*, No. 206-CV-1074-JCM-RJJ, 2008 WL 4372872, at *4 (D. Nev. Sept. 17, 2008) (noting that Title IX does not require a school to allow students to use restrooms that correspond with their gender identity); *In re R.M.A. v. Blue Springs R-IV Sch. Dist.*, 477 S.W.3d 185, 187 (Mo. Ct. App. 2015) (dismissing appeal on procedural grounds and noting the court's ruling that the student had "no existing, clear, unconditional legal right which allows . . . access [to] restrooms or locker rooms consistent with . . . gender identity").

A divided Fourth Circuit panel recently disagreed, concluding that the applicable regulation is "susceptible to more than one plausible reading" and that DOE's view is entitled to deference. *G.G. ex rel. Grimm*, 822 F.3d at 720-21. That court is mistaken. "Ambiguity is a creature not of *definitional possibilities* but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 117-18 (1994) (emphasis added). Here, as explained above, the statutory context shows that "sex" in Title IX does not include "gender identity," that DOE

15

regulations permit schools to maintain separate locker-room and restroom facilities based on sex, and that Defendants' rule would as a practical matter forbid schools from maintaining biologically based locker-room and restroom policies. Deference is never appropriate where, as here, federal agencies seek to rewrite unambiguous statutory and regulatory language.

**2.     Defendants did not follow the requisite notice-and-comment procedures when creating their legislative rule.**

The APA requires agencies to comply with notice-and-comment procedures when creating legislative or substantive (as opposed to interpretive) rules. 5 U.S.C. § 553(b); *First Nat'l Bank of Lexington, Tenn. v. Sanders*, 946 F.2d 1185, 1188 (6th Cir. 1991). As explained below, the Title IX rule that Defendants have created and are enforcing against Highland is legislative. Therefore, it must be set aside because Defendants have not satisfied any of the requisite procedures. *Ohio Dep't of Human Servs. v. U.S. Dep't of Health & Human Servs.*, 862 F.2d 1228, 1237 (6th Cir. 1988).

The hallmark of a legislative rule is that it "has the force of law." *Ohio Dep't of Human Servs.*, 862 F.2d at 1233; *see also Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002) (noting that the chief inquiry in deciding whether a rule is legislative is "whether the agency action binds private parties or the agency itself with 'the force of law'"). A rule's binding nature may be demonstrated on its face or in its application. *A & E Coal Co. v. Adams*, 694 F.3d 798, 801 (6th Cir. 2012).

The face of Defendants' rule shows that it is binding because it "is couched in mandatory language." *Gen. Elec. Co.*, 290 F.3d at 383. Indeed, the Dear Colleague Letter "reads like a ukase." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). It uses the word "must," for example, at least fifteen times to describe the obligations of

schools. *See* Dear Colleague Letter at 2-5 (Ex. 3). Defendants' heavy reliance on this obligatory language undermines their claim that the Dear Colleague Letter is "significant guidance," as opposed to a legislative rule, because "significant guidance documents should not include mandatory language such as 'shall,' 'must,' 'required' or 'requirement.'" Final Bulletin for Agency Good Guidance Practices at 12-13 (2007) (Ex. 12). Defendants' consistent use of mandatory terminology demonstrates their intent to bind schools, including Highland, with the force of law.

Defendants' enforcement of the rule also shows that they intend it to be binding. Defendants act as if their gender-identity decree is "controlling in the field." *Appalachian Power*, 208 F.3d at 1021. They have been enforcing their rule against schools throughout the country. Compl. ¶ 48. And now DOE is enforcing it against Highland. Compl. ¶¶ 3-4, 97-127; Letter of Findings at 12 (Ex. 8) ("[W]ithin 30 calendar days . . . OCR will issue a Letter of Impending Enforcement Action."). Because Defendants are widely enforcing the rule, "[it] is for all practical purposes 'binding.'" *Appalachian Power*, 208 F.3d at 1021.

Another characteristic of a legislative rule is that it adds substantive content to the existing statutory and regulatory requirements. *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 680 (6th Cir. 2005) (stating that an agency creates a legislative rule when it "is adding substantive content of its own" and not "merely explicating Congress' desires"); s*ee also Iowa League of Cities v. EPA*, 711 F.3d 844, 873 (8th Cir. 2013) ("Expanding the footprint of a regulation . . . is the hallmark of legislative rules."). "When 'an agency gets out the Dictionary of Newspeak and pronounces that for purposes of its regulation war is peace, it has made a substantive change." *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*,

979 F.2d 227, 235 (D.C. Cir. 1992) (quoting *Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408, 412 (7th Cir. 1982)). Here, Defendants have decreed that "sex" includes the fundamentally distinct concept of "gender identity," and in so doing, they have added substantive content that Congress has specifically and repeatedly decided not to include. Moreover, instead of allowing schools to maintain sex-specific overnight accommodations, locker rooms, and restrooms, Defendants have effectively changed Title IX to mandate that schools must permit students to use facilities that correspond to their professed gender identity. That drastic paradigm shift undoubtedly adds substantive content to what Congress intended Title IX to require.

Because Defendants have created a legislative rule without following the APA's notice-and-comment procedures, this Court should set it aside.

### 3. Defendants' rule is arbitrary, capricious, and not in accordance with law.

An agency rule is arbitrary and capricious if the agency "relied on factors" that Congress did not intend for the agency to consider, "entirely failed to consider an important aspect of the problem," or "offered an explanation . . . that . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants' rule is arbitrary and capricious under this standard.

To begin with, Defendants relied on a concept—gender identity—that Congress did not intend for them to consider. As explained above, Title IX's text, context, and legislative history demonstrate that Congress, by using the term "sex," did not intend to codify the altogether distinct and subjective notion of gender identity. *See supra* at 11-16.

In addition, Defendants failed to consider the practical problems that schools will face if they regulate students' access to overnight accommodations, locker rooms, and restrooms based on professed gender identity. First, Defendants ignore that some people profess gender identities (like nonbinary or genderqueer) that are neither male nor female, *see supra* at 12 n.2, and that, under Defendants' rule, any student professing such an identity must be permitted to use any sex-specific facilities they want. Second, according to Defendants, schools must defer to a student's professed gender identity (or a parent's profession of his or her child's gender identity) *without any medical diagnosis or verification*. Dear Colleague Letter at 2 (Ex. 3). The absence of any verification requirement is extremely problematic. Dodds Decl. ¶ 37 (Ex. 1). It would permit, for example, a male adolescent to begin professing a female identity in order to access girls' intimate facilities for the purpose of viewing them in various states of undress. *See* Compl. ¶ 89; Dodds Decl. ¶ 37 (Ex. 1). Third, Defendants fail to adequately account for the many students who, for dignity and privacy reasons, do not want to share sex-specific facilities with the opposite sex. *See* Dodds Decl. ¶ 38 (Ex. 1). Defendants acknowledge that schools *may* accommodate with individual-user facilities any student voluntarily seeking additional privacy. Dear Colleague Letter at 2-4 (Ex. 3). But Defendants ignore that many schools like Highland do not have, and that they lack the funding to create, sufficient individual-user facilities to accommodate all the students who assert their dignity and privacy rights. *See* Dodds Decl. ¶ 41 (Ex. 1).

In situations where an agency seeks to change the law, the agency acts in an arbitrary and capricious manner if it does not, at the very least, "display awareness that it is changing

19

position." *Encino Motorcars, LLC v. Navarro,* -- S. Ct. --, No. 15-415, 2016 WL 3369424 at *7 (June 20, 2016). In this case, Defendants have changed their position. For approximately 40 years, schools have understood that Title IX prohibits them from discriminating based on sex (not gender identity). Federal agencies have historically affirmed that understanding of "sex" in federal nondiscrimination law. For example, the DOJ filed a brief in 2006 arguing that "the term 'sex,' as used in Title VII, prohibits discrimination based on the *biological state of a male or female*" and does not prohibit discrimination "based on an individual's sexual identity disorder or discontent with the sex into which they were born." Mot. to Dismiss at 6, 7, *Schroer v. Billington*, 577 F. Supp. 2d 293, Case No. 1:05-cv-01090-JR (D.D.C. Aug. 1, 2005), ECF No. 7 (quotations omitted; emphasis added). But Defendants have now changed their position, announcing that "sex" includes "gender identity." By failing to acknowledge that their current position on the meaning of "sex" is different from their old one, Defendants have engaged in arbitrary and capricious action.

Defendants have similarly changed their policies on overnight accommodations. For four decades, the text of Title IX and its regulations have unambiguously proclaimed that housing and sleeping accommodations can be separated based on sex. 20 U.S.C. § 1686; 34 C.F.R. § 106.32. But now, Defendants have announced that such accommodations can be separated only based on gender identity, which means that students of one sex will be able to access overnight accommodations designated for the other sex. Because Defendants do not acknowledge their change of policy, they have acted arbitrarily and capriciously.[4]

---

[4] Because Defendants' new position on overnight accommodations directly contradicts the statutory language that expressly allows schools to separate those accommodations based on sex, 20 U.S.C. § 1686, it is not only arbitrary and capricious, but also not in accordance with

The same is true of Defendants' rule on locker-room and restroom access. DOE regulations have always interpreted Title IX's "separate living facilities" provision as permitting schools to separate locker rooms, showers, and toilet facilities based on sex. 34 C.F.R. § 106.33. Yet Defendants have changed course, declaring that schools may separate those facilities based only on professed gender identity. Again, Defendants fail to acknowledge the change in policy, and thus their actions are arbitrary and capricious.

Finally, in addition to being arbitrary and capricious, Defendants' rule is also contrary to law because instead of bringing schools like Highland into compliance with Title IX, it will actually force them to violate Title IX, as properly understood, by creating hostile environments based on sex. *See Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 489 (6th Cir. 2006) (discussing a Title IX hostile-environment claim). School policies that require students to change clothes, sleep, and use the restroom with the opposite sex will create "offensive educational environment[s]" for many students. *Id.* Defendants' rule will thus engender the type of sex-based hostile environments that Title IX sought to end. *See* Compl. ¶ 86; Dodds Decl. ¶ 39 (Ex. 1). In this way, Defendants' actions are not in accordance with law and should be set aside.

### 4.  Defendants' rule violates constitutional rights.

Agency rules that violate constitutional rights must be set aside. 5 U.S.C. § 706(2)(B). Defendants' rule violates the United States Constitution in two ways. First, it contravenes the Spending Clause in Article I, Section 8, as discussed in the next section. *See infra* at 23-26.

---

law. *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007) ("Agency action is 'not in accordance with the law' when it is in conflict with the language of the statute.").

Second, Defendants' rule violates, and forces schools like Highland to violate, students' constitutional rights of bodily privacy.

Fundamental constitutional rights are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). "[A]n abundance of common experience . . . leads inexorably to the conclusion that there must be a fundamental constitutional right to be free from forced exposure of one's person to strangers of the opposite sex." *Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d 489, 495 (6th Cir. 2008). The Sixth Circuit has thus recognized that all individuals, including students, have a constitutional right to bodily privacy that forbids the government from placing them in situations where they will risk exposing their unclothed or partially clothed bodies "to viewing by the opposite sex." *Id.* at 494; *see also Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) (stating that "it is generally considered a greater invasion [of privacy] to have one's naked body viewed by a member of the opposite sex").

Allowing students to access overnight accommodations, locker rooms, or restrooms designated for the opposite sex so long as they profess an opposite-sex identity, as Defendants' rule requires, will violate the constitutional privacy rights of other students using those shared facilities. This is because those students will be placed in situations where they must risk exposing their partiality or fully unclothed bodies to people of the opposite sex. *See* Dodds Decl. ¶ 31 (Ex. 1) (explaining that middle-school and high-school students must enroll in physical-education class and that those students must change their clothes before and after that class); *id.* ¶ 32 (explaining that "two students of the same sex typically share a single bed" on overnight school trips). "[N]either liberty nor justice would exist,"

22

*Glucksberg*, 521 U.S. at 721, if schools compel students to change clothes, sleep, or use the restroom with the opposite sex. Accordingly, Defendants' rule violates fundamental constitutional rights and must be set aside.

### B.     Defendants' actions violate the Spending Clause.

#### 1.     Defendants' rule violates the clear notice requirement.

Title IX was "enacted pursuant to Congress' authority under the Spending Clause." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). When Congress exercises this power, "it generates legislation 'much in the nature of a contract: in return for federal funds, the States [or their political subdivisions] agree to comply with federally imposed conditions.'" *Id.* (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). The nature of the exchange necessitates that Congress state the conditions unambiguously so that the recipients can voluntarily and knowingly decide whether to accept funding. *Pennhurst*, 451 U.S. at 17. The Spending Clause thus requires that federal law provides a funding recipient "clear notice" of its obligations. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

Here, Title IX's plain language, its regulations, its legislative history, and widespread judicial precedent interpreting it all indicate that the statute allows schools that receive federal funding to maintain multi-occupancy overnight accommodations, locker rooms, showers, and restrooms separated based on sex. *See* 20 U.S.C. §§ 1681, 1686; 34 C.F.R. § 106.32 (permitting "separate housing on the basis of sex"); 34 C.F.R. § 106.33 (permitting "separate toilet, locker room, and shower facilities on the basis of sex"); 117 Cong. Rec. 30407 (1971) (Title IX's sponsor stating "I do not read this as requiring integration of

23

dormitories between the sexes," and "[w]e are not requiring that . . . the men's locker room be desegregated"); 118 Cong. Rec. 5807 (1972) (sponsor noting that in certain facilities "personal privacy must be preserved"); *supra* at 15 (collecting cases). Given all this, Highland could not have possibly known when it agreed to accept federal funding subject to Title IX's demands that receipt of funds for special-education programs, free and reduced cost lunches, and educational advancement resources would be conditioned on allowing some individuals to access sex-specific intimate facilities designated for the opposite sex. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that "practical considerations . . . imply that obligations [under federal grant programs] generally should be determined by reference to the law in effect when the grants were made"). Because the federal government cannot "surpris[e] participating States" and local governmental entities "with post acceptance . . . conditions," *Pennhurst*, 451 U.S. at 25, Defendants' rule violates the Spending Clause.

## 2. Defendants' rule unlawfully attempts to commandeer Highland into implementing Defendants' gender-identity policies.

Congress's Spending Clause power allows it to encourage states and their political subdivisions to adopt desired federal policies. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2602 (2012). But Congress cannot use that "pressure" to effectively compel compliance with its mandates. *Id.* Federalism does not permit Congress to "coerce[] a State to adopt [federal regulation] as its own." *Id.* Where the federal government conditions a substantial percentage of a local governmental entity's budget on adopting a federal policy, the Supreme Court has recognized that "the financial 'inducement'" leaves "no real choice" but acquiescence. *Id.* at 2604-05, 2608; *see also id.* at 2604-05 (concluding that although "the

threatened loss of less than one half of one percent of [a governmental entity's] budget" was not coercive in *South Dakota v. Dole*, 483 U.S. 203 (1987), "[t]he threatened loss of over 10 percent of [a governmental entity's] overall budget . . . is economic dragooning that leaves the [entity] with no real option").

Here, DOE has threatened to revoke all Highland's federal funding. Compl. ¶¶ 126-27. For the 2015-2016 school year, Highland received $1,123,390 in federal funding—7.29% of its total funding for the year. Dodds Decl. ¶ 17 (Ex. 1); Compl. ¶ 128. That approximates the "gun to the head" commandeering that the Supreme Court invalidated in *NFIB*, 132 S. Ct. at 2604, and thus Defendants' rule violates the Spending Clause.

### 3. Defendants' rule is unrelated to the purposes for the funding that they are threatening to revoke.

The federal government violates the Spending Clause when it seeks to impose a condition on the receipt of funding that is not "reasonably related to the purpose of the expenditure" at issue. *New York v. United States*, 505 U.S. 144, 172 (1992). The federal dollars that Highland receives are designated for special-education programs, lunches for underprivileged children, educational advancement, and teacher improvement. *See* Dodds Decl. ¶ 17 (Ex. 1); Compl. ¶ 129. Defendants here seek to condition that funding on Highland's willingness to allow students who profess a gender identity inconsistent with their sex to access sex-specific overnight accommodations, locker rooms, and restrooms reserved for the opposite sex. But that condition is completely unrelated to the objectives of the federal funds that Highland receives. Thus, Defendants' actions violate the Spending Clause.

4. **Defendants' rule encounters an independent constitutional bar because it would force Highland to violate its students' privacy rights.**

Congress may not use its Spending Clause power "to induce the States" or other local governmental entities "to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210-11 (explaining that if "federal funds" were "conditioned on" violating constitutional rights, that "would be an illegitimate exercise of the . . . spending power"). But here, as already discussed, Defendants' rule would force Highland into violating its students' constitutional rights to privacy. *See supra* at 22-23. This "constitutes 'an independent constitutional bar' to the conditional grant of federal funds." *Dole*, 483 U.S. at 209. The Spending Clause thus prohibits Defendants from imposing their rule on Highland.

## II. Highland will suffer irreparable harm absent a preliminary injunction.

Without a preliminary injunction, Highland and the students whose rights it is obligated to protect will suffer irreparable harm in multiple ways.

First, a preliminary injunction is necessary to prevent a violation of Highland's constitutional rights. "[I]f it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Am. Civil Liberties Union of Ky. v. McCreary Cty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003). As previously established, Defendants' actions violate Highland's constitutional rights under the Spending Clause. Highland has thus demonstrated irreparable harm. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("a plaintiff can demonstrate . . . irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights").

Second, Defendants' enforcement of their rule against Highland will essentially strip the school district of its authority to enact policies that protect the dignity, privacy, and safety of its students. *See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 829 (2002) (discussing public schools' "'custodial and tutelary responsibility for children'") (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995)); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986) (recognizing "the obvious concern on the part of . . . school authorities acting *in loco parentis*[] to protect children"). Defendants demand that Highland immediately stop enforcing its policies that regulate student access to intimate facilities like overnight accommodations, locker rooms, and restrooms. But forcing Highland to do that is an invasion of its authority to act in the best interests of its students. That intrusion into an important function of a local governmental entity like Highland constitutes irreparable injury. *Cf. Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (noting that "'any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury'") (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) (similar); *O'Centro Espirita Beneficiente Uniao De Vegetal v. Ashcroft*, 314 F.3d 463, 467 (10th Cir. 2002) (similar); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) (similar).

Third, forcing Highland to change its policies on overnight accommodations, locker rooms, and restrooms will likely cause substantial disruption to the school's operations and thus to its ability to educate its students. Dodds Decl. ¶ 42 (Ex. 1). During and immediately

after the DOE's investigation of Highland, many concerned parents whose children attend Highland schools strenuously objected to any policy change that would allow some students to access facilities designated for the opposite sex. *Id.* ¶¶ 35-36. Compelling Highland to take an action that is so controversial within the community is bound to significantly disrupt Highland's efforts to educate the children entrusted to it. *Id.* ¶¶ 42-43 ("That controversy would be detrimental to the learning environment"). This too is an irreparable harm. *See New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (noting "the substantial need of teachers and administrators . . . to maintain order in the schools").

Fourth, the impending revocation of federal funding will similarly interfere with the school's ability to carry out its educational mission and will result in irreparable harm to the students. When Defendants revoke federal funding, many students who are nourished by the school lunch program will go hungry and struggle to focus; other children who thrive in Highland's special-education classes will be harmed when some of the resources available to those classes are eliminated; and students who benefit from Highland's efforts to reduce class sizes will suffer as they receive less individualized attention from Highland's staff. Dodds Decl. ¶¶ 19, 23 (Ex. 1); *see also id.* ¶ 22 ("Students who are hungry typically suffer from an inability to focus, do not perform as well as their peers, and, especially at the elementary school level, may be prone to negative outbursts or behavior."). All this harm is irreparable because even if the federal funding is eventually reimbursed, the harm to Highland and its students that occurs in the interim can never be remedied. *Id.* ¶ 25. Indeed, subsequent funding simply cannot recompense for the difficult days when children experience hunger or otherwise struggle to learn as a result of fewer available educational

resources. *Id.* These harms to students are irreparable. *See Overstreet*, 305 F.3d at 578 (holding that a "plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages"); *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 243 (D.D.C. 2014) (finding that nonprofit hospitals would likely suffer irreparable harm because the threatened loss of funds "would mean reducing hospital services to children").

Fifth, every day that Highland is compelled to open sex-specific overnight accommodations, locker rooms, and restrooms to some students of the opposite sex is a day that many students will be deprived of their constitutional rights to bodily privacy. Those students will be forced to use intimate facilities knowing that an opposite-sex student might enter at any time when they are in various states of undress. Imposing this environment on students throughout the district is demeaning to them and distracting to their educational tasks. *See Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 757 (6th Cir. 2004) ("[I]nvoluntary exposure of [one's unclothed body] in the presence of people of the other sex may be especially demeaning and humiliating.") (quoting *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981)); Dodds Decl. ¶ 41 (Ex. 1). No after-the-fact relief can atone for each day that Highland's students are forced to endure this violation of their constitutional right to bodily privacy. *See Am. Civil Liberties Union of Ky.*, 354 F.3d at 445 (noting that "a finding of irreparable injury is mandated" where "a constitutional right is being threatened or impaired").

29

## III.    The balance of equities tips decisively in Highland's favor.

As explained above, Highland will experience significant harms absent an injunction. In contrast, however, Defendants will not experience any harm if this Court enjoins their unlawful actions. Accordingly, the balance of equities favors Highland.

Defendants might argue that an injunction would harm them by preventing them from pursuing their enforcement action against Highland. But as Highland has shown, the predicate for that enforcement action—Defendants' Title IX rule—is itself unlawful. Therefore, Defendants will not be harmed by a preliminary injunction. *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001) (noting that if a "plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment").

Nor can Defendants establish that Student A would be harmed by the requested injunction. Highland has provided, and will continue to provide, nearby single-use restrooms for Student A and Student A's classmates to use. *See* Compl. at ¶¶ 94-96. Highland thus will continue to ensure that Student A has access to restroom facilities, that Student A is not treated differently than Student A's classmates, and that the dignity and privacy of every student in the district is honored and protected. An injunction will therefore harm no one.

## IV.    The public interest favors a preliminary injunction.

A preliminary injunction will serve the public interest because "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). And the requested injunction will further the public interest in preventing the government from "violat[ing] the

requirements of federal law." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Finally, given that Defendants are actively using their Title IX rule to commandeer the policies of schools like Highland and force them to violate the dignity and privacy rights of their students, the public interest would be served by preserving the status quo until this Court can adjudicate the matter once and for all. *See Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976) ("The general function of a preliminary injunction is to maintain the status quo pending determination of an action on its merits.").

## **CONCLUSION**

For the foregoing reasons, Highland respectfully asks that this Court issue the preliminary injunction that Highland requests in its accompanying motion.

Date: July 15, 2016

Respectfully submitted,

s/ James A. Campbell
James A. Campbell, OH Bar No. 0081501
   *Trial Attorney*
Kenneth J. Connelly, AZ Bar No. 025420*
Jeana Hallock, AZ Bar No. 032678*
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jcampbell@ADFlegal.org
kconnelly@ADFlegal.org
jhallock@ADFlegal.org

J. Matthew Sharp, GA Bar No. 607842*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
msharp@ADFlegal.org

Andrew J. Burton, OH Bar No. 0083178
RENWICK, WELSH & BURTON LLC
9 North Mulberry Street
Mansfield, Ohio 44902
(419) 522-2889
(419) 525-4666 Fax
andrew@rwblawoffice.com

*Counsel for Plaintiff*
*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2016, I filed the foregoing Motion for Preliminary

Injunction, Memorandum of Law in Support, and accompanying documents through the

Court's ECF system. Because Defendants have not yet entered an appearance, I have served

Defendants via U.S. Certified Mail, Return Receipt Requested, as follows:

<table>
<tr><td>U.S. Department of Education<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202</td><td>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530</td></tr>
<tr><td>John B. King, Jr.<br>U.S. Secretary of Education<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202</td><td>Loretta E. Lynch<br>U.S. Attorney General<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530</td></tr>
<tr><td>Civil Process Clerk<br>U.S. Attorney's Office<br>303 Marconi Blvd., Suite 200<br>Columbus, OH 43215</td><td>Vanita Gupta<br>Principal Deputy Assistant Attorney General<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530</td></tr>
</table>

s/ James A. Campbell
James A. Campbell