# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| Board of Education of the Highland Local School District, | |
| Plaintiff, | |
| vs. | Case No: 2:16-cv-524 |
| United States Department of Education; John B. King, Jr., in his official capacity as United States Secretary of Education; United States Department of Justice; Loretta E. Lynch, in her official capacity as United States Attorney General; and Vanita Gupta, in her official capacity as Principal Deputy Assistant Attorney General, | Judge Algenon L. Marbley<br>Magistrate Judge Kimberly A. Jolson |
| Defendants. | |

_____

| |
|---|
| Jane Doe, a minor, by and through her legal guardians Joyce and John Doe, |
| Intervenor Third-Party Plaintiffs, |
| vs. |
| Board of Education of the Highland Local School District; Highland Local School District; William Dodds, Superintendent of Highland Local School District; and Shawn Winkelfoos, Principal of Highland Elementary School, |
| Third-Party Defendants. |

---

**Board of Education of Highland Local School District's Response in Opposition to Intervenor Third-Party Plaintiffs' Motion for Preliminary Injunction**

---

Gary S. McCaleb, AZ 018848*
Steven O'Ban, WA 17265**
Douglas G. Wardlow, AZ 032028**
Jeana Hallock, AZ 032678*
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
gmccaleb@ADFlegal.org
soban@ADFlegal.org
dwardlow@ADFlegal.org
jhallock@ADFlegal.org

J. Matthew Sharp, GA 607842*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
msharp@ADFlegal.org

David Langdon, OH 0067046
   Trial Attorney
LANGDON LAW, LLC
8913 Cincinnati Dayton Road
West Chester, Ohio 45069
(513) 577-7380
(513) 577-7383 Fax
dlangdon@langdonlaw.com

Andrew J. Burton, OH 0083178
RENWICK, WELSH & BURTON LLC
9 North Mulberry Street
Mansfield, Ohio 44902
(419) 522-2889
(419) 525-4666 Fax
andrew@rwblawoffice.com

Matthew John Markling, OH 0068095
Sean Koran, OH 0085539
Patrick Vrobel, OH 0082832
MCGOWN & MARKLING CO., L.P.A.
1894 N. Cleveland-Massillon Road
Akron, Ohio 44333
(330) 670-0005
(330) 670-0002 Fax
mmarkling@mcgownmarkling.com
skoran@mcgownmarkling.com
pvrobel@mcgownmarkling.com

*Counsel for Third Party Defendant, Board of Education of the Highland Local School District*
*Admitted Pro Hac Vice*
** *Application for Pro Hac Vice Admission forthcoming*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................vi

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ............................................................................................3

I.   Sex and Gender Identity ....................................................................................3

Doe seeks preliminary injunction relief based on an understanding of sex and gender identity that contradicts the science of medicine, which defines sex according to a person's unalterable reproductive role and recognizes that it flows from unchanging genetic characteristics. As such, sex is immutable, objective, and binary. By contrast, gender identity is a fluid and subjective psychological construct. There is no scientific basis for the proposition that one's gender identity is based on innate or fixed structural or functional differences in the brain. Doe's contention that appropriate treatments for gender dysphoria necessarily involve affirmation of a child's gender identity is also lacks a scientific basis. In fact, research reveals a real possibility that strategies of gender-identity affirmation may actually lead to additional harm.

II.   Highland's Support of Doe, Doe's Family, And All of Highland's Students. .............5

Highland, its administrative staff, and teachers are committed to creating a learning environment that is conducive to students' emotional, social and academic success. To that end, they provide a number of services to all of their students, including two licensed social workers, a school psychologist, and a licensed nurse. Doe and Joyce Doe have benefited from the services offered by each of these staff members. Highland staff members have a record of being attentive and responsive to the needs of parents and students, including the requests of Joyce Doe and the needs of Doe.

Highland has at all times acted in the best interests of Doe and of all of its students. Although Highland was unable to allow Doe access to the communal female restrooms out of concern for its duties to its other students, Highland offered an accommodation to Doe, so that Doe would not have to use the communal boys' restrooms. Specifically, Highland made available five individual-use restrooms at the school, including staff restrooms. During Doe's fourth and current fifth grade year, Highland further accommodated Doe by allowing Doe's entire class access to the nearby office restroom; thereby making Doe's restroom arrangement even more discreet.

The evidence shows that Doe has been generally happy while at school. Despite reports from Joyce Doe that Doe has a history of self-harm and suicidal ideation, Highland is not aware of any attempts at self-harm while at

i

school. Highland has responsibly put in place appropriate safety plans to protect Doe. Despite the allegations of Doe's complaint, at a meeting just this past month Highland was told by Joyce Doe that Doe's suicide risk was downgraded from high to moderate.

LEGAL STANDARD ...................................................................................................12

Courts consider four facts when deciding whether to issue a preliminary injunction: "(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief." *Entm't Prods., Inc. v. Shelby Cty., Tenn.,* 588 F.3d 372, 377 (6th Cir. 2009). The movant carries the burden of proving that the circumstances "clearly demand" preliminary injunctive relief. *Overstreet v. Lexington-Lafayette*, 305 F.3d 566, 573 (6th Cir. 2002).

ARGUMENT ...............................................................................................................12

I.    Doe Has Not Demonstrated a Likelihood of Success on the Merits. ...........................12

   A.   Doe is Unlikely to Prevail on the Merits of Doe's Equal Protection Claim. .............12

Doe is unlikely to prevail on the merits of Doe's equal protection claim. Because Doe has not been subject to disparate treatment based on sex, and because transgender status is not a protected class, rational basis review applies. Highland's sex-separated facilities and overnight-accommodations policy  survives intermediate scrutiny and therefore easily meets the more lenient rational-basis standard.

     1.   Heightened Scrutiny Does Not Apply. ....................................................................12

Under the Supreme Court's sex-discrimination equal protection jurisprudence, a law or policy impermissibly discriminates based on sex when it treats members of one biological sex more favorably than others. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 519 (1996) (excluding women from male military college); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 733 (1982) (excluding men from attending female nursing school). Highland treats Doe the same way that it treats any other biological male student. Highland has affirmatively provided additional privacy to Doe and any other male or female student by allowing Doe's entire special-education class to use a single-user restroom near their classroom. Acknowledging the real biological distinctions between men and women is not invidious discrimination. Highland's policy does not discriminate based on sex because it does not favor or disadvantage one sex compared to the other.

       (a)     Doe Has Not Been Subjected to Disparate Treatment Based on Sex. ..........12

(b)     Because Transgender Status is Not a Protected Class, Rational Basis Review Applies. ...................................................................................................................14

In the Sixth Circuit, transgender status is not a protected class for purposes of the Equal Protection Clause.  The Sixth Circuit amended its opinion in *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) by deleting a paragraph that would have extended its Title VII and Equal Protection sex-discrimination jurisprudence to cover discrimination based on transgender status. *Smith v. City of Salem*, 369 F.3d 912, 921-22 (6th Cir. 2004), *amended and superseded*, 378 F.3d 566. The Sixth Circuit's opinion in *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005), did nothing to alter the *Smith* court's refusal to extend its sex-discrimination jurisprudence. Classifications that, like Highland's, do not target a protected class are subject to rational basis review. *Romer v. Evans*, 517 U.S. 620, 631 (1996).

2.     Highland's Classification Survives Constitutional Scrutiny. .....................................16

Highland's classification of students for purposes of sex-separated restrooms, locker rooms, and overnight accommodations meets the rigorous standard of intermediate scrutiny and therefore easily meets the appropriate and more lenient rational-basis standard. Under intermediate scrutiny, the challenged classification will be upheld if it serves "important governmental objectives" and the "'discriminatory means employed'" are "'substantially related to the achievement of those objectives.'" *Virginia*, 518 U.S. at 533 (quoting *Miss. Univ. for* Women, 458 U.S. at 724).

(a)     Highland's Classification Bears a Substantial Relationship to the District's Important Interest in Protecting Privacy. ....................................................................17

The protection of bodily privacy is an important government interest, particularly with regard to minors, and the government may protect that interest by excluding members of the opposite sex from places where individuals dress, groom, or engage in other intimate bodily functions. *See Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005); *Brannum v. Overton County Sch. Bd.*, 516 F.3d 489, 497-98 (6th Cir. 2008); *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993). The important government interest in bodily privacy that justifies separating school bathrooms, locker rooms, and student overnight accommodations by sex does not stem from individuals' gender identities but from the physiological differences between biological males and females. *See Virginia*, 518 U.S. at 533 and 550 n. 19. Accordingly, Highland's provision of sex-separated facilities based on biological sex and not gender identity bears a substantial relationship to Highland's important interest in protecting the bodily privacy of students.

Doe's argument that restroom stalls resolve the issue of privacy is flawed. The zone of privacy begins at the door to the sex-separated facility. Moreover, if

Doe were to succeed in obtaining the relief that Doe expressly seeks, it will impact Highland's sex-separated-facilities policies across the entire school district. It is also important to note that the Supreme Court recently telegraphed that the relief Doe seeks threatens the privacy rights of students when it recalled the mandate in *Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*, No. 16A52, 2016 WL 4131636 (August 3, 2016) (On Application to Recall and Stay).

(b)     Highland's Classification Bears a Substantial Relation to the District's Important Interest in Protecting Student Safety...........................................................22

Highland also has an important interest in protecting the safety of its students while dressing, grooming, and performing other intimate bodily functions. *See Johnston v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015). The implementation of the relief that Doe seeks— district-wide sex-separated facility access based on gender identity—would prevent school officials from ejecting biological males from female restrooms and locker rooms until improper conduct actually occurs.

(c)     Highland's Justifications Are Not Pretextual or Motivated by Animus..........23

Contrary to Doe's contention, Highland's sex-separated facilities policy is not unworkable. Reference to the birth certificates of each student kept on record by the school is an entirely adequate proxy for determining a student's actual biological sex in the event a question arises concerning facilities use. The justifications for the policy are thus not pretext for impermissible animus. Highland's extraordinary efforts to support Doe and ensure that Doe thrives at school further undermine Doe's unsupported allegation of animus.

B.   Doe is Unlikely to Succeed on the Merits of Doe's Title IX Claim............................24

Doe is unlikely to succeed on the merits of Doe's Title IX claim because it is flawed as a matter of law. OCR's interpretation of the meaning of "sex" in Title IX and 34 C.F.R. § 106.33, which allows school districts to provide separate restrooms and locker rooms "on the basis of sex" is not entitled to deference. First, OCR may not interpret a statutory term contrary to the unambiguous intent of Congress. *See Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Second, OCR's interpretation of Section 106.33 is not entiled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997), because the regulation is not ambiguous and OCR's interpretation is plainly erroneous and inconsistent with the regulation. Additionally, for the reasons discussed above, the Sixth Circuit's amended opinion in *Smith* , 378 F.3d 566, established that discrimination on the basis of transgender status does not constitute discrimination on the basis of sex under Title VII or Title IX. The same is true of discrimination based on gender transition, because a

person identifies as transgender because they have gone or intend to undergo a gender transition.

II.     Doe Will Not Suffer Irreparable Harm Absent a Preliminary Injunction. ...............28

There is no presumption of irreparable harm because Doe's constitutional rights are neither threatened nor impaired—Highland's sex-separated-facilities policy is constitutional under either rational basis review or intermediate scrutiny. Doe has also failed to put forward sufficient facts to support a finding of irreparable harm. Substantial evidence contradicts Doe's claim that Doe has been suffing increasingly sever psychological harm as a result of Highland's sex-separated facilities policy. Doe's history of childhood trauma and parental abuse as well as co-morbid psychological conditions likely contribute to Doe's alleged suicidal tendency. It is also possible that gender-identity affirmation may do more harm than good. Doe's argument also ignores the fact that Highland is providing Doe an accommodation—the use, along with Doe's entire special-education class, of a single-user bathroom—that does not stigmatize or isolate Doe. In addition, the existence of factual disputes precludes issuance of a preliminary injunction absent an evidentiary hearing. *See Cty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 484 (6th Cir. 2002)

III.    Issuance of an Injunction Would Cause Substantial Harm to Others.......................32

An injunction reversing Highland's current policy would deprive the school of a means to remove a biological male from a female restroom or locker room, jeopardizing constitutionally protected privacy rights and student safety—concerns supported by the testimony of parents with children in Highland schools.

IV.    An Injunction is Against the Public Interest. ................................................................33

An injunction would threaten the constitutionally protected rights of Highland's students. Because it is in the public interest to prevent violations of constitutional rights, issuing an injunction is against the public interest. *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)

CONCLUSION .................................................................................................................34

# TABLE OF AUTHORITIES

## CASES:

*ACLU of Kentucky v. McCreary County, Kentucky,*
354 F.3d 438 (6th Cir. 2003) ..................................................................................................28

*Auer v. Robbins,*
519 U.S. 452 (1997) ................................................................................................... 25, 26

*Barnes v. City of Cincinnati,*
401 F.3d 729 (6th Cir. 2005) ............................................................................. 14, 15, 26

*Beard v. Whitmore Lake School District,*
402 F.3d 598 (6th Cir. 2005) .................................................................................................17

*Brannum v. Overton County School Board,*
516 F.3d 489 (6th Cir. 2008) .................................................................................................17

*Carpenters' District Council, Detroit, Wayne and Oakland Counties and Vicinity, of United
Brotherhood of Carpenters and Joiners of America, AFL-CIO v. Cicci,*
261 F.2d 5 (6th Cir. 1958) .....................................................................................................32

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,*
511 F.3d 535 (6th Cir. 2007) .................................................................................................12

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) .................................................................................................................25

*Christopher v. SmithKline Beecham Corp.,*
132 S. Ct. 2156 (2012) ............................................................................................................26

*Craig v. Boren,*
429 U.S. 190 (1976) .................................................................................................................13

*County Security Agency v. Ohio Department of Commerce,*
296 F.3d 477 (6th Cir. 2002) .................................................................................................31

*Doe v. Luzerne Cty.,*
660 F.3d 169 (3d Cir. 2011) ......................................................................................... 17, 20

*Doe v. Renfrow,*
631 F.2d 91 (7th Cir. 1980) ...................................................................................................17

*Entertainment Productions, Inc. v. Shelby County, Tennessee,*
588 F.3d 372 (6th Cir. 2009) .................................................................................................12

*Equal Employment Opportunity Commission v. R.G. & G.R. Harris Funeral Homes, Inc.*,
  __ F.Supp.3d __, 2016 WL 4396083 (E.D. Mich. Aug. 18, 2016) ................................ 15

*Etsitty v. Utah Transit Authority*,
  502 F. 3d 1215 (2007) .......................................................................................... 33

*Faulkner v. Jones*,
  10 F.3d 226 (4th Cir. 1993) .................................................................................. 17

*Frontiero v. Richardson*,
  411 U.S. 677 (1973) ...................................................................................... 13, 27

*G&V Lounge, Inc. v. Michigan Liquor Control Commission*,
  23 F.3d 1071 (6th Cir. 1994) ................................................................................ 33

*G.G. ex rel. Grimm v. Gloucester Cty. School Board*,
  822 F.3d 709 (4th Cir. 2016) ................................................................................ 21

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011) ........................................................................... 15

*Gloucester County School Board v. G.G. ex rel. Grimm*,
  No. 16A52, 2016 WL 4131636 (August 3, 2016) ................................................. 21

*Johnston v. University of Pittsburgh of Commonwealth System of Higher Education*,
  97 F. Supp. 3d 657 (W.D. Pa. 2015) .............................................................. 19, 22

*Kentucky Waterways Alliance v. Johnson*,
  540 F.3d 466 (6th Cir. 2008) ......................................................................... 25, 26

*Kohler v. City of Wapakoneta*,
  381 F. Supp. 2d 692 (N.D. Ohio 2005) ................................................................ 19

*Leary v. Daeschner*,
  228 F.3d 729 (6th Cir. 2000) ................................................................................ 12

*Lee v. Downs*,
  641 F.2d 1117 (4th Cir. 1981) ............................................................................. 18

*Mississippi University for Women v. Hogan*,
  458 U.S. 718 (1982) ...................................................................................... 13, 16

*New Jersey v. T.L.O.*,
  469 U.S. 325 (1985) ............................................................................................. 17

*Overstreet v. Lexington-Lafayette*,
  305 F.3d 566 (6th Cir. 2002) ............................................................................... 12

*Project Vote v. Blackwell*,
    455 F. Supp. 2d 694 (N.D. Ohio 2006) ..............................................................16

*Reed v. Reed*,
    404 U.S. 71 (1971)...............................................................................................13

*Romer v. Evans*,
    517 U.S. 620 (1996)............................................................................................16

*Sebelius v. Cloer*,
    133 S. Ct. 1886 (2013) .......................................................................................25

*Smith v. City of Salem*,
    369 F.3d 912 (6th Cir. 2004)................................................................. 14, 15, 26

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004)................................................................. 14, 15, 26

*Tuan Anh Nguyen v. Immigration and Naturalization Service*,
    533 U.S. 53 (2001)..............................................................................................23

*United States v. O'Brien*,
    391 U.S. 367 (1968)............................................................................................16

*United States v. Staten*,
    666 F.3d 154 (4th Cir. 2011)...............................................................................16

*United States v. Virginia*,
    518 U.S. 515 (1996)..........................................................................13, 14, 16, 18

*Williams v. McKeithen*,
    939 F.2d 1100 (5th Cir. 1991) ...........................................................................32

*York v. Story*,
    324 F.2d 450 (9th Cir. 1963)...............................................................................18

## STATUTES:

34 C.F.R. § 106.33 ...........................................................................................................24

34 C.F.R. § 106.61 ...........................................................................................................26

**OTHER AUTHORITIES:**

David Finkelhor, Ph.D., et al., *The Victimization of Children and Youth: A Comprehensive, National Survey*, 10 Child Maltreatment 5 (Feb. 2005), available at http://www.unh.edu/ccrc/pdf/CV73.pdf. ...................................................................7

Lawrence S. Mayer and Paul R. McHugh, *Sexuality and Gender: Findings from the Biological, Psychological, and Social Sciences*, THE NEW ATLANTIS (Fall 2016)....................30

## INTRODUCTION

Third-Party Plaintiff Jane Doe ("Doe") is a student in the Highland School District. Third-Party Defendant Board of Education of the Highland Local School District ("Highland") has, as it aims to do with all of its students, always treated Doe with dignity and respect, and accommodated Doe's particular educational needs. It has not, as Doe's guardians allege, discriminated against or otherwise violated Doe's rights. To the contrary, it has acted with compassion toward Doe and made every effort to provide Doe with a safe and supportive educational environment, while at the same time making the same effort on behalf of Doe's classmates and the other students in Doe's school.

This has not always been easy in light of Doe's circumstances. Doe is an eleven-year-old biological male student who suffers from gender dysphoria and a number of other psychological maladies including anxiety, autism, and disordered eating. At a young age, Doe suffered severe abuse at the hands of a parent. Before starting Kindergarten at Highland Elementary, Doe was transferred into the custody of Doe's current legal guardians. In first grade, Doe's guardians had informed the school that Doe was no longer a boy but was in fact a girl and requested that Doe be treated as a female. Since that time, Doe has continued to suffer from psychological problems, including suicidal ideation.

Highland has made every effort to ensure Doe's safety, affirm Doe's dignity, and provide an environment where Doe can learn, develop, and thrive. Highland has even granted Doe and Doe's entire special-education class access to a single-user restroom near their classroom. This prevents Doe from having to use the male communal restroom while ensuring that Doe is not isolated or stigmatized—all of Doe's classmates have access to the

same restroom as Doe. Highland's efforts to support Doe have borne fruit: the evidence indicates that Doe is happiest and most well-adjusted when Doe is at school.

Doe's legal guardians, however, have brought this suit on Doe's behalf alleging that virtually all of Doe's psychological distress is the result of Highland's purported refusal to treat Doe as if Doe were a girl. In their motion for a preliminary injunction, they argue that Title IX and the Equal Protection Clause require Highland and everyone at Doe's school to actively affirm Doe's gender identity, and that granting Doe access to the communal female restrooms would solve all of Doe's problems. This is both factually and legally incorrect. Highland has a duty to protect the constitutional privacy rights and safety of all of Highland's students, and the relief that Doe seeks would prevent Highland from fulfilling that duty. What's more, Doe is currently thriving at school and the safety plan currently in place to protect Doe from self-harm is working. Indeed, Doe's legal guardian informed the school just last month that Doe's suicide risk has been downgraded. Granting the relief that Doe seeks would thus not only jeopardize the privacy and safety of all of Highland's students, there is a very real possibility that it would actually be against Doe's best interests as well.

As explained below, Third-Party Plaintiffs have failed to make the requisite showing for a preliminary injunction. Consequently, this Court should deny their motion outright. Alternatively, there are significant factual disputes that preclude the issuance of a preliminary injunction prior to discovery and an evidentiary hearing.

## STATEMENT OF FACTS

### I.     Sex and Gender Identity

Third-Party Plaintiffs argue that Doe must be allowed access to the girls' restroom at school because Doe professes to be a girl, despite the fact that Doe's sex is male. Doe thus contends that gender identity defines a person's sex—that a transgender person has an "affirmed sex[] that is different from the sex they were assigned or assumed to be at birth." Memorandum of Law in Support of Jane Doe's Motion for a Preliminary Injunction ("Doe PI Mem.") at 3; Expert Declaration of Diane Ehrensaft, Ph.D. ("Ehrensaft Decl."), ¶ 17. Doe thus seeks preliminary injunctive relief based on an understanding of sex and gender identity that contradicts the science of medicine and objective reality. The science of medicine recognizes that "biological sex" "refers to a member of a species in relation to the member's capacity to either donate (male) or receive (female) genetic material for the purpose of reproduction." Decl. of Paul Hruz, M.D., Ph.D., ("Hruz Decl."), ¶ 11. Indeed, "[s]ex is genetically encoded at the moment of conception due to the presence of specific DNA sequences (i.e. genes) that direct the production of signals that influence the formation of the gonad to develop either into a testis or ovary." Hruz Decl. ¶ 15. Because sex is defined in relation to one's unalterable reproductive role and flows from unchanging genetic characteristics, sex is immutable, objective, and binary.[1]

---

[1] "Sex is genetically encoded at the moment of conception due to the presence of specific DNA sequences (i.e. genes) that direct the production of signals that influence the formation of the gonad to develop into a either testis or ovary." Hruz Decl. ¶ 15. "Reliance upon external phenotypic expression of primary sexual traits is a highly accurate means to assign biologic sex. In over 99.9 [percent] of cases this designation will correlate with internal sexual traits and capacity for normal biological sexual function." *Id.*, ¶ 18. An extremely small minority of individuals suffer from disorders of sexual development, e.g., congenital adrenal hyperplasia,

Gender identity, by contrast, is fluid and subjective. Children who profess a gender identity that differs from their sex more often than not desist and profess a gender identity that is consistent with their sex by the end of puberty. Hruz Decl. ¶ 22; Josephson Decl. ¶ 34. Gender identity is a psychological construct that is unverifiable by objective means and, contrary to Doe's contention, does not determine one's sex. Josephson Decl. ¶ 23.

There is likewise no scientific basis for the idea that gender identity relates to the recently coined concept of "neurological sex." While "[l]imited emerging data has suggested structural and functional differences between brains from normal and transgender individuals," "[t]hese data do not establish whether the[] differences are innate and fixed or acquired and malleable." Hruz Decl. ¶ 25. However, the well-known neuronal plasticity of the human brain—something that has been extensively studied in other contexts—suggests the latter. *Id.*

Not surprisingly, Doe's counter-scientific understanding of sex and gender identity leads to a misunderstanding of the causes of and appropriate treatment for psychological distress in children like Doe, who suffer from the psychological disorder of gender dysphoria. Doe's contention that appropriate treatments for gender dysphoria necessarily involve the affirmation of the child's professed gender identity—and Doe's contention that attempts to change a person's gender identity are "unethical, ineffective, and cause extreme psychological harm," *see* Doe PI Mem. at 3-4—are unsupported by research and have no basis in medical science. *See* Hruz Decl. ¶¶ 31-38; Josephson Decl. ¶¶ 27-28. Indeed, strategies of gender-identity affirmation in cases of gender-confused children may decrease

---

and are "delineated 'intersex' because they have physical, anatomic sex characteristics that are a mixture of those typically associated with male and female designations." Josephson Decl. ¶16.

the normally high likelihood that gender dysphoria will resolve naturally by the end of puberty through desistance. Hruz Decl. ¶¶ 39-40. Such strategies may also leave other underlying causes such as family or emotional issues unexplored and untreated. Josephson Decl. ¶ 36 ("For families with significant problems, solely working toward encouraging and affirming their transgender child may miss an opportunity for health and change."). In other words, rather than preventing harm, there is a real possibility that the injunctive relief that Doe seeks may actually lead to further and more severe psychological harm.

## II.     Highland's Support of Doe, Doe's Family, And All of Highland's Students.

Doe was enrolled in Highland Elementary by Joyce Doe when Doe was entering kindergarten, during the 2011-2012 school year. V. Compl. ¶ 60. Doe was listed as male on all school paperwork. *Id.* ¶ 61; *see* Ex.[2] U (birth certificate on file with school). When Doe began attending Highland Elementary Doe was identified as, presented as, understood to be, and treated as male by Joyce Doe, Highland staff, and other students. V. Compl. ¶¶ 62-65. Doe's legal name at that time was a name that is typically understood to be male. *Id.* ¶ 63. Highland has never received any medical or other official legal documentation indicating that Doe is not biologically male. Declaration of William P. Dodds ("Dodds Decl.") ¶ 12; *see also* Doe's V. Compl. ¶ 27 (indicating that Doe was "assigned male at birth").

At the end of Doe's kindergarten year, the principal of Highland Elementary, Shawn Winkelfoos ("Principal Winkelfoos"), was advised by Joyce Doe that Doe liked pink and would be wearing more of it in the coming school year. Declaration of M. Shawn

---

[2] All citations to exhibits within this brief are to exhibits that are attached to the declarations of William P. Dodds, M. Shawn Winkelfoos, Matthew Alan Bradley, and D. Michael Hoyng, which are being filed concurrently under seal.

Winkelfoos ("Winkelfoos Decl.") ¶ 12. Principal Winkelfoos was supportive of Doe wearing more pink because Highland's policies permit students to wear whatever colors and clothes they want within the dress code. *Id.* Highland was also informed by Joyce Doe that Doe would like to be addressed as female, which Highland agreed to do. V. Compl. ¶ 66-67. Doe began presenting as female in first grade during the 2012-2013 school year, and has continued presenting as a female at school since that time. *Id.* ¶ 71. Doe's name was legally changed in second grade during the 2013-2014 school year to a name that is a shortened, gender-neutral version of Doe's former legal name. Ex. V (Judgment Entry – Change of Name of Minor). Highland staff have made a conscious effort to address Doe using Doe's legal name and using the pronouns that Joyce Doe has requested. Winkelfoos Decl. ¶ 20. Highland staff have also taken prompt action to revise school records to reflect Doe's current legal name. Dodds Decl. ¶ 9.

By the time Doe began second grade, Joyce Doe insisted that Doe be allowed to use the girls' restrooms at school. V. Compl. ¶ 72; Winkelfoos Decl. ¶ 13. Highland Superintendent Dodds, Principal Winkelfoos, and Highland staff have at all times wanted to do what is best for Doe. V. Compl. ¶ 68; *see also* Ex. X (February 6, 2014 email from Joyce Doe to Principal Winkelfoos stating "My goal is to do what is best for [Doe] in all aspects and I believe that is your goal as well."). But Highland is also committed to protecting the dignity, privacy, safety, well-being, and rights of all of its other students as well. V. Compl. ¶ 68.

Highland determined that it could not allow Doe to access the girls' restrooms without violating the dignity interests and privacy rights of other students using those shared

6

facilities. *Id.* ¶ 78; *see also* Decl. of Parent H. ¶ 2 (testifying that Parent H.'s 7th grade son who attends Highland told Parent H. that "he would be uncomfortable if a girl came into the restroom while he was in there."); Decl. of S.B. (testifying, "the risk extends to even being in the presence of biological males in situations where my daughters feel vulnerable, such as when they are using the bathroom"); Decl. of Parent S. (testifying, "If Highland were not able to maintain its current privacy policies . . . I would . . . be concerned that my son or daughter may be seen by a member of the opposite sex while only partially clothed . . . I believe that exposing students to people of the opposite sex in these settings violates the privacy and respect that each student deserves and expects, and that parents expect their children will receive, at school.").

Highland also recognized that changing its privacy policies would have ramifications throughout all its schools and that it would expose itself to liability if it adopted policies or practices that violated the constitutional and statutory rights of its students. V. Compl. ¶¶ 75-92; Decl. of S.B. (testifying that opening intimate facilities to the opposite sex based on gender identity violates the rights of other students, "including those of my children, who have suffered severe sexual abuse, molestation, and rape and who will be directly harmed by" such a policy);[3] Decl. of Parent H. (testifying, "I believe that having students of the opposite sex share facilities like restrooms, locker rooms and overnight accommodations would be asking for trouble. In particular, I would be concerned for the safety of students, especially female students."); Decl. of Parent S. (testifying, "If Highland were not able to

---

[3] "In a nationally representative sample of children and youth ages 2 to 17 years," "1 in 12 (82 per 1,000)" were victims of sexual assault. David Finkelhor, Ph.D., et al., *The Victimization of Children and Youth: A Comprehensive, National Survey*, 10 Child Maltreatment 5 (Feb. 2005), available at http://www.unh.edu/ccrc/pdf/CV73.pdf.

maintain its current privacy policies, I would be concerned that some students would take advantage of that . . . to engage in inappropriate behavior. I would also be concerned that my son or daughter may be seen by a member of the opposite sex while only partially clothed and that my son or daughter may see a member of the opposite sex partially or fully undressed."). As a result, Highland declined to allow Doe to use the girls' restrooms.

But, understanding that Doe was also seeking an accommodation not to use the boys' restrooms, Highland offered Doe access to the five individual-use restrooms available at Highland Elementary, including use of the staff restrooms. V. Compl. ¶¶ 93-94; Winkelfoos Decl. ¶ 15. Highland continues to allow Doe to access the individual-use restrooms at Highland Elementary. V. Compl. ¶ 96. On top of that, during Doe's fourth grade year and the current fifth grade year, Highland arranged that all of the students in Doe's special education class were given access to use the nearby office restroom. Winkelfoos Decl. ¶¶ 18-19; V. Compl. ¶¶ 95-96. Highland staff and administrators have done their best—indeed, have gone above and beyond their basic duties—to make Doe's restroom arrangement as discreet as possible, never wanting to draw unnecessary attention to Doe. Winkelfoos Decl. ¶ 17.

Throughout the time that Doe has been enrolled at Highland, Principal Winkelfoos, Superintendent Dodds, and other staff members have perceived Doe to be generally happy while at school. *See id.* ¶ 3 (noting "Throughout Doe's enrollment, I have observed Doe to be very happy at school on a consistent basis."); Dodds Decl. ¶ 5 (similarly reporting "Doe has always seemed to be very happy at school. In fact, I cannot recall having ever seen Doe sad."); *see also* Dodds Decl. ¶ 11 (recounting an interaction from the beginning of this school

year in which Superintendent Dodds received a high five from Doe and had a conversation with Doe regarding Doe having fun at school); *see also* Ex. N (excerpts of Individualized Education Program (IEP) from February of 2014, 2015 and 2016 detailing profile of child including statements about staff perceptions of Doe as "polite", "very kind and loving", "a leader who likes to volunteer in class and help others", who "always has a smile and does everything asked with no argument," "who often wants to please her teachers" and who "likes to be involved in group discussions."). The only times that Principal Winkelfoos recalls seeing Doe unhappy were instances when Doe was confronted by staff for behavior issues. Winkelfoos Decl. ¶ 6. Doe has never attempted self-harm or exhibited anger issues at school. *Id.* ¶¶ 4-5; Dodds Decl. ¶ 6. Even on days when Joyce Doe has reported behavior issues at home and warned the school to monitor Doe closely out of safety concerns for Doe, school personnel have reported that Doe's outlook and behavior while at school have been positive. Ex. L (email correspondence from Joyce Doe warning school personnel about behavior problems and encouraging close monitoring of Doe and email responses from Highland staff and Principal Winkelfoos reporting that Doe "appeared to be in good spirits" and "seemed to have a good day today at school . . . laughing and playing with friends and . . . enjoy[ing] what we did in class."). And whenever Joyce Doe has made Highland aware of concerns involving Doe, Highland has responded promptly, thoroughly, and attentively. *See id.* (documenting multiple responses from school staff including one within a half hour of the initial request and documenting a keen level of attentiveness to Doe by teachers, including having noted the number of pencils in Doe's pencil pouch the day before); *see also* Ex. M (email correspondence, including thorough follow-up questions from Principal

Winkelfoos, regarding Doe's eating disorder and how school personnel can assist Doe in sticking to Doe's meal plan).

In addition to the specific accommodations Highland has made, Highland also provides several support services to its students from which Doe has benefited. For example, Highland has two licensed social workers on staff that are able to meet with students if their guardians have consented. Winkelfoos Decl. ¶ 9. Joyce Doe has given consent and Doe regularly meets with Highland's social workers. *Id.* Highland also has a school psychologist who has evaluated Doe when needed for Doe's IEP and a licensed nurse who has assisted with Doe's meal plan. *Id.*; *see also* Ex. M.

And in terms of protecting Doe (and all of its students), Highland Elementary understands that its responsibility to educate students about bullying is important and should be given careful attention. Indeed, it offers several programs designed to address these issues, including a character course that all students participate in once every seven school days. *See* Winkelfoos Decl. ¶ 11 (describing Character Counts course, school-wide assemblies on character that address bullying, and Positive Behavior Intervention and Supports, a program being implemented this school year that is intended to provide staff and students examples of appropriate behavior in the school setting). Highland also promptly responds to accusations of harassment and bullying. *Id.* ¶ 11; *id.* ¶ 20 ("Every time that Joyce Doe has notified me about her concerns that Doe is being bullied or harassed I have promptly addressed the allegations with the appropriate personnel and, in the case of students, I have ensured that her concerns have been promptly addressed by either myself or other staff members."); Decl. of Matthew Alan Bradley ¶ 3 (testifying, "As the Assistant Principal at the

elementary, I was responsible for carrying out student discipline"); Decl. of D. Michael Hoyng ¶ 2-3 (similar); Dodds Decl. ¶ 10; *see also* Exs. AA-AD (documenting student discipline) *c.f.* Winkelfoos Decl. ¶ 17 ("I do not recall ever being made aware by Joyce Doe or Doe of any allegations of harassment by other students based on or connected to Doe's restroom use.").

Despite Highland's care and despite the significant progress that Doe has made, Doe has still had difficulties. Indeed, Joyce Doe has reported to Highland personnel at least two instances when Doe has been hospitalized for suicidal ideation. *See* Doe's V. Compl. ¶¶ 34, -38, 41; Ex. Y (reporting Doe's hospitalization for self-harm after "ingesting something" as "a cry for help more than an attempt at true permanent damage"); Ex. Q (August 20 2015 email attaching home safety plan). Joyce Doe has reported, contrary to the allegations in the complaint she signed, *see* Doe's V. Compl. ¶¶ 34, 38, 41, that at least one of these incidents was attributable to "the 'hurts' of the past . . . such as [Doe's] bio mom abandoning [Doe] and papaw dying" and "nothing seem[ed] to be school related." Ex. Y. Highland has been very responsive when it has been made aware of safety concerns relating to Doe. *See*, *e.g.*, Ex. L. For example, after being provided by Joyce Doe with a copy of her home safety plan in August last year, the school created its own school safety plan for Doe, Ex. R, which it recently revisited with Joyce Doe in order to update the plan for the current school year. In connection with this review, Joyce Doe informed Highland that Doe's suicide risk had been downgraded from high to moderate. Ex. S; Winkelfoos Decl. ¶ 22; *see also* ex. T (Joyce Doe approving plan). And no matter the outcome of Doe's lawsuit, Highland will continue to care for, protect, and nurture Doe as long as Doe is a student in its district.

## LEGAL STANDARD

Four factors guide the determination of whether to issue a preliminary injunction: "(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief." *Entm't Prods., Inc. v. Shelby Cty., Tenn.*, 588 F.3d 372, 377 (6th Cir. 2009). A preliminary injunction should only issue "if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Lafayette*, 305 F.3d 566, 573 (6th Cir. 2002).

## ARGUMENT

### I.    Doe Has Not Demonstrated a Likelihood of Success on the Merits.

To establish a likelihood of success on the merits, the "plaintiff must show more than a mere possibility of success." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007). Indeed, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Doe has failed to meet this burden.

### A.  Doe is Unlikely to Prevail on the Merits of Doe's Equal Protection Claim.

#### 1.  Heightened Scrutiny Does Not Apply.

##### (a)    Doe Has Not Been Subjected to Disparate Treatment Based on Sex.

The Supreme Court's sex-discrimination equal protection cases have found impermissible sex discrimination only when a law or policy treats members of one biological

sex more favorably than members of the other sex. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 519 (1996) (excluding women from male military college); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 733 (1982) (excluding men from attending female nursing school); *Craig v. Boren*, 429 U.S. 190, 191-92 (1976) (allowing women to buy beer at a younger age than men); *Frontiero v. Richardson*, 411 U.S. 677, 678-79 (1973) (imposing a higher burden on women than men to establish spousal dependency); *Reed v. Reed*, 404 U.S. 71, 71-74 (1971) (affording an automatic preference for men over women when administering estates). Here, Doe has not been treated less favorably than members of the opposite sex. Highland's policy of allowing access to sex-separated facilities based on biological sex does not favor male or female students. And Highland treats Doe the same way that it treats any other biological male student. Indeed, by giving Doe's entire class access to a single-user restroom near their classroom, Highland has affirmatively provided additional privacy to Doe and any other male or female student in Doe's special-education class who seeks it. Winkelfoos Decl. ¶ 18-19 (testifying that, at Doe's guardian's request, Highland allows Doe and the other students in Doe's special-education class to utilize a single-user restroom near their classroom). Because Highland's policy does not favor one sex over the other or disadvantage Doe based on Doe's biological sex, it does not constitute discrimination based on sex for purposes of the Equal Protection Clause.

For this Court to find unconstitutional sex discrimination here would be an unprecedented expansion of the Supreme Court jurisprudence on this issue.

> [O]ur precedent . . . does not make sex a proscribed classification. Supposed inherent differences are no longer accepted as a ground for race or national origin classifications. Physical differences between men and women, however, are enduring: The two sexes are not fungible; a community made up

13

exclusively of one sex is different from a community composed of both.

*Virginia*, 518 U.S. at 533 (quotation marks, citations, and alterations omitted). Acknowledging the real biological distinctions between men and women is not invidious discrimination when males and females are afforded equivalent benefits and subject to equivalent restrictions. Thus, intermediate scrutiny does not apply to Plaintiffs' constitutional sex-discrimination claim. *See id.* at 532 (acknowledging that the Court "carefully inspect[s]" under intermediate scrutiny only "official action that closes a door or denies opportunity to women (or to men)").

### (b) Because Transgender Status is Not a Protected Class, Rational Basis Review Applies.

Doe argues that binding Sixth Circuit precedent establishes that discrimination based on transgender status constitutes sex discrimination in violation of the Equal Protection Clause. *See* Doe PI Mem. at 19 (citing *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) and *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005). Doe is flatly incorrect. In fact, exactly the opposite is true. In *Smith*, the Sixth Circuit *declined* to extend protected-class status under Title VII and the Equal Protection Clause to individuals alleging discrimination based solely on their identification as transgender persons. The court's initial opinion in *Smith* included a paragraph stating that "[d]iscrimination based on transsexualism is rooted in the insistence that sex (organs) and gender (social classification of a person as belonging to one sex or the other) coincide," which is "the very essence of sex stereotyping." *Smith v. City of Salem*, 369 F.3d 912, 921-22 (6th Cir. 2004), *amended and superseded*, 378 F.3d 566. Thus, the argument continued, "to the extent that Smith . . . alleges discrimination based solely on his identification as a transsexual, he has alleged a claim of sex stereotyping. . . ." *Id.* at 922. The

paragraph's argument is *precisely* what Doe argues in this case. *See* Doe PI Mem. at 15-16 (arguing that transgender discrimination amounts to discrimination based on gender norms, citing *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011)). However, two months after the publication of its initial opinion in *Smith*, the Sixth Circuit issued an amended opinion that is identical to the court's initial opinion in all respects but one: the amended opinion omits the transgender-discrimination paragraph. 378 F.3d 566. There can thus be no doubt that, unlike the Eleventh Circuit in *Glenn*, the Sixth Circuit has not extended its Title VII or Equal Protection sex-discrimination jurisprudence to cover discrimination based on transgender status. *See also EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, __ F. Supp. 3d __, 2016 WL 4396083, *1 (E.D. Mich. Aug. 18, 2016) (repudiating the EEOC's position "that it stated a Title VII claim by virtue of alleging that [an employee's] termination was due to transgender status or gender identity" because "those are not protected classes").

The issuance of *Barnes v. City of Cincinnati* six months later did nothing to alter the Sixth Circuit's refusal to extend its sex-discrimination jurisprudence in *Smith*. The plaintiff in *Barnes* stated a claim for relief under Title VII's prohibition of sex discrimination because he, like the plaintiff in *Smith*, "alleg[ed] that his failure to conform to sex stereotypes concerning how a man should look and behave was the driving force behind the defendant's actions." *Barnes v. City of Cincinnati*, 401 F.3d at 737. But *Barnes* did not involve a claim for discrimination based on transgender status. Accordingly, it did not affect the *Smith* court's repudiation of Doe's argument that "discrimination against a transgender individual is inherently based on sex." Doe PI Mem. at 15.

Because transgender status is not a protected class for purposes of equal protection

analysis in the Sixth Circuit, Doe is not entitled to heightened or intermediate scrutiny. Classifications that, like Highland's, do not target a protected class are subject to rational basis review, and courts "uphold the [government's] classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

### 2. Highland's Classification Survives Constitutional Scrutiny.

Highland's classification of students for purposes of sex-separated restrooms, locker rooms, and overnight accommodations easily meets the standard of rational-basis review. However, even under the more rigorous standard of intermediate scrutiny, Highland's classification would still be constitutional.

Under intermediate scrutiny, the challenged classification will be upheld if it serves "important governmental objectives" and the "'discriminatory means employed'" are "'substantially related to the achievement of those objectives.'" *Virginia*, 518 U.S. at 533 (quoting *Miss. Univ. for Women*, 458 U.S. at 724). Intermediate scrutiny presents a lower hurdle than strict scrutiny, and thus the government need not demonstrate a "perfect fit" between means and ends—a "reasonable fit" will suffice. *United States v. Staten*, 666 F.3d 154, 159, 162 (4th Cir. 2011) (citations and internal quotation marks omitted); *see also Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 701 (N.D. Ohio 2006) (citing *United States v. O'Brien,* 391 U.S. 367, 88 S. Ct. 1673, 20 L.Ed.2d 672 (1968)) ("[T]he government need only articulate an important or substantial governmental interest, and the Court must determine if the means chosen to enforce that interest is no greater than is essential to the furtherance of that interest.").

**(a) Highland's Classification Bears a Substantial Relationship to the District's Important Interest in Protecting Privacy.**

The protection of bodily privacy is an important government interest, particularly with regard to minors. *See Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005) ("Students of course have a significant privacy interest in their unclothed bodies."); *Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d 489, 498 (6th Cir. 2008) (stating that there is a "universal understanding among middle school age children in this country that a school locker room is a place of heightened privacy"); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 337–38 (1985) (noting that a "search of a child's person ... is undoubtedly a severe violation of subjective expectations of privacy"); *Doe v. Renfrow*, 631 F.2d 91, 92–93 (7th Cir. 1980) (stating that it "does not take a constitutional scholar" to conclude that a strip search invades a student's privacy rights); *Doe v. Luzerne Cty.*, 660 F.3d 169, 176–77 (3d Cir. 2011) (observing that several circuits have recognized "a constitutionally protected privacy interest in [one's] partially clothed body").

It is also well-established that the government may protect individuals' interests in bodily privacy by excluding members of the opposite sex from entering into or viewing places in which individuals dress, groom, or engage in other intimate bodily functions. *See, e.g., Brannum,* 516 F.3d at 497–98 (holding that the use of surveillance cameras to record plaintiff middle-school students in their undergarments while in the school locker room "significantly invaded the students' reasonable expectations of privacy" in violation of their constitutional rights); *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993) ("The point is illustrated by society's undisputed approval of separate public rest rooms for men and women based on privacy concerns. The need for privacy justifies separation and the

17

differences between the genders demand a facility for each gender that is different."); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981) ("Most people, however, have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating."); *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963) ("The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.").

The important government interest in bodily privacy that justifies separating school bathrooms, locker rooms, and student overnight accommodations by sex does not stem from individuals' gender identities. Rather, these bodily privacy interests arise from the physiological differences between biological males and biological females. *See Virginia*, 518 U.S. at 533 and 550 n. 19 (acknowledging physical differences between men and women and stating that, in light of those differences, the "[a]dmi[ssion of] women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements."). It follows that sex must be defined in terms of biology and physiology for the purpose of protecting bodily privacy through sex-separated bathrooms, showers, and accommodations. The fact that gender identity does not determine sex but rather is a psychological construct that, in the case of persons suffering from gender dysphoria, may change over time buttresses this conclusion. Hruz Decl. ¶¶ 19-22; Josephson Decl. ¶¶ 17-19, 23.

In short, the physiological differences between males and females justify separating bathrooms and other intimate facilities on the basis of sex, not gender identity. Accordingly,

Highland's provision of sex-separated facilities and overnight accommodations based on biological sex and not gender identity unquestionably bears a substantial relationship to Highland's important interest in protecting the bodily privacy of its students. *See Johnston v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 669 (W.D. Pa. 2015) (holding that separating "bathroom and locker room facilities on the basis of birth sex is substantially related to a sufficiently important government interest") (internal quotations omitted).

Apparently recognizing this overwhelming body of case law, Doe contends that allowing Doe to use the girls' restroom will not cause Doe to "view any . . . girls, or . . . girls to view [Doe]" because the stalls in the restrooms are separated by dividers and open at the top and bottom. Doe PI Mem. at 21. Doe's argument is flawed, however, and must be rejected.

First, Doe's argument implicitly admits that there is a privacy issue by positing that stall dividers are necessary to solve the problem. Second, stall dividers do not solve the problem. The zone of privacy begins at the door to the sex-separated facility. In *Kohler v. City of Wapakoneta,* 381 F. Supp. 2d 692 (N.D. Ohio 2005), the court found a privacy violation when a male made audio recordings of females using stall-enclosed toilets in the women's room. In so finding, the court held that "it is appropriate to consider that even if Kohler did not expect privacy from other women in the women-only restroom, she reasonably expected her activities to be secluded from perception by men." *Id.* at 704. If a woman is protected from a male hearing, after the fact and remotely, her conduct of personal hygiene inside the lady's room even when she is enclosed in a stall, she is certainly protected from a male being

19

physically present in such a facility. Finally, Doe's argument fails because the constitutionally protected privacy interest in one's unclothed body includes a right to be free from state-compelled *risk* of intimate exposure to the opposite sex. *See, e.g.*, *Luzerne Cty.*, 660 F.3d at 176-77 (recognizing a "constitutionally protected privacy interest in . . . [one's] partially clothed body" and acknowledging that a "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex[]"). The mere fact that the restrooms contain stalls does not eliminate the risk of involuntary exposure to the opposite sex.

Of even greater concern, if Doe were to succeed in obtaining the relief that Doe seeks, it will impact Highland's sex-separated-facilities policies across the entire school district. In this very case, the government defendants are arguing that, per their Dear Colleague Letter, Highland must provide all students access based on their professed gender identity to "restrooms, locker rooms, shower facilities, housing, and athletic teams, as well as single-sex classes" in all educational programs, district-wide. Dear Colleague Letter at 4 (May 13, 2016) (ECF No. 10-3). More importantly, the relief that Doe seeks in the Third-Party Complaint would expressly require Highland to adopt gender-identity-affirming policies applicable to all students and staff at all of Highland's schools and school activities, including policies that allow students to access bathrooms, locker rooms, and beds on overnight trips according to their gender identity. Doe Compl., Request for Relief, ¶¶ B(iv)-(vi) (seeking an injunction requiring Highland to "retain[] a consultant to develop and provide training for all district personnel . . ., students, and community members on . . . the importance of affirming transgender students in school" and to "retain[] a consultant to develop protocols for

affirming and supporting transgender students, including ensuring use of the proper facilities, correcting school records, and privacy, and to provide training to district and school staff on implementing those protocols."). The existence of stalls in the elementary school's restrooms does not mitigate the risks to bodily privacy that are sure to arise if Doe obtains the relief that Doe explicitly seeks and individuals are granted access to Highland's restrooms, locker rooms, and overnight accommodations consistent with their gender identity.

Finally, it is important to note that the Supreme Court very recently telegraphed that the relief that Doe seeks in this case threatens the privacy rights of students by recalling the mandate in *Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*, No. 16A52, 2016 WL 4131636 (August 3, 2016) (On Application to Recall and Stay). The facts in *G.G.* are quite similar to the facts here—there, a girl claiming a male gender identity sought access to boys' restroom facilities. *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 714-716 (4th Cir. 2016). Like Highland, the Gloucester County School Board provided individualized, entirely private facilities for the professed transgender student, but that was not enough: relying on our Federal Defendants' rewrite of Title IX and its implementing regulations to include "gender identity," G.G. demanded access to communal boys' restrooms. *Id.* The school resisted, winning at district court but losing at the Fourth Circuit. *Id.* at 717. The Fourth Circuit timely issued its mandate, and the lower court almost immediately (without even notifying the parties) enjoined the School Board to admit G.G. to the boys' communal facilities. On August 3, 2016, the Supreme Court recalled the mandate and stayed the district court's injunction. *Gloucester*, 2016 WL 4131636 at *1. This returned Gloucester to the status quo,

which is virtually identical to the status quo in this case: Doe has access to fully private facilities for his personal needs while other students are assured that that they may use their single-sex communal facilities without the risk of an opposite-sex student being present in those facilities and the consequent violation of their privacy.

> **(b) Highland's Classification Bears a Substantial Relation to the District's Important Interest in Protecting Student Safety.**

Highland also has an important interest in protecting the safety of its students while dressing, grooming, and performing other intimate bodily functions. *See Johnston,* 97 F. Supp. 3d at 668 (holding that schools have an important interest in "providing . . . students with a safe and comfortable environment for performing [intimate bodily] functions consistent with society's long-held tradition of performing such functions in sex-segregated spaces based on biological or birth sex"). In particular, Highland has an important interest in preventing biological males from professing a female gender identity in order to enter female restrooms and locker rooms for nefarious purposes. Doe contends that this concern has "no rational connection to [Doe's] use of the restroom" at the elementary school. Doe PI Mem. at 24. But the issue extends beyond Doe's use of restrooms: Doe's complaint expressly requests district-wide relief in the form of an injunction requiring Highland to develop district-wide protocols to ensure that all restrooms, locker rooms, and other facilities are accessible in a manner that "affirm[s] and support[s] transgender students." *See* Doe Compl., Request for Relief, ¶ B(vi). The implementation of the relief that Doe seeks—district-wide sex-separated facility access based on gender identity—would prevent school officials from ejecting biological males from female restrooms and locker rooms until improper conduct actually occurs. Highland's current policy of allowing access to sex-separated facilities on the basis of

biological sex, by contrast, helps prevent biological males with nefarious intentions from entering female restrooms, or vice versa, before any misconduct can occur. It thus bears a substantial relationship to Highland's important interest in protecting the safety of students.

### (c) Highland's Justifications Are Not Pretextual or Motivated by Animus.

Doe contends that Highland's policy of requiring students to use restrooms and locker rooms corresponding with their biological sex is unworkable because schools have "no practical means . . . of ascertaining whether students have characteristically male or female genitalia," and thus, Doe argues, Highland's justifications must be pretext for impermissible animus. Doe PI Mem. at 24-26.

In fact, however, Highland's policy is not unworkable. The school has a record of each student's biological sex. Dodds Decl. ¶ 3 (describing Highland's practice of obtaining student birth certificates for school admission); Ex. A (describing school's registration requirements). To the extent a question were to arise regarding a student's biological sex, reference to the school's records would be an entirely adequate proxy for determining the student's actual biological sex. Because the vast majority of students will bear anatomical characteristics that conform to the sex indicated in the school's records, relying on such records to apply the school's sex-separated facilities and accommodations policy whenever a question arises will, in the aggregate, substantially advance Highland's important interest in protecting bodily privacy. *See Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 70 (2001) (noting that even under heightened scrutiny a classification need not "be capable of achieving its ultimate objective in every instance"). Highland's policy is thus entirely workable, undermining Doe's unsupported allegation that its justifications are pretext for animus.

Doe's unsupported allegation of animus not only contradicts the evidence but borders on the frivolous, given Highland's extraordinary efforts to accommodate Doe. While balancing its concerns for the privacy and safety of all students, Highland has consistently taken all possible steps to support Doe and ensure that Doe thrives at school. *See* Ex. L (email correspondence documenting multiple responses from school staff including one within a half hour of the initial request and documenting a keen level of attentiveness to Doe by teachers, including having noted the number of pencils in Doe's pencil pouch the day before); Ex. M (email correspondence regarding Doe's eating disorder and how school personnel can assist Doe in sticking to Doe's meal plan including thorough follow-up questions from Principal Winkelfoos); Winkelfoos Decl. ¶ 9 (testifying that Highland has provided Doe with the support of two social workers, a school psychologist, and a licensed nurse).

In light of the foregoing arguments, Doe is unlikely to prevail on the merits of Doe's Equal Protection claim.

**B.  Doe is Unlikely to Succeed on the Merits of Doe's Title IX Claim.**

Like Doe's Equal Protection claim, Doe's Title IX claim is fatally flawed as a matter of law. First, Doe argues that, although 34 C.F.R. § 106.33 allows school districts to provide separate restrooms and locker rooms "on the basis of sex," Highland must defer to OCR's interpretation of its own regulation to require Title IX recipients to "allow transgender students access to [sex-separated facilities] consistent with their gender identity." Dear Colleague Letter at 3 (May 13, 2016) (ECF No. 10-3). *See* Doe PI Mem. at 12-15. Doe is incorrect.

Here, OCR is not interpreting its own regulation. It is interpreting the statutory term "sex" to include gender identity. But the statutory term "sex" unambiguously does not include gender identity. *See* Pl. PI Mem. at 11-15. OCR may not redefine a statutory term contrary to the unambiguous intent of Congress. *See Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

Moreover, pursuant to *Auer v. Robbins*, 519 U.S. 452 (1997), courts "defer to the agency's interpretation" of "an agency regulation" only when (1) "the language of the regulation is ambiguous" and (2) the agency's interpretation is not "plainly erroneous or inconsistent with the regulation." *Kentucky Waterways All. v. Johnson*, 540 F.3d 466, 474-475 (6th Cir. 2008). OCR's interpretation of Section 106.33 is not entitled to *Auer* deference because OCR's interpretation redefines an unambiguous statutory term. While "sex" is not expressly defined in Title IX or its implementing regulation, that does not render the language of Section 106.33 ambiguous. Rather, undefined statutory terms are "interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013). As previously discussed, the constitutionally protected privacy interests that justify the separation of the sexes in bathrooms and locker rooms arise from the physiological differences between men and women, not from the psychological construct of gender identity. The ordinary meaning of the term "sex" in the context of sex-separated facilities is thus unambiguous and plainly does not include gender identity. *See* Pl. PI Mem. at 11-15. Because Section 106.33 is unambiguous, OCR's interpretation is not entitled to *Auer*

deference. *See Kentucky Waterways All.*, 540 F.3d at 474 ("If the language of the regulation is clear, then '[t]o defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create a de facto new regulation.'").

In addition, OCR's interpretation of Section 106.33 to include gender identity within the mean of "sex" in Title IX is "plainly erroneous." *Kentucky Waterways All.*, 540 F.3d at 474. OCR's interpretation fails to consider important problems that it creates, and it conflicts with prior agency interpretations. *See* 34 C.F.R. § 106.61 ("[N]othing contained in this section shall prevent a recipient from considering an employee's sex in relation to employment in a locker room or toilet facility used only be members of one sex."); *see also* Pl. PI Mem. at 19-23. In addition, OCR's interpretation would effectively render schools unable to separate overnight accommodations, locker rooms, and restrooms based on sex. *See* Pl. PI Mem. at 13-14. Consequently, OCR's interpretation is not entitled to deference and must be rejected. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167-69 (2012) (declining *Auer* deference where the agency's interpretation "lack[ed] the hallmarks of thorough consideration" and was "flatly inconsistent with the [statute]").

Doe also argues that *Smith* and *Barnes* "establish that discrimination against a transgender individual constitutes discrimination 'on the basis of sex'" under Title IX. Doe PI Mem. at 14-18. As previously discussed, Doe is mistaken. The *Smith* court issued an amended opinion deleting a paragraph that would have made transgender status a protected class, thereby refusing to hold that Title VII prohibits discrimination based on transgender status. *Compare Smith*, 378 F.3d at 575 *with Smith*, 369 F.3d at 921-22. And *Barnes* did nothing to change this holding of *Smith. See supra*, Section I.A.1(b).

Finally, Doe argues that an individual who has undergone a gender transition is protected "based on sex" in the same way that a religious convert is protected from discrimination based on religion. Doe PI Mem. at 18-19. This argument, too, is fatally flawed and must be rejected. By definition, a person identifies as "transgender" because they have undergone or intend to undergo a *trans*ition of their *gender*. Accordingly, an allegation of discrimination based on an individual's gender transition is identical to an allegation of discrimination based on an individual's transgender status. Because, as previously discussed, transgender status is not a protected class for purposes of Title VII or Title IX in the Sixth Circuit, Doe cannot succeed on a claim alleging discrimination based on gender transition.

Doe's analogy to discrimination against a religious convert fails for another, independently sufficient reason. Sex is "an immutable characteristic," *Frontiero*, 411 U.S. at 686, whereas religion is not. A person's desire to change their sex from male to female or female to male, however sincere, cannot be actualized. A person can claim a different gender identity, change the balance of their hormones, alter the appearance of their anatomy, alter their dress, and even change their legal name and sex designation on certain documents. But sex is more than the sum of these things—it is genetic, encoded at the moment of conception, and it cannot be changed. Josephson Decl ¶¶ 23-26; Hruz Decl. ¶¶ 11-18. For this reason, the comparison to religious conversion falls flat.

For all of the foregoing reasons, the settled law of the Sixth Circuit precludes Doe from prevailing on the merits of Doe's Equal Protection and Title IX claims. Because Doe is unlikely to succeed on the merits, Doe is not entitled to a preliminary injunction.

## II. Doe Will Not Suffer Irreparable Harm Absent a Preliminary Injunction.

First, as demonstrated above, Doe's Equal Protection and Title IX claims fail as a matter of law. Accordingly, Doe's constitutional and statutory civil rights are neither threatened nor impaired, and there is no presumption of irreparable injury. *See ACLU of Ky. v. McCreary Cty. Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) (irreparable injury is presumed only when "it is found that a constitutional right is being threatened or impaired").

Second, Doe has failed to put forward sufficient facts to support a finding of irreparable harm. Doe contends that Highland's restroom policy and purported refusal to affirm Doe's gender identity have stigmatized Doe and caused Doe to suffer increasing levels of psychological distress. Doe PI Mem. at 27. Doe also claims that if Highland continues to apply its restroom policy, it will be "debilitating" for Doe. *Id.* at 28. Indeed, Doe goes so far as to suggest that failing to allow Doe to use the girls' restroom and otherwise treat Doe as a girl creates an increasing risk that Doe may attempt suicide. *Id.* at 28.

However, substantial evidence establishes that Doe's suicide risk is in fact decreasing, directly contradicting Doe's contention that Doe has been suffering increasingly debilitating psychological harm as a result of purported isolation and stigma at school. In particular, on August 15, 2016, Doe's legal guardian reported to the school that Doe's suicide risk had been downgraded from high to moderate. Winkelfoos Decl. ¶ 22. Doe's guardian also reported that Doe had had a good summer, that there were no major concerns at home, and that there was no longer any need to accompany Doe to the restroom—part of the safety plan Highland had implemented for Doe to prevent self-harm. Winkelfoos Decl. ¶ 18; Ex.

R. Moreover, Doe's extreme allegations of psychological harm and suicide risk purportedly occasioned by Highland's treatment of Doe lack a sufficient evidentiary basis to support a finding of irreparable harm. To support Doe's factual allegations of irreparable harm, Doe relies almost entirely on a declaration from Doe's counselor, Ms. Hill (the opinions of Joyce Doe regarding the cause of Doe's alleged psychological trauma amount to the speculation of a layperson and should not be given significant weight). But Ms. Hill only began seeing Doe for mental health services in January 2016 and did not diagnose Doe's gender dysphoria. Hill Decl. ¶ 4.

In addition, Ms. Hill outlines a history of childhood trauma and parental abuse as well as a number of conditions co-morbid with Doe's gender dysphoria, including anxiety, disordered eating, learning disabilities, a language disorder, and autism. Hill Decl. ¶¶ 8-10. It is highly likely that some of these factors are reasons for Doe's gender dysphoria, not the result of it. Josephson Decl. ¶ 33. Indeed, in a case like Doe's, it would be exceptionally difficult to distinguish between primary gender confusion and gender uncertainty resulting from the personality shattering effects of early abuse by a parent. *Id.* at 31. Unsurprisingly, Ms. Hill's declaration reveals numerous likely contributors to Doe's alleged suicidal tendency apart from the school's refusal to allow Doe to use the girls' restroom. *Id.* at ¶ 30. Doe's parental abuse and abandonment, attachment failures, and co-existent psychiatric disorders almost certainly contribute. *Id.*

Moreover, it is well-established that 80 to 95 percent of children with gender dysphoria will naturally desist and return to identification with their natal gender by the end of puberty absent direct intervention to affirm transgender identity. Hruz Decl. ¶ 36. The

rate of gender-dysphoria desistance in autistic children is likely similar if not higher than for children without autism. *Id.* Absent intervention that affirms Doe's gender identity as female, Doe's gender dysphoria is therefore highly likely to resolve, particularly if Doe's underlying family issues are addressed. Hruz Decl. ¶ 36; Josephson Decl. ¶¶ 34-37. In this light, it is ethically questionable whether such "gender affirming" treatment should be pursued. Affirming Doe's transgender identity may very well do more harm than good, particularly in light of the fact that adults who have undergone social transition with or without surgical modification of external genitalia continue to have rates of depression, anxiety, substance abuse, and suicide far above the general population. Hruz Decl. ¶ 38. It is simply not helpful for any individual, transgender or otherwise, to have a demand met—such as a demand for affirmation of gender identity—when the demand is fueled by underlying emotional problems. Josephson Decl. ¶ 41. And, contrary to the claims of Ms. Hill and Doe's expert psychologist, Dr. Ehrensaft, medical science does not currently understand the effects of requiring transgender individuals to use facilities that match their genetic sex rather than their perceived gender identity, whether such requirements are beneficial or harmful, or whether any benefit or harm is transitory or persistent—the necessary research has not yet been done. Josephson Decl. ¶ 41; *see generally* Lawrence S. Mayer & Paul R. McHugh, *Sexuality and Gender: Findings from the Biological, Psychological, and Social Sciences*, New Atlantis (Fall 2016). What is certain is that, with regard to restrooms and other intimate facilities, there is no evidence to support societal measures that promote or encourage gender transition as a medically necessary or effective treatment for gender dysphoria. Hruz Decl. ¶¶ 39-40.

It is also important to note that the serious tension between Doe's autism diagnosis and Doe's contention that Doe suffers from stigma and psychological harm because she is not allowed to use the girls' restroom. Doe's alleged sensitivity to social stigma and rejection would be unlikely in an autistic individual. Josephson Decl. ¶ 38.

Finally, Doe's irreparable-harm argument ignores the fact that Highland is providing Doe an accommodation—the use, along with Doe's entire special-education class, of a single-user bathroom near their classroom—that does not stigmatize or isolate Doe and not disaffirm Doe's perceived gender identity. Winkelfoos Decl. ¶¶ 18-19. No evidence indicates that this accommodation creates any risk of harm or is otherwise insufficient to meet Doe's needs.

Taken together, the evidence before the court is insufficient to support a finding of a threat of irreparable harm to Doe, and Doe is thus not entitled to a preliminary injunction. But even if this Court were to weigh the evidence and reach a different conclusion, disputed issues of fact remain. Specifically, the parties' factual disputes include without limitation (1) whether Doe has been or may be psychologically harmed by Highland's restroom policy or other conduct alleged by Doe, (2) the causes and extent of Doe's psychological distress and past suicidal behaviors, (3) whether affirming Doe's gender identity as a female and allowing Doe to use the girls' restroom would alleviate or exacerbate Doe's psychological distress and any risk of suicide, and (4) whether Doe has been subjected to bullying or harassment, and whether any such incidents were properly handled by Highland. When disputed issues of fact exist, a preliminary injunction may not issue absent an evidentiary hearing. *See Cty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 484 (6th Cir. 2002) ("[T]he notice requirement

of Rule 65(a)(1) also 'implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition'") (quoting *Williams v. McKeithen*, 939 F.2d 1100, 1105 (5th Cir. 1991) (internal quotation marks omitted)); *Carpenters' Dist. Council, Detroit, Wayne and Oakland Ctys. and Vicinity, of United Bhd. of Carpenters and Joiners of Am., AFL-CIO v. Cicci*, 261 F.2d 5, 8 (6th Cir. 1958) (holding that, "if the allegations of a complaint are denied by a defendant, [the defendant] is entitled to a hearing, which includes the right to offer evidence in support of … factual claims" before a preliminary injunction may issue). Consequently, at the very least, Highland is entitled to an evidentiary hearing and an opportunity to prepare for the hearing through limited discovery before a preliminary injunction may issue. Indeed, such an evidentiary hearing would bring forth much stronger science that calls into serious question the efficacy and ethics of the treatment to which Doe is currently being subjected—and in so doing, provide him with a greater range of treatment options than is apparently now being made available.

### III. Issuance of an Injunction Would Cause Substantial Harm to Others.

As detailed above in Section I.A.2 (a) and (b), Highland's policy of allowing access to sex-separated facilities consistent with students' biological sex safeguards students' constitutionally protected privacy rights and promotes student safety. An injunction reversing Highland's policy would deprive the school of any basis to remove a biological male from female restrooms or locker rooms. And it would create a risk that a disturbed biological male might obtain access to a female restroom or locker room for a nefarious purpose by falsely claiming a female gender identity. An injunction would thus jeopardize constitutionally protected privacy rights and endanger student safety—concerns supported

by the testimony of parents with children attending Highland schools. *See* Decl. of Parent H. ¶ 5 "I believe that having students of the opposite sex share facilities like restrooms, locker rooms and overnight accommodations would be asking for trouble. In particular, I would be concerned for the safety of students, especially female students…"); Decl. of Parent S. ¶ 9 ("I believe that exposing students to people of the opposite sex in [a restroom, locker room, or overnight accommodation] violates the privacy and respect that each student deserves and expects, and that parents expect their children will receive, at school."). It would also create a liability risk for Highland. *See Etsitty v. Utah Transit Auth.*, 502 F. 3d 1215, 1224 (2007) (observing that the use of female public restrooms by a biological male could result in liability for an employer); Decl. of S.B (testifying that opening intimate facilities to the opposite sex based on gender identity violates the rights of other students, "including those of my children, who have suffered severe sexual abuse, molestation, and rape and who will be directly harmed by" such a policy).[4]

### IV.    An Injunction is Against the Public Interest.

The public has a strong interest in ensuring that children can attend schools that provide a safe environment for learning and provide adequate protection for students' constitutionally protected privacy rights. Here, as previously discussed, an injunction would jeopardize the privacy rights of all of the students attending Highland schools. Because it is in the public interest to prevent violations of constitutional rights, *see G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994), issuing an injunction is against the public interest.

---

[4] *See supra* n. 1.

## CONCLUSION

In sum, Doe has failed to meet its burden to demonstrate a likelihood of success on the merits; Doe has not established a threat of irreparable injury; an injunction would cause substantial harm to others; and an injunction is against the public interest—and most certainly against the interests of girls and boys under Highland's care who would be exposed to the opposite sex in their once-private facilities. For these reasons, Highland respectfully requests that the Court deny Doe's motion for a preliminary injunction.

In the alternative, if the Court determines that Doe has made a prima facie showing that a preliminary injunction should issue, there are significant disputed issues of fact that preclude the issuance of a preliminary injunction without first holding an evidentiary hearing.

Date: September 6, 2016

Respectfully submitted,

s/ David Langdon

Gary S. McCaleb, AZ 018848*
Steven O'Ban, WA 17265**
Douglas G. Wardlow, AZ 032028**
Jeana Hallock, AZ 032678*
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
gmccaleb@ADFlegal.org
soban@ADFlegal.org
dwardlow@ADFlegal.org
jhallock@ADFlegal.org

J. Matthew Sharp, GA 607842*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100

David Langdon, OH 0067046
  *Trial Attorney*
LANGDON LAW, LLC
8913 Cincinnati Dayton Road
West Chester, Ohio 45069
(513) 577-7380
(513) 577-7383 Fax
dlangdon@langdonlaw.com

Andrew J. Burton, OH 0083178
RENWICK, WELSH & BURTON LLC
9 North Mulberry Street
Mansfield, Ohio 44902
(419) 522-2889
(419) 525-4666 Fax
andrew@rwblawoffice.com

Matthew John Markling, OH 0068095

Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
msharp@ADFlegal.org

Sean Koran, OH 0085539
Patrick Vrobel, OH 0082832
MCGOWN & MARKLING CO., L.P.A.
1894 N. Cleveland-Massillon Road
Akron, Ohio 44333
(330) 670-0005
(330) 670-0002 Fax
mmarkling@mcgownmarkling.com
skoran@mcgownmarkling.com
pvrobel@mcgownmarkling.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2016, I filed the foregoing document, entitled

Board of Education of Highland Local School District's Response in Opposition to

Intervenor Third-Party Plaintiffs' Motion for Preliminary Injunction, through the Court's

ECF system.

s/ David Langdon
David Langdon