**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **BOARD OF EDUCATION OF THE** | : | |
| **HIGHLAND LOCAL SCHOOL** | : | |
| **DISTRICT,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 2:16-CV-524** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **UNITED STATES DEPARTMENT** | : | |
| **OF EDUCATION,** *et al.*, | : | **Magistrate Judge Jolson** |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |
| **JANE DOE, a minor, by and through her** | : | |
| **legal guardians JOYCE and JOHN DOE** | : | |
| | : | |
| **Intervenor Third-Party Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BOARD OF EDUCATION OF THE** | : | |
| **HIGHLAND LOCAL SCHOOL** | : | |
| **DISTRICT,** *et al.*, | : | |
| | : | |
| **Third-Party Defendants.** | : | |

## OPINION & ORDER

Jane Doe, an eleven-year-old transgender girl, seeks to use the girls' restroom at

Highland Elementary School. Highland will not permit her to do so. After an investigation, the

Office of Civil Rights ("OCR") of the Department of Education ("DOE") found that Highland's

policy impermissibly discriminated against Jane on the basis of her sex in violation of Title IX of

the Education Amendments of 1972. Highland now asks this Court to enjoin DOE and the

Department of Justice ("DOJ") from enforcing the antidiscrimination provisions of Title IX

1

against Highland.  Jane Doe, in turn, asks the Court to enjoin Highland's policy and order Highland to permit her to use the girls' restroom and otherwise treat her as a girl.  For the reasons that follow, the Court **DENIES** Highland's Motion for Preliminary Injunction and **GRANTS** Jane Doe's Motion for Preliminary Injunction.

## I.      BACKGROUND

### A.  Statutory and Regulatory Background

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX also specifies that nothing in the statute "shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."  *Id.* § 1686.  The DOE has promulgated regulations clarifying that a recipient of federal funds "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities for students of the other sex."  34 C.F.R. § 106.33.

Over the past several years, DOE has issued several guidance documents explaining the agency's interpretation of Title IX and its implementing regulations with respect to transgender students.  In a 2010 Dear Colleague Letter, a guidance document explaining DOE's interpretation of Title IX, OCR wrote that Title IX "protect[s] all students, including . . . transgender . . . students, from sex discrimination."  (10/26/10 Dear Colleague Letter, Doc. 33-1 at 8.)  In April 2014, OCR issued a "significant guidance document" stating that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity."  (Questions and Answers on

Title IX and Sexual Violence, Doc. 33-2 at B-2.) In December 2014, OCR published further guidance clarifying that "[u]nder Title IX, a recipient generally must treat transgender students consistent with their gender identity in all aspects of the planning, implementation, enrollment, operation, and evaluation of single-sex classes." (Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities, Doc. 33-3 at 25.) In April 2015, OCR issued a Title IX Resource Guide, which stated that schools should "help ensure that transgender students are treated consistent with their gender identity in the context of single-sex classes." (Resource Guide, Doc. 33-4 at 21-22.) Most recently, on May 13, 2016, DOJ and DOE issued joint guidance that "[w]hen a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity." (Dear Colleague Letter on Transgender Students, Doc. 33-5 at 3.) The letter also clarified that "[h]arassment that targets a student based on gender identity, transgender status, or gender transition is harassment based on sex, and the Departments enforce Title IX accordingly." (*Id.* at 2.)

## B. Factual Background

Jane Doe is an eleven-year-old transgender girl who is enrolled in the fifth grade at Highland Elementary School. Jane, who was assigned male at birth, has communicated to her family that she is female since she was four years old. (Declaration of Joyce Doe, Doc. 35-2 at ¶ 2.) After her parents sought out the advice of medical and mental health professionals, Jane was diagnosed with gender dysphoria. (*Id.* at ¶ 4; Declaration of Lourdes Hill, Doc. 36-2 at ¶ 5.) According to Diane Ehrensaft, a developmental and clinical psychologist who specializes in working with children and adolescents with gender dysphoria, gender dysphoria is "the medical diagnosis for the severe and unremitting emotional pain resulting from th[e] incongruity"

3

between one's gender identity and the sex he or she was assigned at birth.  (Declaration of Diane Ehrensaft, Ph.D, Doc. 35-4 at ¶¶ 23-24.)  Jane's health care providers recommended that she socially transition to treat her gender dysphoria.  (Hill Decl., Doc. 36-2 at ¶ 7.)  "Social transition" involves "changes that bring the child's outer appearance and lived experience into alignment with the child's core gender," including "changes in clothing, name, pronouns, and hairstyle."  (Ehrensaft Decl., Doc. 35-4 at ¶ 27.)

When Jane began kindergarten at Highland Elementary, she used a traditionally male name and was listed as male in school records.  (Compl., Doc. 1 at ¶¶ 61-63.)  In 2012, however, Jane's parents, Joyce and John Doe, helped her socially transition by obtaining appropriate clothing and a legal name change, treating her as their daughter, and asking others to treat her likewise.  (Joyce Doe Decl., Doc. 35-2 at ¶ 5.)  According to Joyce, Jane immediately began to feel more joyful, at ease with herself, and less angry.  (*Id.* at ¶ 6.)  That summer, before she started first grade, Joyce informed Defendant Shawn Winkelfoos, the principal of Highland Elementary, that Jane had socially transitioned and asked that the School District treat her as female, permit her to use the girls' restroom, and ensure that her school records reflected her chosen name and correct gender marker.  (*Id.* at ¶¶ 7-8; Compl., Doc. 1 at ¶ 66.)  Winkelfoos denied her request to permit Jane to use the girls' restroom and to change the records to reflect her female name, although the School District has stated that it agreed to "address [Jane] as a female."  (*Id.* at ¶ 67; Joyce Doe Decl., Doc. 35-2 at ¶¶ 9-10.)  Highland has a policy that "students using sex-specific locker rooms and restrooms, or overnight accommodations during school trips or events, must use the facilities that correspond to their biological sex."  (Compl., Doc. 1 at ¶ 74.)  Jane, therefore, was required to use the office restroom, which was generally

used by school personnel and other adults. (Joyce Doe Decl., Doc. 35-2 at ¶ 9.) Joyce and John Doe observed that this arrangement was "taking a toll on Jane's mental health." (*Id.* at ¶ 11.)

Joyce renewed her request the following year, in the summer of 2013, before Jane started second grade. (*Id.* at ¶ 12.) Winkelfoos again denied the request and Jane was required to use the unisex restroom in the teachers' lounge. (*Id.* at ¶ 15.) Jane reported to Joyce that when she would pass through the lounge to access the restroom, "teachers would glare at her and make her feel uncomfortable." (*Id.*) Jane began to suffer from extreme anxiety and depression. (*Id.* at ¶ 16.) In May 2014, she was hospitalized for suicidal ideation and depressed mood. (*Id.*)

In December 2013, Joyce filed a complaint with OCR, which proceeded to investigate the complaint. (*Id.*; Compl., Doc. 1 at ¶ 97.) The complaint alleged that Highland discriminated against Jane on the basis of her sex by requiring her to use a separate individual-user bathroom and denying her access to the same bathrooms used by other female students. (*Id.* at ¶ 98; Complaint-in-Intervention, Doc. 32 at ¶ 72.) On August 29, 2014, OCR amended the complaint to include an additional allegation, namely, that school staff members subjected Jane to harassment, including by referring to her as a boy and failing to use female pronouns when referring to her, and that the School District failed to respond appropriately when staff members were informed of student harassment toward Jane. (*Id.* at ¶ 73; Compl., Doc. 1 at ¶ 100.)

In September 2014, at the beginning of Jane's third-grade year, Joyce also filed a complaint with Superintendent William Dodds against Principal Winkelfoos, alleging that Highland had created a hostile environment for Jane. Dodds investigated the complaint and found it to be without merit. (Joyce Doe Decl., Doc. 35-2 at ¶ 17.) That same month, Joyce put in a request to Superintendent Dodds to ask the Board of Education to permit Jane to use the

girls' restroom.  (*Id.* ¶ 18.)  Dodds later told Joyce that the Board had considered her request and voted not to grant it.  (*Id.*)

As the beginning of fourth grade approached, Jane became anxious about returning to school because she would not be permitted to use the girls' restroom and she feared that teachers and other students would harass and bully her, including by using her birth name and male pronouns when referring to her.  (*Id.* at ¶ 19.)  In August 2015, she attempted suicide.  (*Id.*)

After Jane began fourth grade, the School District required her to use a restroom in the staff room.  (*Id.* at ¶ 20.)  The restroom was kept locked so that for Jane to gain access to it, a staff member had to walk her to the restroom, unlock the door, wait outside, and escort her back to class.  (*Id.*)  As a result, Jane began to refuse to use the restroom at school and to limit her fluid intake during the day.  (*Id.* at ¶ 21.)  Joyce characterized her as more agitated and combative when she returned home each day.  (*Id.*)  Jane herself stated that when she has to use a different restroom from everyone else, she feels alone and not part of the school.  (Declaration of Jane Doe, Doc. 35-1 at ¶ 5.)  She said that when other students line up to go to the restroom, she "leave[s] the line to go to a different restroom, [and] other kids say, 'Why are you going that way? You're supposed to be over here.'"  (*Id.* at ¶ 6.)  One friend asked her: "Why are you going to another restroom? You're a girl.  Girls go to the girls' restroom."  (*Id.* at ¶ 7.)  She also stated that other students sometimes bully her, call her a boy, or tell her to act like a boy, and that some teachers have told her she was a boy and called her by her birth name.  (*Id.* at ¶¶ 9, 11.)

Based on her experience working with transgender children, Dr. Ehrensaft believes that "it would be psychologically damaging for a transgender child to be forced to use a separate restroom and repeatedly referred to by her birth name and male pronouns," and that

circumstances such as a history of serious health conditions and prior suicide attempts "would amplify risk of harm to the child." (Ehrensaft Decl., Doc. 35-4 at ¶ 42.)

Notwithstanding the prohibition on Jane's use of the girls' restroom, Jane has used the girls' restroom on several occasions, and Joyce asserts that none of these occasions caused any harm to other students. (Joyce Doe Decl., Doc. 35-2 at ¶ 22.) While Jane participated in an after-school running club in April and May 2014, her coach allowed her to use a girls' restroom at the school. (*Id.* at ¶ 23.) In October 2014, Jane attended an after-school program called God's Kids, during which the office and teachers' lounge were locked and Jane was permitted to use the girls' restroom. (*Id.* at ¶ 24.) In April 2015, Jane used the girls' restroom at the local zoo during a school field trip there. (*Id.* at ¶ 25.) Finally, she used a girls' restroom at the elementary school during after-school choir practice and at Highland High School during a summer volleyball camp. (*Id.* at ¶¶ 26-27.)

Defendants Dodds and Winkelfoos have submitted affidavits attesting that they and other School District officials have taken prompt action to revise school records to reflect Jane's current legal name and insisting that Highland staff have made a concerted effort to address her with the name and pronouns of her choice. (Declaration of William Dodds, Doc. 64 at ¶ 9; Declaration of Shawn Winkelfoos, Doc. 65 at ¶ 20.) Dodds and Winkelfoos also stated that they perceive Jane to be consistently happy while at school and that at the beginning of the school year Jane "high-fived" Dodds and told him she was having fun at school. (Dodds Decl., Doc. 64 at ¶¶ 5, 11; Winkelfoos Decl., Doc. 65 at ¶ 3.) They also submitted copies of emails between Joyce Doe and school officials documenting steps Highland took to help Jane deal with her eating disorder and other health issues. (Emails, Docs. 65-1, 65-2.) Finally, they assert that Jane has never attempted self-harm or exhibited anger issues at school. (Winkelfoos Decl., Doc. 65 at

¶¶ 4-5; Dodds Decl., Doc. 64 at ¶ 6.)  She has regularly met with the school's social workers and psychologist, with Joyce Doe's consent.  (Winkelfoos Decl., Doc. 65 at ¶ 9.)  Finally, they point to the school safety plan Highland created for Jane and note that Joyce recently informed them that Jane's suicide risk had been downgraded from high to moderate.  (*Id.* at ¶ 22; Doc. 65-9.)

Three parents of other Highland students submitted affidavits in support of the School District's policies.  One parent testified that her seventh-grade son who attends Highland Middle School "would be uncomfortable if a girl came into the restroom while he was in there" and that she did not approve of her son sharing a restroom, locker room, or overnight accommodations with girls.  (Declaration of Parent H., Doc. 68 at ¶¶ 2, 5.)  Another Highland parent, whose two foster daughters have suffered horrific sexual abuse and, as a result, suffer from psychological trauma, submitted an affidavit explaining that for her daughters, "the male anatomy is a weapon by which they were assaulted" and they would feel vulnerable being in the presence of biological males when showering, changing clothes, or using the bathroom.  (Declaration of S.B., Doc. 69 at ¶¶ 6, 14-15.)  As a result, she contends that "[t]he very presence of a male, regardless of whether he identifies as a female, in my daughters' restroom or locker room . . . will almost certainly cause severe trauma that will set back their emotional and psychological healing process."  (*Id.* at ¶ 16.)

On March 29, 2016, OCR notified Highland that its treatment of Jane Doe violated Title IX.  (Complaint-in-Intervention, Doc. 32 at ¶ 75.)  The following day, OCR presented a proposed Resolution Agreement to the School District, which provided, in relevant part, that the School District would grant Jane access to sex-specific facilities consistent with her gender identity, treat Jane consistent with her gender identity, and engage a third-party consultant with expertise in child and adolescent gender identity to assist it in implementing the terms of the Agreement.

(Compl., Doc. 1 at ¶ 104; Resolution Agreement, Doc. 10-4 at 2-3.) On June 10, 2016, the School District filed this lawsuit, stating in its complaint that Highland had decided not to accept the Resolution Agreement. (Compl., Doc. 1 at ¶ 118.) That same day, OCR sent a letter to the School District's attorney informing him that OCR had learned of the lawsuit. (Letter, Doc. 10-7 at 2.) The letter noted that, due to the lawsuit as well as several unsuccessful attempts to communicate with the School District, OCR planned to end the 90-day period for negotiations over the Resolution Agreement. (*Id.* at 1-2.) The letter further stated that within 10 days OCR would issue another letter finding the School District in violation of Title IX. (*Id.* at 2.)

On June 28, 2016, OCR issued its letter of findings from its investigation. (Complaint-in-Intervention, Doc. 32 at ¶ 76; Letter, Doc. 10-8.) OCR found that the School District was in violation of Title IX because it: "(1) failed to assess whether a hostile environment existed for [Jane]; and 2) denied [Jane] access to restrooms consistent with [Jane's] gender identity." (*Id.* at 2.) The letter further stated:

> If OCR determines that the matter cannot be resolved voluntarily by informal means OCR then must either initiate proceedings to effectuate the suspension or termination of or refusal to grant or to continue Federal financial assistance or seek compliance through any means otherwise authorized by law. Such other means may include, but are not limited to, referring the matter to the Department of Justice to initiate a lawsuit. 34 C.F.R. § 106.71 (incorporating, among other provisions, 34 C.F.R. §§ 100.7(c)-(d)); 100.8; 100.9(a)).

(*Id.* at 12.) The School District received $1,123,390 in federal funds for the 2015-2016 school year out of a total budget of $15,400,000. (Compl., Doc. 1 at ¶ 128.)

On July 29, 2016, OCR issued a Letter of Impending Enforcement Action to the School District. (Enforcement Letter, Doc. 33-7.) OCR stated that it "will either initiate administrative proceedings to suspend, terminate, or refuse to grant or continue financial assistance to the District or refer the case to the U.S. Department of Justice for judicial proceedings to enforce any

rights of the United States under its laws." (*Id.* at 14.)  The letter further stated that OCR "can take this action after 15 calendar days of the date of this letter if a resolution of this matter is not reached." (*Id.* at 14-15.)

### C.  Procedural History

On June 10, 2016, the Board of Education of the Highland Local School District ("Highland" or "School District") commenced this lawsuit, alleging that the actions of the DOJ, DOE, Secretary of Education John King, Attorney General Loretta Lynch, and Principal Deputy Assistant Attorney General Vanita Gupta (collectively, "Defendants" or "federal Defendants") violated:  (1) the Administrative Procedure Act ("APA"); (2) the Spending Clause of Article I, Section 8 of the United States Constitution; (3) the federalism guarantees of the United States Constitution; (4) the separation-of-powers guarantees of the United States Constitution; and (5) the Regulatory Flexibility Act.  (Compl., Doc. 1 at ¶¶ 132-247.)  The School District filed a motion for preliminary injunction on July 15, 2016.  (Doc. 10.)

On July 21, 2016, Jane Doe and her parents moved to intervene as third-party plaintiffs in the suit and to proceed pseudonymously.  (Docs. 15-16.)  The Court granted both motions (Doc. 29), and Jane subsequently filed her own motion for preliminary injunction against Dodds, Winkelfoos (together, the "individual Third-Party Defendants"), the Board of Education of the Highland Local School District, and the Highland Local School District (collectively, "Third-Party Defendants").  (Docs. 35-36.)  In her third-party complaint, Jane brings claims against Third-Party Defendants for violations of: (1) her Fourteenth Amendment right to equal protection of the laws; (2) her right to be free from sex discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*; and (3) her fundamental right to privacy under the United States Constitution.  (Doc. 32 at ¶¶ 78-108.)

Both motions for preliminary injunction are now ripe for review.  The Court has also granted the State of Ohio's motion for leave to file an *amicus curiae* brief on behalf of the School District.  (*See* Doc. 30.)

Highland asks the Court to enjoin the federal Defendants from enforcing what the School District characterizes as the "agency rule" declaring: (1) that the term "sex" in Title IX and its regulations includes "gender identity"; and (2) that Title IX requires schools to allow students to access overnight accommodations, locker rooms, and restrooms consistent with their professed gender identity.  (Doc. 10 at 1.)  Highland also asks the Court to enjoin Defendants from: (1) enforcing Title IX in a manner that would require it to allow transgender students "to access overnight accommodations, locker rooms, and restrooms designated for the opposite sex"; and (2) taking any adverse action against the School District, including but not limited to steps to revoke its federal funding, because of its policy "requiring students to use sex-specific overnight accommodations, locker rooms, and restrooms consistent with their sex."  (*Id.* at 1-2.) Defendants and Jane Doe oppose Highland's motion for preliminary injunction.  (Docs. 33-34.)

Jane Doe asks for a preliminary injunction requiring the School District and other Third-Party Defendants to "treat her as a girl and treat her the same as other girls, including using her female name and female pronouns and permitting Jane to use the same restroom as other girls at Highland Elementary School during the coming school year."  (Doc. 36 at 2.)  The School District and the individual Third-Party Defendants oppose Jane Doe's motion for preliminary injunction.  (Docs. 61, 71.)[1]

---

[1] The States of Texas, Arkansas, Arizona, West Virginia, Alabama, Wisconsin, Georgia, Nebraska, Louisiana, South Carolina, Utah, and Mississippi and the Commonwealth of Kentucky have filed a Motion for Leave to File Brief as *Amici Curiae*.  (Doc. 53.)  Additionally, a group of school administrators and staff members from California, the District of Columbia, Florida, Illinois, Kentucky, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Rhode Island, Texas, Vermont, Washington, and

## II.   LEGAL STANDARD

The Sixth Circuit's test to determine whether injunctive relief is appropriate under

Federal Rule of Civil Procedure 65 requires the Court to weigh the following factors: (1) whether

the movant has a substantial likelihood of success on the merits; (2) whether there is a threat of

irreparable injury to the movant without the injunction; (3) whether issuance of the injunction

would cause substantial harm to others; and (4) whether the public interest would be served by

granting injunctive relief.  *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010).  These

four factors "guide the discretion of the district court," but "they do not establish a rigid and

comprehensive test for determining the appropriateness of preliminary injunctive relief."

*Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982).  Whether the

combination of the factors weighs in favor of issuing injunctive relief in a particular case is left

to the discretion of the district court.  *See Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

While the Sixth Circuit has held that "the proof required for the plaintiff to obtain a

preliminary injunction is much more stringent than the proof required to survive a summary

judgment motion," *id.*, a party "is not required to prove his case in full at a preliminary

injunction hearing and the findings of fact and conclusions of law made by a court granting the

preliminary injunction are not binding at trial on the merits," *Certified Restoration Dry Cleaning*

*Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation omitted).  A plaintiff

Wisconsin filed a Motion for Leave to Participate as *Amici Curiae* in Support of Jane Doe and,
subsequently, a Corrected Motion for Leave to File Amicus Brief.  (Docs. 86, 91-1.)  Leave to
participate as *amicus curiae* is a "privilege within the sound discretion of the courts."  *United*
*States v. Michigan*, 940 F.2d 143, 165 (6th Cir. 1991) (internal quotation marks and citation
omitted).  Because school districts and their staff throughout these states are also affected by the
agency action at issue here, the Court finds that these parties have "an important interest and a
valuable perspective on the issues presented."  *United States v. City of Columbus*, No. 2:99-cv-
1097, 2000 WL 1745293, at *1 (S.D. Ohio Nov. 20, 2000) (quotation marks and citations
omitted).  The Court, therefore, **GRANTS** the motions to file amicus briefs.  (Docs. 53, 86, 91-
1.)

has "the burden of establishing a clear case of irreparable injury and of convincing the Court that the balance of injury favor[s] the granting of the injunction." *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968) (per curiam).

### III.    HIGHLAND'S MOTION FOR PRELIMINARY INJUNCTION

At the outset, Defendants contend that the Court lacks subject-matter jurisdiction over the School District's APA claim.  Because Congress has established a specific enforcement scheme for Title IX, Defendants argue that the School District is prohibited from seeking judicial review in this Court before any enforcement action has occurred.  (Doc. 33 at 1.)

After an investigation, if OCR finds a school district in violation of Title IX and cannot obtain voluntary compliance from the district, OCR may seek compliance in one of two ways. First, it may initiate administrative proceedings to withhold federal funds from the school district.  *See* 20 U.S.C. § 1682; 34 C.F.R. § 100.8(c).  A district is entitled to a hearing before an administrative law judge followed by an administrative appeal and discretionary review by the Secretary of Education.  *Id.* § 100.10(a), (e).  A district may then seek review of an adverse decision in the appropriate court of appeals.  20 U.S.C. § 1683; *see* 20 U.S.C. § 1234g(a)-(b). Alternatively, instead of initiating administrative proceedings, OCR may refer the matter to DOJ to commence a civil action in the appropriate federal district court to enjoin further violations. 34 C.F.R. § 100.8(a); *see also* 20 U.S.C. § 1682.

Relying heavily on *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 218 (1994), Defendants contend that this enforcement scheme precludes district court jurisdiction over parallel pre-enforcement challenges.  In *Thunder Basin*, the Supreme Court held that Congress's intent to preclude district court review of pre-enforcement challenges was "fairly discernible in the statutory scheme" of the Federal Mine Safety and Health Amendments Act of 1977 (the

13

"Mine Act"), a statute with an enforcement process quite similar to that of Title IX.  *Id.* at 207 (quotation marks and citation omitted).

Whether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, purpose, legislative history, and the opportunity provided for meaningful review of the claims.  *Id.*  The Mine Act "establishes a detailed structure for reviewing violations of 'any mandatory health or safety standard, rule, order, or regulation promulgated' under the Act."  *Id.* (quoting 30 U.S.C. § 814).  A mine operator's challenge to a citation issued under the Mine Act is heard by an administrative law judge with discretionary review by the Federal Mine Safety and Health Review Commission.  *Id.* at 207-08.  An operator may appeal an adverse decision to the appropriate court of appeals.  *Id.* at 208.  The Mine Act specifies that the Commission and the courts of appeals have exclusive jurisdiction over challenges to agency enforcement proceedings but is "facially silent with respect to pre-enforcement claims."  *Id.*  In *Thunder Basin*, a mine operator failed to post identifying information about the miners' union representatives, taking the position that nonemployees should not be permitted to serve as representatives, and the Mine Safety and Health Administration sent the operator a letter instructing it to post the miners' representative designations as required by the Mine Act's regulations.  *Id.* at 204.  The mine operator filed suit for injunctive relief before it was actually issued a citation.  *Id.* at 205.

The Supreme Court held that the structure and legislative history of the Act showed Congress's intent to preclude pre-enforcement challenges in federal district courts.  *Id.* at 216. First, the Court noted that the Act's "comprehensive review process does not distinguish between preenforcement and postenforcement challenges, but applies to all violations of the Act and its regulations."  *Id.* at 208-09.  The Act expressly authorizes district court jurisdiction in only two

14

provisions, neither of which provides a right of action to the mine operators themselves.  *Id.* at 209.  Second, the legislative history suggested that before enactment Congress was concerned that civil penalties against operators were both too low and non-mandatory and, in particular, that under an earlier statute, mine operators could contest civil-penalty assessments *de novo* in federal district court once the administrative review process was complete.  *Id.* at 210.

The enforcement mechanisms of Title IX are indeed similar to that of the Mine Act, notably the administrative hearing and appeal process, judicial review in the court of appeals, and express authorization of district court jurisdiction in suits by the Secretary but not the regulated parties.  *See* 20 U.S.C. §§ 1682-83; 34 C.F.R. § 100.8(a)(1).  The School District resists this comparison to the Mine Act, pointing to statutory language in Title IX that provides that "[a]ny department or agency action taken pursuant to section 1682 . . . shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds."  20 U.S.C. § 1683.  Section 1682, in turn, authorizes the agency to effectuate compliance with the anti-discrimination provisions of the statute by initiating termination proceedings against funding recipients.  But the judicial review provided "for similar action" in § 1683 references the general provision for judicial review of funding termination decisions in 20 U.S.C. § 1234g(b), which provides that a recipient may seek judicial review in the appropriate court of appeals and that "[t]he Secretary may not take any action on the basis of a final agency action until judicial review is completed."  *Id.* § 1234g(a); *see Freeman v. Cavazos*, 923 F.2d 1434, 1440 (11th Cir. 1991) (holding that the "applicable judicial review provision" for "similar action" in Title VI of the Civil Rights Act is 20 U.S.C. § 1234g).

The remainder of § 1683, in turn, only applies to funding terminations "not otherwise subject to judicial review." Therefore, when an action *is* "otherwise subject to judicial review," no *additional* judicial review is available under § 1683.

This understanding finds support in other cases involving the potential termination of federal funds. For example, a district court in this circuit held that a provision of Title VI, 42 U.S.C. § 2000d-2, which is virtually identical to § 1683, precluded federal district court jurisdiction over a complaint seeking an injunction against a pending administrative process. *Sch. Dist. of City of Saginaw, Mich. v. U.S. Dep't of Health, Educ., & Welfare*, 431 F. Supp. 147, 152 (E.D. Mich. 1977). *See also Taylor v. Cohen*, 405 F.2d 277, 281 (4th Cir. 1968) (finding no subject-matter jurisdiction over a complaint for injunctive relief against a federal agency because Title VI dictates that "[j]udicial review must await the outcome of the administrative hearing"). In both cases, the availability of administrative review at the agency level, coupled with judicial review in the court of appeals, divested the district court of only pre- or mid-enforcement jurisdiction. *See id.* at 279-80 ("[I]f specific statutes relating to programs receiving federal assistance afford review of agency action, then review under the Administrative Procedure Act is not available.").

Highland also looks for support from *Cannon v. University of Chicago*, in which the Supreme Court held that there is a private right of action under Title IX for victims of discrimination, for the proposition that the presumption of reviewability should apply to other Title IX claims that are not expressly precluded. 441 U.S. 677, 709 (1979). A district court in Texas, which recently concluded it had jurisdiction over a challenge from several states to the guidance at issue here, also relied on *Cannon* in adopting this reasoning. *Texas v. United States*, --- F. Supp. 3d ----, 2016 WL 4426495, at *10 (N.D. Tex. Aug. 21, 2016) ("Neither Title VII nor

16

Title IX presents statutory schemes that would preclude Plaintiffs from bringing these claims in federal district court. Indeed, the Supreme Court has held that Title IX's enforcement provision, codified at Title 20 U.S.C. §§ 1681–1683, does not provide the exclusive statutory remedy for violations.") (citing *Cannon*, 441 U.S. at 680).  The *Texas* court's analysis can charitably be described as cursory, as there is undoubtedly a profound difference between a discrimination victim's right to sue in federal district court under Title IX and a school district's right to challenge an agency interpretation in federal district court.  This Court cannot assume that the first right implies the second.

Indeed, in *Cannon*, applying the four-part text from *Cort v. Ash*, 422 U.S. 66 (1975), to determine whether a private right of action existed, the Court noted that the first factor—whether the statute was enacted for the benefit of a special class of which the plaintiff is a member— favored finding an implied right of action for the plaintiff, who alleged she had been denied admission to a university on the basis of her sex.  *Cannon*, 441 U.S. at 694.  Title IX was not, on the other hand, enacted to benefit school districts.  Further, in *Cannon*, the Supreme Court found that the statutory structure was "aimed at protecting individual rights without subjecting the Government to suits."  *Id.* at 715.  This militates squarely against finding a private right of action in federal district court for school districts against the federal government.  And the *Cannon* Court also noted that allowing an action against the agency would be "far more disruptive" of its enforcement efforts "than a private suit against the recipient of federal aid could ever be."  *Id.* at 707 n.41.  The implied right of action the Supreme Court found in *Cannon* does not support, and even weakens, Highland's position.  There is "[n]othing in the language and structure of the Act or its legislative history [to] suggest[] that Congress intended to allow [regulated parties] to

evade the statutory-review process by enjoining the [agency] from commencing enforcement proceedings." *Thunder Basin*, 510 U.S. at 216.

Highland also relies on *Sackett v. Environmental Protection Agency*, 132 S. Ct. 1367, 1374 (2012), where the Supreme Court found that a district court had subject-matter jurisdiction to consider two landowners' APA claim challenging the issuance of an EPA compliance order. The agency argued that because the statute "expressly provided for prompt judicial review, on the administrative record, when the EPA assesses administrative penalties after a hearing" but "did not expressly provide for review of compliance orders," the compliance order was unreviewable. *Id.* at 1373. The Court rejected that argument, explaining that "if the express provision of judicial review in one section of a long and complicated statute were alone enough to overcome the APA's presumption of reviewability for all final agency action, it would not be much of a presumption at all." *Id.* But the enforcement scheme of the Clean Water Act, the statute at issue in *Sackett*, bears little resemblance to that of Title IX or the Mine Act in *Thunder Basin*. In *Sackett*, receipt of a compliance order subjected the plaintiffs to additional penalties for each day they failed to comply and made it more difficult for them to obtain a permit from the Army Corp of Engineers for the discharge of pollutants. *Id.* at 1372. Highland faces no such consequences for its failure to comply with Title IX at this time. Moreover, and more importantly, express judicial review of such orders came only by way of a civil action initiated by the agency; there was no corresponding review in the court of appeals after administrative action as Title IX provides for funding-termination decisions. *Id.* at 1372-73. Here, in contrast, the enforcement scheme imposes no immediate penalties for non-compliance and the School District itself may initiate judicial review in the court of appeals after an adverse funding-termination decision from the agency.

There is also no merit in Highland's argument that now that Jane has intervened in the lawsuit, it will be deprived of any meaningful judicial review if this Court finds that it lacks jurisdiction over Highland's complaint while Highland is nevertheless forced to defend against Jane's third-party complaint.  In such a scenario, Highland retains the ability, of course, to raise as a defense to Jane's Title IX claim its arguments that the guidance violates Title IX.

The Court lacks subject-matter jurisdiction over the APA claim and, accordingly, it also lacks jurisdiction over Highland's constitutional claims.  *See Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2132-33 (2012) ("Accordingly, the appropriate inquiry is whether it is "fairly discernible" from the [statute] that Congress intended covered employees appealing covered agency actions to proceed exclusively through the statutory review scheme, even in cases in which the employees raise constitutional challenges to federal statutes.").  Dismissal of Highland's constitutional claims "does not foreclose all judicial review of petitioners' constitutional claim" because "meaningful review" of such claims is also available in the court of appeals.  *Id.*  That Congress "declined to include an exemption from [court of appeals] review for challenges to a statute's constitutionality indicates no such exception."  *Id.* at 2134-35.  *See also Thunder Basin*, 510 U.S. at 215 ("The [agency] has addressed constitutional questions in previous enforcement proceedings.  Even if this were not the case, however, petitioner's statutory and constitutional claims here can be meaningfully addressed in the Court of Appeals." (footnotes omitted)).

Because the Court lacks jurisdiction over its complaint, Highland's motion for preliminary injunction is **DENIED**.[2]

---

[2] Even if the Court had subject-matter jurisdiction here, Highland's APA claim would fail because it has an "adequate remedy in a court" and thus Highland cannot state a claim under the APA.  5 U.S.C. § 704.  The Sixth Circuit recently held that a tour bus company operator, who sued the Federal Motor Carrier Safety Administration for a violation of the APA after the agency

## IV. JANE DOE'S MOTION FOR PRELIMINARY INJUNCTION

### A. Jane is Likely to Succeed on the Merits of Her Title IX and Equal-Protection Claims

Jane argues that she is likely to succeed on the merits of her Title IX and equal-protection claims and makes no argument regarding her right-to-privacy claim. Accordingly, the Court will focus on the merits of only the first two claims.

#### 1. Jane is Likely to Succeed on Her Title IX Claim

In *Cannon v. University of Chicago*, the Supreme Court held that Title IX affords an implied private right of action to victims of discrimination. 441 U.S. at 709. To succeed on a Title-IX discrimination claim, Jane must show: (1) that she was excluded from participation in an education program because of her sex; (2) that the educational institution received federal financial assistance at the time of the exclusion; and (3) that the discrimination harmed her. *See id.* at 680 & n.2; *Preston v. Commonwealth of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994) (holding that the *Cannon* Court "implicitly recognized the necessity of causation," the third element of a discrimination claim, when it held plaintiff had stated a cause of action for discrimination under Title IX). The parties do not dispute that the School District

---

issued him an out-of-service order and then later rescinded it, had an adequate remedy in a court when the applicable statute provided for a hearing after an out-of-service order was imposed, followed by review in the appropriate court of appeals. *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 428 (6th Cir. 2016).[2] Here too, Highland has an adequate remedy in a court because it may seek review in the Sixth Circuit if OCR commences an enforcement action and issues an adverse decision to Highland. In the same vein, if, instead of commencing administrative proceedings, DOJ filed suit against Highland in federal district court to enjoin its policies, Highland would "almost by definition [] have an adequate remedy in a court, that is, the remedy of opposing the Attorney General's motions in the court in which [s]he files h[er] papers." *NAACP v. Meese*, 615 F. Supp. 200, 203 (D.D.C. 1985). Highland's argument to the contrary—that its only avenue for review in the court of appeals does not allow it to make a direct challenge to the guidance itself—fails because its remedy remains the same regardless of its type of challenge: keeping its federal funding while maintaining its policy of denying Jane access to the girls' restroom.

receives financial assistance, but they disagree on whether Jane was excluded from participation in an education program because of her sex and whether this discrimination harmed her.

As a preliminary matter, the regulation pertaining to "[e]ducation programs or activities" provides that "in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex: . . . (2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner; . . . [or] (7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity."  34 C.F.R. § 106.31(b).  The Court easily concludes, and Third-Party Defendants do not dispute, that access to a communal school bathroom constitutes an "aid, benefit[], or service[]" or a "right, privilege, advantage, or opportunity." Access to the bathroom is thus an education program or activity under Title IX.

The crux of Jane's motion turns on whether she was excluded from the girls' bathroom "on the basis of sex."  20 U.S.C. § 1681.  Title IX authorizes implementing agencies to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute."  *Id.* § 1682.  Title IX's implementing regulations permit schools to "provide separate toilet, locker room, and shower facilities on the basis of sex" so long as the "facilities provided for students of one sex" are "comparable to facilities provided for students of the other sex."  34 C.F.R. § 106.33; 28 C.F.R. § 54.410.  Title IX does not define "sex" in either the statute or the regulations, and the regulations are silent as to how to determine a transgender student's sex for purposes of access to bathrooms, locker rooms, and shower facilities.

The School District argues that Defendants' guidance is inconsistent with the objectives of Title IX.  Under the School District's view, the statute's aim is to prohibit federally funded schools from discriminating only on the basis of biological sex, which it contends is defined as

the sex appearing on one's birth certificate.[3]  Further, the School District argues that "sex" under

Title IX unambiguously means "biological sex" and does not include "gender identity."  Jane

counters that the federal Defendants' interpretation is consistent with Title IX and its

implementing regulations and that the interpretation must be given controlling weight under *Auer*

*v. Robbins*, 519 U.S. 452, 461 (1997).

      *Auer* requires courts to give controlling weight to an agency's interpretation of its own

regulation provided that the regulation is ambiguous and the agency's interpretation is not

"plainly erroneous or inconsistent with the regulation."  *Id.* (quoting *Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 359 (1989)).  *Auer* deference is not appropriate, however, when

"there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and

considered judgment on the matter in question,'" for instance, when the agency's interpretation

conflicts with a prior interpretation or appears to be nothing more than a convenient litigation

position or *post hoc* rationalization advanced to defend past agency action against attack.

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (quoting *Auer*, 519

U.S. at 462).

      In deciding whether *Auer* deference is warranted, the Court must first determine whether

the statute and its implementing regulations are ambiguous, that is, "whether the language at

issue has a plain and unambiguous meaning with regard to the particular dispute in the case."

*Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  Whether the language is ambiguous

depends on "the language itself, the specific context in which that language is used, and the

broader context of the statute as a whole."  *Id.* at 341 (citing *Estate of Cowart v. Nicklos Drilling*

*Co.*, 505 U.S. 469, 477 (1992)).

---

[3] Under Ohio law, a person may not change the sex recorded on his or her birth certificate, and,
therefore, a birth certificate reflects the sex a person has been assigned at birth.  *See* Ohio Rev.
Code §§ 3705.15, 3705.22.

Turning first to the language of the statute and regulations, the parties debate the

dictionary definition of "sex" at the time of the enactment of Title IX, but the Court sees no need

to recite those definitions extensively because they do not settle the question of ambiguity.

Suffice it to say that dictionaries from that era defined "sex" in myriad ways and, therefore,

Highland has not persuaded the Court that dictionary definitions reflect a uniform and

unambiguous meaning of "sex" as biological sex or sex assigned at birth.[4]  To the extent that

Highland tries to divine Congress's view of "sex" at the time of Title IX's enactment, the Court

puts little stock in the wisdom of that endeavor or its possibility of success.[5]  As the Supreme

Court acknowledged in *Oncale v. Sundowner Offshore Services, Inc.*, a case that held that same-

sex sexual harassment was actionable under Title VII even though it was "assuredly not the

principal evil Congress was concerned with when it enacted Title VII," a statue's "prohibitions

often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the

provisions of our laws rather than the principal concerns of our legislators by which we are

---

[4] For instance, in 1973 the American Heritage Dictionary defined sex as "the physiological, functional, and psychological differences that distinguish the male and the female." Am. Heritage Dictionary 548, 1187 (1973). The 1970 Webster's Seventh New Collegiate Dictionary defined sex to include "behavioral peculiarities" that "distinguish males and females." Webster's Seventh New Collegiate Dictionary 347, 795 (1970). These definitions suggest a view of sex that is not solely tied to reproductive function or genitalia. On the other hand, according to the 1980 Random House College Dictionary, sex is "either the male or female division of a species, esp. as differentiated with reference to the reproductive functions." Random House College Dictionary 1206 (rev. ed. 1980). The 1976 American Heritage Dictionary defined sex as "the property or quality by which organisms are classified according to their reproductive functions." Am. Heritage Dictionary 1187 (1976).

[5] Nor is the Court persuaded by Highland's attempts to glean the meaning of sex from Congress's *inaction*, specifically its failure to amend Title VII or Title IX to insert the phrase "gender identity" in contrast with its decision to add this phrase to the Violence Against Women Act. *See* 42 U.S.C. § 13925(b)(13)(A); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, 'including the inference that the existing legislation already incorporated the offered change.'") (internal quotation marks omitted); *Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335, 1342 (D.C. Cir. 1998) ("Congress does not express its intent by a failure to legislate.") (citing *United States v. Estate of Romani*, 523 U.S. 517, 535 (1998) (Scalia, J., concurring)).

governed."  523 U.S. 75, 79 (1998).  Provided that the discrimination "meets the statutory

requirements" that it was "because of . . . sex," it passes muster under Title VII.  *Id.* at 79-80.

Looking at both the specific and broader context of the use of the term "sex," neither

Title IX nor the implementing regulations define the term "sex" or mandate how to determine

who is male and who is female when a school provides sex-segregated facilities.  The Fourth

Circuit, the only federal appeals court that has examined this question, recently concluded that

Title IX and the regulation that permits separate restroom facilities for males and females, 34

C.F.R. § 106.33, were ambiguous as to how to make this determination for purposes of access to

sex-segregated restrooms, because the statute "permits both the Board's reading—determining

maleness or femaleness with reference exclusively to genitalia—and the Department's

interpretation—determining maleness or femaleness with reference to gender identity."  *G.G. ex*

*rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 720 (4th Cir. 2016), *mandate recalled*

*and stayed*, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 136 S. Ct. 2442 (2016).[6]  In support

of its finding of ambiguity, the Fourth Circuit noted that to interpret "sex" to mean "biological

sex" would still raise a number of questions as to how the bathroom regulation would apply.  *Id.*

at 720-21.  For instance, "which restroom would a transgender individual who had undergone

sex-reassignment surgery use? What about an intersex individual? What about an individual born

with X–X–Y sex chromosomes? What about an individual who lost external genitalia in an

---

[6] Although the Supreme Court recalled and stayed the Fourth Circuit's mandate pending a
decision on a petition for certiorari, a grant of certiorari, much less a stay of a mandate pending a
decision on certiorari, "do[es] not [itself] change the law."  *Schwab v. Dep't of Corr.*, 507 F.3d
1297, 1298 (11th Cir. 2007) (per curiam).  Accordingly, "unless the Supreme Court rules
otherwise, the Fourth Circuit precedent detailed above binds [district courts in the Fourth Circuit]
on questions of law."  *Height v. United States*, No. 5:16-cv-00023, 2016 WL 756504, at *4 n.3
(W.D.N.C. Feb. 25, 2016).  A district court within the Fourth Circuit itself has accordingly
concluded it was bound by *Gloucester.  See Carcano v. McCrory*, --- F. Supp. 3d ----, 2016 WL
4508192, at *13 (M.D.N.C. Aug. 26, 2016).  Although this Court is, of course, not so bound, it is
entitled to give great weight to a decision of the Fourth Circuit that remains good law.  *See Terry
v. Tyson Farms, Inc.*, 604 F.3d 272, 278 & n.3 (6th Cir. 2010).

accident?" *Id.* Highland urges the Court to reject the reasoning of *Gloucester* but also tries to distinguish that case because the Fourth Circuit only considered the ambiguity of the regulation permitting sex-segregated bathrooms, 34 C.F.R. § 106.33, not the meaning of "sex" in Title IX itself. This argument is unconvincing, as the Fourth Circuit looked broadly at the meaning of "sex" throughout the statue and its implementing regulations. *See Gloucester*, 822 F.3d at 723 ("We agree that 'sex' should be construed uniformly throughout Title IX and its implementing regulations.").

Moreover, the Sixth Circuit has expressly held that a plaintiff can prevail on a claim for sex discrimination under Title VII,[7] an analog provision of the Civil Rights Act of 1964, if he or she "has suffered discrimination because of his or her gender non-conformity." *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004); *see also Barnes v. City of Cincinnati*, 401 F.3d 729, 741 (6th Cir. 2005) ("A claim for sex discrimination under Title VII, however, can properly lie where the claim is based on 'sexual stereotypes.'"). In *Smith*, the Sixth Circuit held that such a holding was required by the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), *superseded by statute on other grounds as stated in Burrage v. United States*, 134 S. Ct. 881, 889 n.4 (2014). Gender nonconformity, as defined in *Smith*, is an individual's "fail[ure] to act and/or identify with his or her gender," in that case, an individual who was assigned male at birth but later identified as female. 378 F.3d at 575.

Third-Party Defendants try to make hay of the fact that the Sixth Circuit issued an amended opinion in *Smith*, which deleted a paragraph stating that "to the extent that Smith also alleges discrimination based solely on his identification as a transsexual, he has alleged a claim

---

[7] Courts look to Title VII of the Civil Rights Act of 1964 "as an analog for the legal standards in both Title IX discrimination and retaliation claims." *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007); *see also Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 n.2 (6th Cir. 2013).

of sex stereotyping pursuant to Title VII." *Smith v. City of Salem*, 369 F.3d 912, 922 (6th Cir. 2004), *opinion amended and superseded by Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004). But even after excising that language, the amended opinion in *Smith* expressly rejected a view of sex as a classification based purely on reproductive organs or sex assigned at birth.  *See* 378 F.3d at 572 ("[W]e find that the district court erred in relying on a series of pre-*Price Waterhouse* cases from other federal appellate courts holding that transsexuals, as a class, are not entitled to Title VII protection because 'Congress had a narrow view of sex in mind' and 'never considered nor intended that [Title VII] apply to anything other than the traditional concept of sex.'"); *id.* at 575 ("[A] label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity."); *id.* at 573 (quoting a Ninth Circuit case, *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000), for the proposition that "'sex' under Title VII encompasses both the anatomical differences between men and women and gender").[8]  *Smith* thus supports a reading that under Title IX discrimination on the basis of a transgender person's gender non-conformity constitutes discrimination "because of sex."

---

[8] An analogy employed by another district court shows just why discrimination against a transgender employee constitutes discrimination "because of sex" under Title VII:

> Imagine that an employee is fired because she converts from Christianity to Judaism. Imagine too that her employer testifies that he harbors no bias toward either Christians or Jews but only "converts." That would be a clear case of discrimination "because of religion." No court would take seriously the notion that "converts" are not covered by the statute. Discrimination "because of religion" easily encompasses discrimination because of a *change* of religion. But in cases where the plaintiff has changed her sex, and faces discrimination because of the decision to stop presenting as a man and to start appearing as a woman, courts have traditionally carved such persons out of the statute by concluding that "transsexuality" is unprotected by Title VII. In other words, courts have allowed their focus on the label "transsexual" to blind them to the statutory language itself.

*Schroer v. Billington*, 577 F. Supp. 2d 293, 306-07 (D.D.C. 2008).

Third-Party Defendants also cite several district court cases that have cut the other way and held that Title IX and its regulations permit schools to provide sex-specific locker-room, shower, and toilet facilities. But, again, these cases do not support a reading of the statute as unambiguous because the Sixth Circuit, as well as several other courts of appeals, have held that sex-discrimination claims based on gender noncomformity are cognizable under Title IX's close cousin, Title VII. *See Smith*, 378 F.3d at 573-75; *Gloucester*, 822 F.3d at 720; *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ("Accordingly, discrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender."); *Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000); *Schwenk*, 204 F.3d at 1201 (noting that "[t]he initial judicial approach" of interpreting Title VII to ban discrimination on the basis of an individual's "distinguishing biological or anatomical characteristics" rather than the individual's "sexual identity" or "socially-constructed characteristics" was "overruled by the logic and language of *Price Waterhouse*").

Additionally, although Highland contends that the "weight of authority" is on its side, the School District cites only district court cases, most of which concerned the application of Title IX *before* the agencies' most recent guidance was issued.[9] For the Court to find that the statute was ambiguous, it need not find that the agencies' interpretation is the *only* plausible reading of "sex" in the statute, but, rather, that it is *one* of the plausible readings. Therefore, the district court cases Third-Party Defendants cite are not dispositive of this issue. The Court finds that the term "sex" in Title IX and its implementing regulations regarding sex-segregated bathrooms and

---

[9] For instance, in *Johnston v. University of Pittsburgh of Commonwealth System of Higher Education*, a district court confronted similar facts but did not consider the agency's interpretation of § 106.33 and thus lacks persuasive effect here. 97 F. Supp. 3d 657, 670 (W.D. Pa. 2015). The Fourth Circuit rejected *Johnston* on the same grounds. *See Gloucester*, 822 F.3d at 723 n.9.

living facilities is ambiguous, *see* 20 U.S.C. § 1686; 34 C.F.R. § 106.32; *id.* § 106.33, and thus presumptively entitled to *Auer* deference.

Next, the Court concludes that the agencies' interpretation is not "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (quoting *Methow Valley*, 490 U.S. at 359). An agency's view "need not be the best or most natural one by grammatical or other standards. . . . Rather, the [agency's] view need be only reasonable to warrant deference." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991) (internal citation omitted). The agencies easily satisfy this deferential standard. First, the only federal appeals court that has considered this question has already determined that Defendants' interpretation of § 106.33 is reasonable. *See Gloucester*, 822 F.3d at 722 (holding that § 106.33 "sheds little light on how exactly to determine the 'character of being either male or female' where those indicators diverge" and concluding that the agencies' interpretation was reasonable). Moreover, the Sixth Circuit's construction of sex discrimination under Title VII in *Smith* and *Barnes* to include discrimination against transgender individuals who do not conform to the stereotypes of the sex assigned to them at birth weighs in favor of finding that the agencies' interpretation of Title IX and its implementing regulations is reasonable. The Court finds that Defendants' interpretation is not clearly erroneous or inconsistent with Title IX implementing regulations. *Auer*, 519 U.S. at 461.

Moreover, although neither Highland nor the individual Third-Party Defendants advance this argument, the Court finds that the agency's interpretation does not conflict with a prior interpretation, as Defendants have not previously issued guidance stating that sex discrimination does *not* include discrimination based on transgender status. Nor does it appear to be merely a convenient litigation position or a *post hoc* rationalization. *See Christopher*, 132 S. Ct. at 2166-

28

67.  Rather than taking this position only in this litigation, Defendants have consistently

articulated this interpretation of Title IX over the last several years and enforced it accordingly.

(*See* Docs. 33-1, 33-2, 33-3, 33-4, 33-5.)  Nor is it a *post hoc* rationalization, given that it is in

line with regulations and guidance of other agencies.  *See Gloucester*, 822 F.3d at 722-23 (citing

guidance and regulations from various federal agencies, including the Occupational Safety and

Health Administration, the Equal Employment Opportunity Commission, the Department of

Housing and Urban Development, and the Office of Personnel Management, that provide that

transgender individuals should be permitted to access the bathroom that corresponds with their

gender identity).  Defendants' interpretation of Title IX is entitled to *Auer* deference and given

controlling weight.  *Auer*, 519 U.S. at 461.[10]  Under this interpretation of Title IX, Jane has been

denied access to the communal girls' restroom "on the basis of [her] sex."

Finally, the Court turns to the third element of a Title IX discrimination claim: whether

the discrimination has harmed Jane.  Some issues in this case are difficult, but determining

whether Jane has been harmed from the School District's policy is not one of them.  Testimony

from Joyce Doe and Jane herself indicates that Jane feels stigmatized and isolated[11] when she is

forced to use a separate bathroom and otherwise not treated as a girl.  Although Winkelfoos and

Dodd assert that Jane seems happy at school and Third-Party Defendants all argue that Jane's

---

[10] The Court also notes that the Fourth Circuit found that the agencies were entitled to *Auer*
deference before DOE and DOJ even issued the May 2016 Dear Colleague letter.  The agencies'
position is, therefore, arguably even stronger here than it was in *Gloucester*.

[11] Relying on an expert affidavit from Dr. Allan M. Josephson, who has never met Jane, the
School District makes the argument that Jane's "alleged sensitivity to social stigma and
rejection" are unlikely because she is autistic.  (Doc. 61 at 31; *see* Declaration of Allan M.
Josephson, M.D., Doc. 63 at ¶ 38 ("Finally, a unique aspect of Jane's case is the diagnosis of
autism. There are significant concerns about this diagnosis. Jane appears to be social related to
others in a reciprocal which militates against the diagnosis. Indeed, the sensitivity to rejection
related to her transgender presentation would be unlikely in an autistic individual.").)  The Court
flatly rejects this unsupported assertion, which, quite frankly, calls into question much of Third-
Party Defendants' other purported medical evidence regarding gender dysphoria.

emotional difficulties stem not from her treatment at school but from other challenges she faces, such as her disabilities and eating disorder, the Court simply cannot discount, and indeed gives great weight to, the statements of Jane and Joyce Doe.  Even a moderate risk of suicide—which the School District takes pains to trumpet has been downgraded from a high risk—indicates significant risk of harm to Jane, and both her testimony and Joyce's demonstrate that she feels stigmatized when she is not treated as a girl and that she has been bullied at school.  Moreover, according to Joyce, Jane often goes the entire day without using the bathroom because she hates being singled out when she is forced to use a separate bathroom, which would clearly impair her ability to focus on learning.  Even without considering the evidence in the record from experts on both sides regarding gender dysphoria and its effects, the Court concludes that Jane is likely to be able to show harm from Highland's discriminatory policy and, therefore, to succeed on the merits of her Title IX claim.

### 2.  *Jane is Likely to Succeed on Her Equal Protection Claim*

Under the familiar tiers-of-scrutiny framework in cases arising under the Equal Protection Clause of the Fourteenth Amendment, the actions of a governmental entity that discriminates on the basis of sex are subject to heightened scrutiny.  *Craig v. Boren*, 429 U.S. 190, 197 (1976).  State entities "may not exclude qualified individuals based on 'fixed notions concerning the roles and abilities of males and females.'"  *United States v. Virginia*, 518 U.S. 515, 541-42 (1996) (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982)).  Therefore, "generalizations about 'the way women are,' estimates of what is appropriate for *most women*, no longer justify denying opportunity to women whose talent and capacity place them outside the average description."  *Id.* at 550.  Accordingly, the Supreme Court has consistently held that a party who seeks to defend discriminatory classifications on the basis of sex must offer

an "exceedingly persuasive justification" for that classification.  *Id.* at 531; *Mississippi Univ. for Women*, 458 U.S. at 724.  The government must show "at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'"  *Virginia*, 518 U.S. at 533 (quoting *Mississippi Univ. for Women*, 458 U.S. at 724).  The governmental interests enumerated must be "real, as [o]pposed to . . . merely speculative."  *Bernal v. Fainter*, 467 U.S. 216, 227-28 (1984).  If the governmental action at issue does not concern a suspect or quasi-suspect classification, such as sex, however, a court will uphold it "so long as it bears a rational relation to some legitimate end."  *Romer v. Evans*, 517 U.S. 620, 631 (1996).

Third-Party Defendants argue that the Supreme Court's jurisprudence applying heightened, or intermediate, scrutiny to sex-discrimination claims has all involved cases where members of one "biological sex" were treated more favorably than members of the other "biological sex."  (Doc. 61 at 13.)  They argue that because "transgender status" is not a protected class, rational basis review applies to Jane's equal-protection claim, although they insist that Highland's policy also survives intermediate scrutiny.  Jane, in turn, argues that the Court should apply intermediate scrutiny to her equal-protection claim but that Third-Party Defendants' asserted interests do not pass muster even under rational basis review.

a. Heightened Scrutiny Applies to Jane's Equal-Protection Claim

The Supreme Court has not decided whether transgender status is a quasi-suspect class under the Equal Protection Clause.  The parties dispute whether *Smith v. City of Salem* mandates application of heightened scrutiny in the Sixth Circuit.  The question of the level of scrutiny in an equal-protection claim was not squarely before the *Smith* court.[12]  Jane argues, however, that

---

[12] In addition to a Title VII claim, the plaintiff in *Smith*, a public employee, also brought an equal-protection claim under § 1983, but the only issue before the Sixth Circuit regarding the

*Smith* mandates a finding that discrimination against transgender individuals constitutes

discrimination on the basis of sex, because the *Smith* court held that the district court had "erred

in relying on a series of pre-*Price Waterhouse* cases from other federal appellate courts holding

that transsexuals, as a class, are not entitled to Title VII protection because 'Congress had a

narrow view of sex in mind.'"  378 F.3d at 572.  The Court incorporates its earlier analysis of

*Smith* and agrees that *Smith* supports a conclusion that transgender individuals are a quasi-

suspect class because discrimination against them is discrimination on the basis of sex.  Reading

*Smith* differently, and also pointing to Sixth Circuit cases holding that sexual orientation is not a

quasi-suspect classification, the individual Third-Party Defendants urge the Court to "conduct its

own analysis" of whether heightened scrutiny applies.  *See Love v. Beshear*, 989 F. Supp. 2d

536, 545 (W.D. Ky. 2014).  But even if the Court does so, it still concludes that heightened

scrutiny is appropriate in this case.

    In *Love*, the district court ruled on a challenge to Kentucky's statute banning same-sex

marriage.  *Id.*  In the process, the court conducted its own analysis of whether heightened

scrutiny should apply to classifications based on sexual orientation after determining that the

issue was unsettled in the Sixth Circuit.  *Id.*  The court examined *Davis v. Prison Health

Services*, 679 F.3d 433, 438 (6th Cir. 2012), which held that sexual-orientation classifications

should not receive heightened scrutiny, but noted that *Davis* relied on a line of cases beginning

with *Bowers v. Hardwick*, 478 U.S. 186 (1986), which was overruled by *Lawrence v. Texas*, 539

U.S. 558, 578 (2003).  Accordingly, the *Love* Court concluded that it was required to "conduct

its own analysis to determine whether sexual orientation classifications should receive

---

equal-protection claim was not which tier of scrutiny to apply, but whether the plaintiff had
stated such a claim without referring specifically to the Equal Protection Clause.  378 F.3d at
576-77.  The Sixth Circuit did note that the facts the plaintiff "alleged to support his claims of
gender discrimination easily constitute a claim of sex discrimination grounded in the Equal
Protection Clause of the Constitution."  *Id.* at 577.

heightened scrutiny." 989 F. Supp. 2d at 545. Other district courts in the Sixth Circuit have done the same. *Bassett v. Snyder*, 951 F. Supp. 2d 939, 961 (E.D. Mich. 2013); *Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 986 (S.D. Ohio 2013). After applying the four-factor test, two of these courts also concluded that heightened scrutiny should apply to classifications based on sexual orientation. *Love*, 989 F. Supp. 2d at 545-46; *Obergefell*, 962 F. Supp. 2d at 991. The third concluded it was required to apply *Davis* but observed that the "Sixth Circuit's pronouncements on the question are worthy of reexamination." *Bassett*, 951 F. Supp. 2d at 961. And although the Supreme Court did not squarely decide the level-of-scrutiny question when it issued a decision that same-sex marriage bans violate the Equal Protection Clause in *Obergefell v. Hodges*, 135 S. Ct. 2584, 2608 (2015), it is fair to say that *Davis* is no longer good law, particularly in light of *Obergefell*'s emphasis on the immutability of sexual orientation and the long history of anti-gay discrimination. *See id.* at 2594, 2596. Like the district courts that examined suspect classification based on sexual orientation, this Court will proceed to conduct its own analysis of the four-factor test to determine whether heightened scrutiny applies to a transgender plaintiff's claim under the Equal Protection Clause.

The Supreme Court employs the following four factors to determine whether a new classification requires heightened scrutiny: (1) whether the class has been historically "subjected to discrimination," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986); (2) whether the class has a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985); (3) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) whether the class is "a minority or politically powerless," *id.*

A district court in the Southern District of New York recently held that heightened scrutiny applied to a transgender plaintiff's equal-protection claim because discrimination on the basis of transgender status is discrimination on the basis of sex. *Adkins v. City of New York*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015). The court considered the four-factor test to identify a quasi-suspect class and determined that transgender individuals were indeed such a class. *Id.* at 139-40. The Court agrees with the analysis of *Adkins* and largely incorporates it here.[13] *See also Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015);[14] *Mitchell v. Price*, No. 11-cv-260, 2014 WL 6982280, at *8 (W.D. Wisc. Dec. 10, 2014) ("Although the issue has yet to be settled in this circuit, the parties agree that [the plaintiff's] Fourteenth Amendment equal protection claims based on her transgender status receive heightened scrutiny.").

First, there is not much doubt that transgender people have historically been subject to discrimination including in education, employment, housing, and access to healthcare. *Adkins*, 143 F. Supp. 3d at 139. Second, there is obviously no relationship between transgender status and the ability to contribute to society. Third, transgender people have "immutable [and] distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638, or as

---

[13] *Adkins* held that transgender people were a quasi-suspect class in light of the Second Circuit's holding that gay people were a quasi-suspect class in *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd by United States v. Windsor*, 133 S. Ct. 2675 (2013). The Supreme Court did not squarely hold whether gay people are a suspect class, *see* 133 S. Ct. at 2706 (Scalia, J., dissenting), and, of course, this Court is not bound by the Second Circuit's reasoning in *Windsor*. Nevertheless, the Court finds the reasoning of *Adkins*, as well as the Second Circuit's *Windsor* decision, persuasive on the four-factor analysis.

[14] *Norsworthy* is especially instructive. There, the court did not even reach the question of whether the four factors weighed in favor of finding transgender individuals were a quasi-suspect class because it held that the Ninth Circuit's decision in *Schwenk v. Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000), compelled a conclusion that they were, noting that *Schwenk* interpreted *Price Waterhouse* to stand for the proposition that by discriminating against a transgender plaintiff for failing to "conform to socially-construed gender expectations," as transgender people do by definition, a defendant had engaged in discrimination because of sex. *Norsworthy*, 87 F. Supp. 3d at 1119 (quoting *Schwenk*, 204 F.3d at 1201-02). The Ninth Circuit's holding and reasoning in *Schwenk*, as noted earlier, are very similar to the Sixth Circuit's in *Smith*.

the Second Circuit put it in *Windsor*, "the characteristic of the class calls down discrimination when it is manifest," 699 F.3d at 183; *see also Adkins*, 143 F. Supp. 3d at 139-40 (noting that transgender people encounter obstacles when there is a mismatch between the sex indicated on a birth certificate and the person's gender identity, and that "transgender people often face backlash in everyday life when their status is discovered").  Finally, as a tiny minority of the population, whose members are stigmatized for their gender non-conformity in a variety of settings, transgender people are a politically powerless minority group.  The efforts of states to pass legislation requiring individuals to use sex-segregated bathrooms that correspond with their birth sex are but one example of the relative political powerlessness of this group.  *See Carcano*, 2016 WL 4508192, at *6-7 (describing the enactment of North Carolina's "bathroom bill"); *see also Adkins*, 143 F. Supp. 3d at 140 (noting that there are no openly transgender members of the United States Congress or the federal judiciary).

Therefore, even if *Smith* did not require that this Court apply heightened scrutiny to Jane's equal-protection claim, the Court finds that heightened scrutiny is appropriate under the four-factor test to determine suspect and quasi-suspect classifications.

b.  <u>Highland's Discriminatory Classification is Not Substantially Related to Its Interests in Its Students' Dignity and Privacy</u>

Highland asserts two justifications for its treatment of Jane: the dignity and privacy rights of other students; and purported safety issues and lewdness concerns.  (Compl., Doc. 1 ¶¶ 78-90.)  Turning first to the privacy and dignity interests, Jane does not dispute that the protection of the privacy of students, including Jane herself, is an important interest.  (Doc. 84 at 11.)  First, the Court notes that Highland Elementary students use sex-segregated bathrooms with stall dividers that open on the top and bottom by approximately two feet.  (Compl., Doc. 1 at ¶ 83.)  There is no evidence that Jane herself, if allowed to use the girls' restroom, would infringe upon

the privacy rights of any other students.  Therefore, Third-Party Defendants have failed to put forth an "exceedingly persuasive justification," or even a rational one, for preventing Jane from using the girls' restroom.  *Mississippi Univ. for Women*, 458 U.S. at 724.  The "fit between the means and the important end" of protecting student privacy is not "exceedingly persuasive." *Nguyen v. I.N.S.*, 533 U.S. 53, 70 (2001) (quoting *Virginia*, 518 U.S. at 533).

Highland also advances an argument that students' "zone of privacy" in the restroom starts at the door of the restroom, not merely at the stall door, and that, therefore, students' privacy interests would be imperiled if Jane even enters the girls' bathroom.  *Amici* from school districts in twenty states around the country, however, provide further support for the Court's conclusion that Highland cannot show that allowing a transgender girl to use the girls' restroom would compromise anyone's privacy interests.  When they adopted inclusive policies permitting transgender students to use bathrooms and locker rooms that correspond with their gender identity, all of these school districts wrestled with the same privacy concerns that Highland now asserts and, in fact, at least one of the districts was investigated by OCR for non-compliance with Title IX before ultimately reaching a Resolution Agreement with the agency.  (Doc. 91-3 at 6.) The school administrators agreed that although some parents opposed the policies at the outset, no disruptions in restrooms had ensued nor were there any complaints about specific violations of privacy.  (*Id.* at 10.)  Such testimony from other school officials who have experienced these issues lends further support to Jane's argument that Highland's purported justification for its policy is "merely speculative" and lacks any "factual underpinning."  *Bernal*, 467 U.S. at 227-28 (holding that a state's asserted justification for imposing a citizenship requirement for notaries was "utterly" insufficient to pass strict scrutiny because the state put forth no factual showing that the unavailability of non-citizen notaries' testimony presented a problem for the state).

Moreover, none of the cases upon which Third-Party Defendants rely to support their privacy argument is persuasive and relevant to this case.  First, Third-Party Defendants rely heavily on *Johnston v. University of Pittsburgh* for the proposition that a university's policy of segregating its bathrooms and locker rooms on the basis of birth sex was substantially related to the government interest in ensuring student privacy.  97 F. Supp. 3d at 669.  *Johnston* has little persuasive value here because the court relied on outdated, pre-*Price Waterhouse* case law from other circuits.  *Id.* at 671 (citing *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984)).  In so doing, the *Johnston* court expressly "recognize[d] that other courts have declined to follow the definition articulated in *Ulane*," and cited *Smith v. City of Salem*, but determined that "because neither the Supreme Court nor the Third Circuit has addressed the precise issue, this Court will follow the definition embraced by *Ulane* and its progeny."  *Id.* at 671 n.14.  Needless to say, *Smith* is binding precedent on this Court and, therefore, it cannot follow the reasoning of *Johnston*.

Third-Party Defendants also cite several Sixth Circuit cases concerning the right to bodily privacy against invasive strip searches or videotaping, which is not the issue before the Court in this case.  For instance, the Sixth Circuit stated in *Brannum v. Overton County School Board* that "there must be a fundamental constitutional right to be free from forced exposure of one's person to strangers of the opposite sex."  516 F.3d 489, 495 (6th Cir. 2008) (quoting *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987)).  But the right at issue in *Brannum* arose under the Fourth Amendment and is more properly characterized as a right to be free from unreasonable searches and seizures of the body.  Of course, no such search or seizure of anyone's body is at issue here. The other cases Third-Party Defendants cite are similarly unpersuasive.  *See Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005); *Doe v. Luzerne Cnty.*, 660 F.3d 169, 177 (3d

Cir. 2011) (holding that a deputy sheriff stated a claim for a Fourteenth Amendment violation when a superior officer instructed her to undress and shower while filming her); *Lee v. Downs*, 641 F.2d 1117, 1118-19 (4th Cir. 1981) (upholding verdict for a female prisoner who was forcibly restrained by male guards while a female nurse removed her clothing).

Next, Highland argues that the Supreme Court has "telegraphed that the relief that Doe seeks in this case threatens the privacy rights of students by recalling the mandate" in *Gloucester*.  (Doc. 61 at 21.)  The Supreme Court grants such stays when a court of appeals "tenders a ruling out of harmony with [its] prior decisions, or [presents] questions of transcending public importance[] or issues which would likely induce [the Supreme Court] to grant certiorari."  *Russo v. Byrne*, 409 U.S. 1219, 1221 (1972) (Douglas, J.).  It is not for this Court to speculate which, if any, of these justifications motivated the Supreme Court when it took action in *Gloucester*, and even if Highland has somehow been able to divine what the Supreme Court has "telegraphed" by staying the mandate in that case, this Court unfortunately lacks such powers of divination.  Moreover, unlike in most cases in which the Supreme Court stays a mandate, one of the five Justices who voted for the stay, Justice Breyer, wrote a brief concurrence that made no mention of irreparable harm, stating only that he voted to grant the application "as a courtesy" and that the order would "preserve the status quo (as of the time the Court of Appeals made its decision)."  *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 136 S. Ct. 2442 (2016) (Breyer, J., concurring).  When the Justice whose vote tips the scales issues a statement regarding his position and does not mention irreparable harm, it would be unreasonable for this Court to find that the stay of the mandate in *Gloucester* requires a finding of irreparable harm to Highland and its students.  This Court follows statements of law from the Supreme Court, not whispers on the pond.

Finally, the Court also rejects individual Third-Party Defendants' argument that Highland's classification is both rationally and substantially related to its privacy interests because it is expressly permitted under federal law. *See* 34 C.F.R. § 106.33. As the Court has already explained in Section IV(A)(1), *supra*, the DOE and DOJ have interpreted this regulation to require that schools that provide sex-segregated facilities must allow students to use those facilities consistent with their gender identity.

At bottom, Highland cannot show that its refusal to let Jane use the girls' restroom is substantially related to its interest in student privacy.

    c.   <u>Highland's Discriminatory Classification is Not Substantially Related to its Safety and Lewdness Concerns</u>

Highland's justifications of safety and lewdness concerns suffer from many of the same flaws. Again, *amici* school administrators testified that *no* incidents of individuals using an inclusive policy to gain access to sex-segregated facilities for an improper purpose have *ever* occurred. (Doc. 91-3 at 11.) Although parents did raise safety concerns in many instances before the implementation of the policies, the fears turned out to be "wholly unfounded in practice." (*Id.*) Indeed, if anything, these administrators stressed that protection of the transgender students themselves is usually their most pressing concern, because those students, already accustomed to being stigmatized and in some cases harassed, "are not interested in walking around the locker rooms and checking out anatomy. They're just trying to get through [physical education class] safely." (Interview with Diane K. Bruce, Director of Health and Wellness, District of Columbia Public Schools, Doc. 89-1 at 12.)[15]

---

[15] Although the Court understands that some members of the Highland community may have concerns about their children's privacy, ultimately the affidavits submitted by concerned parents do not change the Court's conclusion that these fears and apprehensions are unlikely to lead to disruption or safety incidents in the Highland Elementary School restrooms, which are the

Additionally, the Fourth Circuit rejected this argument in *Gloucester* when it found that the record was devoid of any actual evidence showing "amorphous safety concerns."  822 F.3d at 723 n.11 ("We also note that the [school board] has been, perhaps deliberately, vague as to the nature of the safety concerns it has.").  The Fourth Circuit also pointed out a logical flaw in the argument that allowing transgender students to use the bathroom consistent with their gender identity would lead to danger from "sexual responses prompted by students' exposure to the private body parts of students of the other biological sex."  *Id.*  Like Highland, the school district in *Gloucester* did not require segregated restrooms for gay boys or girls even though this concern about "sexual responses" would, in theory, apply to a gay male who used a boys' restroom or a gay female who used a girls' restroom.  *See id.*

The Court finds that because Third-Party Defendants have failed to show that the School District's discriminatory policy is substantially related to their interests in privacy or safety, Jane is likely to succeed on the merits of her claim under the Equal Protection Clause.

d.  Even if Rational Basis Review Applies, Highland's Classification is Not Rationally Related to Its Asserted Interests

Even if the Court were to apply rational basis review to Jane's equal-protection claim, she would likely succeed on the merits.  As already stated, Highland most certainly has a legitimate interest in the privacy and safety of its students.  But Highland cannot show that its restroom policy is rationally related to those interests.  The experience of *amici* school districts belies Highland's speculative assertion that students' privacy or safety interests will be impaired; school districts that have encountered these very issues have been able to integrate transgender students fully into the academic and social community without disruption, and certainly without the doomsday scenarios Highland predicts, such as sexual predators entering an elementary-

subject of this case.  (Parent H. Decl., Doc. 68; Parent S.B. Decl., Doc. 69; Parent S. Decl., Doc. 70.)

school restroom.  And there is certainly *no* evidence in the record that Jane herself—the only student to whom a preliminary injunction would apply—is likely to violate other students' privacy or put their safety at risk when using the girls' restroom.  Highland's policy rests on "mere negative attitudes [and] fear," which are not "permissible bases for" differential treatment, and cannot survive even rational basis review.  *City of Cleburne*, 473 U.S. at 448.  Under either standard of scrutiny, Jane has shown that she is likely to succeed on the merits of her equal-protection claim.

### B.  Jane Will be Irreparably Harmed Absent an Injunction

Irreparable harm is presumed as a matter of law when a moving party shows "that a constitutional right is being threatened or impaired."  *Am. Civil Liberties Union of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  And there is likewise a presumption of an irreparable injury when a plaintiff has shown a "violat[ion] [of] a civil rights statute."  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001).  Jane can show irreparable injury simply because both her Title IX claim and constitutional claim are likely to succeed on the merits.

Moreover, for the same reasons detailed in Section IV(A)(1), *supra*, Jane has also shown that she would be irreparably harmed absent an injunction.  The stigma and isolation Jane feels when she is singled out and forced to use a separate bathroom contribute to and exacerbate her mental-health challenges.  This is a clear case of irreparable harm to an eleven-year-old girl.

### C. The Balance of Equities and the Public Interest Favor Injunction

As discussed exhaustively above, the Court finds no merit in Third-Party Defendants'
argument that other students would be harmed by allowing Jane to use the bathroom consistent
with her gender identity, as other students already do.  The balance of equities tips especially
sharply in Jane's favor because the injunction she seeks is narrowly tailored to permit her to use
the girls' restroom and does not even implicate locker rooms or overnight accommodations at the
middle- and high-school levels.  Moreover, "it is always in the public interest to prevent the
violation of a party's constitutional rights."  *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
23 F.3d 1071, 1079 (6th Cir. 1994).  Similarly, "the overriding public interest lay[s] in the firm
enforcement of Title IX."  *Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993).

The Court concludes that the balance of equities and the public interest favor the granting
of Jane's preliminary-injunction motion.  Accordingly, all four factors of the preliminary-
injunction test weigh in Jane's favor and the Court **GRANTS** her motion.[16]

---

[16] Last month, in *Texas v. United States*, a federal district court issued a sweeping nationwide
preliminary injunction against the federal Defendants, enjoining them from enforcing the
guidance at issue here.  In issuing the injunction, the court stated that "an injunction should not
unnecessarily interfere with litigation currently pending before other federal courts on this
subject regardless of the state law." 2016 WL 4426495, at *17.  The *Texas* court stated:

> Defendants are enjoined from enforcing the Guidelines *against Plaintiffs and their
> respective schools*, school boards, and other public, educationally-based institutions.
> Further, while this injunction remains in place, Defendants are enjoined from initiating,
> continuing, or concluding any investigation based on Defendants' interpretation that the
> definition of sex includes gender identity in Title IX's prohibition against discrimination
> on the basis of sex. Additionally, Defendants are enjoined from using the Guidelines or
> asserting the Guidelines carry weight *in any litigation initiated following the date of this
> Order*.

*Id.* (emphases added).  Because Ohio was not a party to the *Texas* litigation, and because this
litigation was initiated before the *Texas* court issued its preliminary injunction, the injunction
does not apply here.  This is also consistent with the Supreme Court's admonition that
"injunctive relief should be no more burdensome to the defendant than necessary to provide
complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also*

## V.     CONCLUSION

For the foregoing reasons, the Court **DENIES** the School District's Motion for

Preliminary Injunction (Doc. 10) and **GRANTS** Jane Doe's Motion for Preliminary Injunction.

(Docs. 35-36.)  The Court orders School District officials to treat Jane Doe as the girl she is,

including referring to her by female pronouns and her female name and allowing her to use the

girls' restroom at Highland Elementary School.

Finally, Federal Rule of Civil Procedure 65(c) provides that a court may issue an

injunction only if the movant posts bond.  Neither Jane nor the Third-Party Defendants have

briefed the issue of an appropriate bond.  The Court **ORDERS** Jane Doe to post a bond of $100.

**IT IS SO ORDERED.**

                                  **s/ Algenon L. Marbley**
                                **ALGENON L. MARBLEY**
                                **UNITED STATES DISTRICT JUDGE**

**DATED:  September 26, 2016**

---

*Texas v. United States*, 787 F.3d 733, 769 (5th Cir. 2015) (upholding issuance of a nationwide injunction of the Obama administration's executive action on immigration because of "a substantial likelihood that a partial injunction would be ineffective" in providing complete relief to the plaintiff states due to migration of individuals across state lines).  Moreover, to construe otherwise would prevent other district courts and courts of appeals from weighing in on the important issues presented in this case, which would "substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue."  *United States v. Mendoza*, 464 U.S. 154, 160 (1984); *see also Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) ("Allowing one circuit's statutory interpretation to foreclose . . . review of the question in another circuit," would "squelch the circuit disagreements that can lead to Supreme Court review.").